## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF LOUISIANA

**ERNEST TAYLOR,**                                            Case No. _____

      **Plaintiff;**

**v.**

**THE CITY OF BATON ROUGE;**
**CARL DABADIE, JR., Chief of Police;**
**MARY E. ROPER, Former Parish Attorney;**
**LEA ANNE BATSON, Interim Parish Attorney;**
**LISA FREEMAN, City Prosecutor;**
**FRANK J. GREMILLION, Assistant Parish Attorney;**
**JAMES L. HILBURN, Assistant Parish Attorney;**
**TEDRICK K. KNIGHTSHEAD, Assistant Parish Attorney**
**JAMES THOMAS, Police Officer;**
**PATRICK WENNEMANN, Police Officer;**
**JEREMIAH A. ARDOIN, Police Officer;**
**JANE DOE, Police Officer; and**
**JOHN DOE #1 - #4, Police Officers**

*IN THEIR INDIVIDUAL AND*
*OFFICIAL CAPACITIES*

      **Defendants.**

---

## VERIFIED COMPLAINT AND REQUEST FOR JURY TRIAL

1.    Plaintiff, Ernest Taylor, through undersigned counsel, submits this complaint against Defendants (1) The City of Baton Rouge; (2) Baton Rouge Chief of Police Carl Dabadie, Jr.; (3) East Baton Rouge Parish Attorney Mary E. Roper; (4) Baton Rouge City Prosecutor Lisa Freeman; (5) East Baton Rouge Assistant Parish Attorney Frank J. Gremillion; (6) East Baton Rouge Assistant Parish Attorney James L. Hilburn; (7) East Baton Rouge Assistant Parish Attorney Tedrick K. Knighthead; (8) Baton Rouge Police Officer James Thomas; (9) Baton Rouge Police Officer Patrick Wennemann; (10) Baton Rouge Police Officer Jane Doe; (11) Baton Rouge Police Officer Jeremiah A. Ardoin; and (12-15) Baton Rouge Police Officers John

Doe #1 - #4 (hereinafter referred to collectively as "Defendants").

2.    Through this action Plaintiff seeks all relief to which he may be entitled, including, but not limited to monetary damages from Defendants for abrogating Plaintiff's rights under the United States Constitution and Louisiana law.  Plaintiff asserts that Defendants created and/or maintained policies, procedures, practices, and/or customs which contravene the rights guaranteed to Plaintiff under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, while also violating various provisions of Louisiana law.

3.    At the present time, Plaintiff does **NOT** assert claims against Defendants pursuant to the Second Amendment to the U.S. Constitution, as those claims are currently being adjudicated in a separate case – *Ernest Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB, currently pending in this Court.

4.    Plaintiff specifically reserves the right to incorporate a claim for monetary damages arising from Defendants' violation of Plaintiff's rights under the Second Amendment to the U.S. Constitution in the event that claim is dismissed from the proceeding identified above.

5.    At the present time, Plaintiff is not seeking any injunctive or declaratory relief, but specifically reserves the right to amend this complaint to assert the necessity of such relief in the future.

6.    Plaintiff specifically asserts the applicability of La. C.C. Art. 2324(C) to the claims asserted herein.

## JURISDICTION AND VENUE

7.    This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. This action is also brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 alleging violations of Plaintiff's First, Fourth, Fifth, and Fourteenth

Amendments to the United States Constitution.

8.      Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. §1391

9.      This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367, including, but not limited to, claims asserted pursuant to Louisiana Civil Code Articles 2315, 2316, 2317 and 2320, and for violations of Article I, Sections 3, 5, 9, 11 and 13 of the Louisiana Constitution.

## PARTIES

### Plaintiff

10.      Plaintiff Ernest Taylor ("Taylor") is a resident and domiciliary of The City of Baton Rouge, East Baton Rouge Parish, Louisiana, and is a citizen of the United States of America and the State of Louisiana. Taylor resides within the 70805 zip code.

11.      Taylor has previously been arrested and prosecuted pursuant to outdated and unconstitutional laws for engaging in activities that are lawful and constitutionally protected.

12.      In the future, Taylor intends to engage in constitutionally protected activities that are prohibited by unconstitutional laws enforced by the Baton Rouge Police Department

### Defendants

13.      Defendant The City of Baton Rouge ("City") is a municipality and political subdivision of the State of Louisiana.  For purposes of this complaint, references to the City include both the City of Baton Rouge and the Parish of East Baton Rouge, as appropriate. Reference to departments or subdivisions within the City such as "Baton Rouge City Police," "Baton Rouge Police Department" and "BRPD" include the City, and the individuals acting within the department or subdivision, as appropriate.  The City may be served through its agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

14.     Defendant Carl Dabadie, Jr. ("Dabadie") is the current Baton Rouge Chief of Police, and is sued both in his individual capacity, and in his official capacity as a policymaker for the City.  Dabadie may be served through his agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

15.     Defendant Mary E. Roper ("Roper") is the former East Baton Rouge Parish Attorney, and is sued solely in her individual capacity, as she is no longer a City official.  Roper may be served at 830 Main Street, Baton Rouge, LA 70802.

16.     Defendant Lea Anne Batson is currently the Interim Parish Attorney, and is sued in both her individual capacity, and in her official capacity as a policymaker for the City. Batson may be served through her agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

17.     Defendant Lisa Freeman ("Freeman") is the Baton Rouge City Prosecutor, and is sued both in her individual capacity, and in her official capacity as a policymaker for the City.  Freeman may be served through her agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

18.     Defendant Frank J. Gremillion ("Gremillion") is an Assistant Parish Attorney and head of the East Baton Rouge Parish Attorney's Litigation Division.  Gremillion is being sued in his individual capacity and in his official capacity as a policymaker for the City.  Gremillion may be served through his agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

19.     Defendant James L. Hilburn ("Hilburn") is a former Assistant Parish Attorney with the East Baton Rouge Parish Attorney's office, and is sued solely in his individual capacity, as he is no longer an official of the City.  Hilburn may be at 628 St. Louis Street, Baton Rouge,

LA 70802

20.     Defendant Tedrick Knightshead ("Knightshead") is an Assistant Parish Attorney with the East Baton Rouge Parish Attorney's Office, and is sued solely in his individual capacity. Knightshead may be served through his agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

21.     Defendant James Thomas ("Thomas") is an officer with the Baton Rouge Police Department, and is sued solely in his individual capacity. Thomas may be served at the Baton Rouge Police Department, 704 Mayflower Street, Baton Rouge, LA 70802.

22.     Defendant Patrick Wennemann ("Wennemann") is a corporal in the Baton Rouge Police Department, and is sued solely in his individual capacity. Wennemann may be served at the Baton Rouge Police Department, 704 Mayflower Street, Baton Rouge, LA 70802.

23.     Defendant Jeremiah A. Ardoin ("Ardoin") is an officer with the Baton Rouge Police Department, and is sued solely in his individual. Ardoin may be served at the Baton Rouge Police Department, 704 Mayflower Street, Baton Rouge, LA 70802.

24.     Upon information and belief Defendant Jane Doe was an officer-in-training with the Baton Rouge Police Department accompanying Corporal Wennemann in his police cruiser during the early morning hours of October 13, 2012, and who participated in Plaintiff's arrest, the search of his vehicle, and the confiscation of his personal property. Officer Doe is being sued solely in her individual capacity. Officer Doe may be served at the Baton Rouge Police Department, 704 Mayflower Street, Baton Rouge, LA 70802.

25.     Defendants John Doe #1 - #4 are officers with the Baton Rouge Police Department who accompanied Officer Thomas to Plaintiff's residence on the evening of April 29, 2014 and/or early morning hours of April 30, 2014. Officers Doe #1 - #4 are being sued

solely in their individual capacities.  Plaintiffs will amend this complaint to include the names of all officers present at Taylor's home once this information has been provided by Defendants.

## FACTS

26.      Each of the foregoing paragraphs is incorporated as if fully set forth herein.

### The Events of October 13, 2012

27.      On October 13, 2012, at approximately 1:35 A.M., Officers Thomas, Wennemann, and Jane Doe were traveling in marked Baton Rouge Police Department (also referred to as "BRPD") patrol vehicles near the 4000 Block of Plank Road in Baton Rouge.[1]

28.      Officer Doe, as an officer in training, was accompanying Corporal Wennemann in his vehicle.  *See* Criminal Discovery, attached hereto as Exhibit A.

29.      Upon information and belief, Officers Thomas and Wennemann were patrolling this area of Baton Rouge with Officer Jane Doe for the express purpose of illustrating to the officer-in-training the methods and procedures utilized by the Baton Rouge Police Department in high crime areas, such as the 70805 zip code.

30.      At or around the same time, Plaintiff Ernest Taylor was in his vehicle, a gray Cadillac Brougham, leaving the parking lot of an abandoned discount store located across the street from Romeo's Lounge on Plank Road in Baton Rouge.  Taylor had parked his vehicle in that location prior to entering Romeo's earlier that evening.

31.      Romeo's Lounge is located at 4115 Plank Road in Baton Rouge, Baton Rouge, LA, in the 70805 zip code.

32.      After purportedly observing a vehicle leave the parking lot of the Boss Lady Lounge, located at 3827 Plank Road, without its headlights engaged, Officer Wennemann

---

[1] Videos taken from the dashboard cameras of Thomas and Wennemann's vehicles have been submitted conventionally in Taylor's other pending suit, *Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB (M.D. La.).

radioed Officer Thomas instructing him to initiate a stop of the vehicle.

33.    At the time he received this instruction from Corporal Wennemann, Officer Thomas did not observe any vehicles being operated without their headlights.

34.    Still, after receiving Wennemann's instruction, Thomas activated his patrol vehicle's lights and sirens and proceeded at a high rate of speed away from 3827 Plank Road in the direction of the parking lot from which Taylor had just departed.

35.    Despite the fact that neither Taylor nor his vehicle had ever been present at 3827 Plank Road at any time on October 12th or 13th, 2012, and that the lights of Taylor's vehicle were in operation when Officer Thomas approached from the rear, Officer Thomas positioned his police cruiser behind Taylor's vehicle to initiate a traffic stop.

36.    Taylor complied with Officer Thomas' request by pulling onto a side street, placing his vehicle in park, turning off the engine, and opening the door to his vehicle.

37.    Officer Thomas followed Taylor and parked his marked police vehicle behind Taylor's Cadillac.

38.    Once his police cruiser was parked, Officer Thomas exited and loudly and forcefully instructed Taylor to step out of his vehicle and walk towards the front of Thomas' parked cruiser.

39.    In compliance with Officer Thomas' instruction, Taylor exited his vehicle and moved to the rear of his vehicle where he began conversing with Officer Thomas.

40.    Immediately upon approaching Taylor, Officer Thomas proceeded to perform a "pat-down" of Taylor for the stated purpose of identifying any concealed weapons.

41.    Prior to placing his hands upon Taylor and performing a warrantless search of Taylor's person, Thomas had no probable cause to arrest Taylor, did not request Taylor's

consent, and lacked any reasonable suspicion that Taylor had any dangerous weapons on his person.

42.     While Officer Thomas was patting Taylor down, Corporal Wennemann and Officer Jane Doe arrived at the scene, exited Wennemann's police cruiser and approached Taylor's vehicle.

43.     As he approached, Corporal Wennemann observed two long-barreled firearms in plain view inside of Taylor's vehicle.

44.     Upon observing Taylor's firearms, Wennemann shouted an expletive and indicated that Taylor had a "shotgun on the floor" and "a rifle between the seats."

45.     Responding to Officer Wennemann's remarks, Taylor informed Wennemann, Thomas, and Jane Doe that he "had papers" on the weapons, meaning that the firearms in his vehicle were legally in his possession, and that he had documentation to establish this fact.  *See* Firearm Documentation, attached as Exhibit B.

46.     At this time Taylor also alerted the officers to the presence of a third firearm located in the trunk of his vehicle.

47.     Officer Thomas told Taylor that "[i]t doesn't matter if you've got papers on them or not … you're not supposed to have weapons in your vehicle at a bar."

48.     When Taylor responded that he had not brought any weapons inside any establishment that sold or served alcohol, Thomas stated, "[y]ou had them in the parking lot."

49.     Officer Thomas then requested that Taylor take a seat in the back of his police cruiser, explicitly stating to Taylor, "[y]ou're not under arrest."

50.     As Taylor attempted to comply with Officer Thomas' request to take a seat in the back of the police cruiser, Thomas forcibly grabbed Taylor, pushing him in the direction of the

cruiser.

51.     Taylor balked at Thomas' unnecessary use of force, stating, "[y]ou don't have to put your hands on me" and "[y]ou ain't gotta push me, I'm going."

52.     Despite Taylor's willingness to cooperate, his agreement to follow Thomas' direction, and Thomas' explicit statement that Taylor was not under arrest, Officer Thomas proceeded to subdue Taylor through the use of force, stating, "I'm holding you … I'm going to put you in f---ing handcuffs," and wrestled Taylor to the ground.

53.     Officer Wennemann observed Officer's Thomas' use of unnecessary force against Taylor, and proceeded to assist Thomas in subduing Taylor, placing him in handcuffs, and relocating him to the back seat of Thomas' vehicle.

54.     The force used by Thomas and Wennemann was a "takedown," a form of "hard control technique" generally recognized by law enforcement personnel to present a higher likelihood of injury than other tactics.

55.     The use of hard control techniques are generally reserved for situations where officers encounter active aggression.

56.     At no time did Taylor display any active aggression toward Officers Thomas, Wennemann, or Doe.

57.     As a result of Thomas' and Wennemann's unnecessary use of force, Taylor sustained physical injuries in the nature of scrapes and bruises.

58.     At the time Thomas and Wennemann placed Taylor in handcuffs and relocated him to Thomas' police cruiser, both officers intended to arrest Taylor for violating §13:95.3, despite the lack of any evidence to suggest that Taylor or his vehicle had been present at the location where officer Wennemann observed the vehicle operating without headlights, and

despite the knowledge that Louisiana citizens were afforded the right to keep firearms in their vehicles at all times, absent narrow circumstances not present in Taylor's situation.

59.     With Taylor secured in the back seat of Thomas' police cruiser, Officers Thomas, Wennemann, and/or Doe proceeded, without consent, to search the interior of Taylor's vehicle and confiscate his lawfully held firearms.

60.     Upon searching the trunk of Taylor's vehicle – without requesting or receiving Taylor's consent - Officers Thomas, Wennemann, and Doe also located a third gun – A Yugo 59/66 SKS-type rifle – which they also seized.

61.     All three of Taylor's lawfully-held guns were confiscated by Thomas, Wennemann and Doe, and retained by the Baton Rouge Police Department as evidence of Taylor's violation of §13:95.3.

62.     After he had taken Taylor into custody, Officer Thomas also used his police radio to relay Taylor's information to a dispatch officer for the purpose of identifying any outstanding warrants issued for Taylor's arrest.

63.     Upon information and belief, the dispatch officer performed a search of Taylor's information and identified an affidavit of probable cause signed by a member of the East Baton Rouge Sheriff's Department, but did not identify any valid warrant for arrest.

64.     The dispatch officer informed Thomas that she had been able to locate only the Sheriff's Department affidavit when checking Taylor for outstanding warrants.

65.     While Officers Thomas, Wennemann, and/or Doe were inspecting the firearms they had seized from Taylor's vehicle, another unknown officer of the Baton Rouge Police Department arrived at the scene with another officer-in-training.

66.     Upon information and belief, one of the individuals arriving at the scene was an

officer-in-training with the BRPD who was accompanying the other individual, a senior officer, for the purpose of being instructed on the methods and procedures employed by the Baton Rouge Police Department in high crime areas, such as the 70805 zip code.

67.     Taylor had previously been stopped by other BRPD officers despite having committed no offense.

68.     On the previous occasions where Taylor had been unjustifiably stopped by members of the BRPD, the officers would take pictures of Taylor's guns, purportedly to perform a check to ensure that Taylor was in legal possession.  Taylor's guns had never previously been seized.

69.     During these events Taylor explained to Officers Thomas, Wennemann, and Doe his understanding that he was allowed to carry the guns inside of his vehicle.

70.     Officers Thomas, Wennemann, and/or Doe responded that it was illegal for anyone to possess a firearm in the parking lot of an establishment that sold alcohol.

71.     As Taylor's vehicle was not the one Officer Wennemann had observed leaving the parking lot at 3827 Plank Road, Officer Thomas and/or Officer Wennemann repeatedly questioned Taylor about the location where his vehicle had been parked.

72.     Prior to questioning Taylor, neither Officer Thomas, Wennemann, nor Doe advised Taylor of his rights under the Fifth Amendment to the U.S. Constitution, as required by the U.S. Supreme Court's decision in *Miranda v. Arizona.*

73.     In an attempt to elicit information from Taylor that would establish Taylor's presence at The Boss Lady Lounge, Officer Thomas asked Taylor if he had been at an establishment "down there by Mohican[2]," prior to being pulled over.

---

[2] 3827 Plank Road, the location of the Boss Lady Lounge, is in close proximity to the intersection of Plank Road and Mohican Street.

Complaint and Request for Jury Trial                                                                                11

74.     Taylor responded negatively, indicating that he had been parked at a location within a block of where Officer Thomas pulled him over.

75.     When Taylor indicated that he had not been present at the location where Officer Wennemann observed the vehicle leaving without its lights engaged, Officer Thomas and/or Wennemann began to question Taylor about the owner of the abandoned store parking lot where his vehicle had been parked.

76.     Taylor responded that he did not know who owned the property where his vehicle had been parked.

77.     As he was unable to determine the location where Taylor's vehicle had been parked, Officer Thomas indicated that he would drive by the location where Corporal Wennemann had observed the vehicle entering the roadway without its lights engaged so that this information could appear in the incident report filed by the officers.

78.     Officers Thomas and/or Wennemann determined that the vehicle purportedly observed by Officer Wennemann without its lights engaged had left The Boss Lady Lounge, located at 3827 Plank Road, and included this information within the incident report filed in connection with Taylor's October 13, 2012 arrest.

79.     Only after restraining Taylor in Officer Thomas' police cruiser, searching his vehicle, seizing his firearm, and performing an extensive interrogation was Taylor advised of his Fifth Amendment *Miranda* rights.

80.     Officers Thomas, Wennemann, and Doe arrested Taylor for Possession of a Firearm Where Alcohol Is Being Sold (in violation of Baton Rouge Code of Ordinances §13:95.3); Resisting An Officer (in violation of Baton Rouge Code §13:108), and for violation of Baton Rouge Code of Ordinances §11:283 (requiring a motor vehicle operator to "dim the lights

to the lowermost distribution of light when approaching an oncoming vehicle within five hundred (500) feet, or when following another vehicle within two hundred (200) feet to the rear"). *See* Exhibit A.

81.     Despite the fact that the dispatch officer had not informed Officers Thomas and/or Wennemann that there were any outstanding warrants for Taylor's arrest – only an affidavit signed by a deputy sheriff – the Incident Report drafted by Thomas and/or Wennemann indicates the presence of an outstanding warrant, and upon this basis asserts that Taylor was also in violation of La. C. Cr. P. 575.

82.     La. C. Cr. P. 575 does not criminalize any conduct, it only provides procedural exceptions to the time limitations appearing in La. C. Cr. P. 572.

83.     Taylor was brought to East Baton Rouge Parish Prison, where he remained for several days until bail was posted on his behalf.

84.     At the time of the incidents described above, Taylor owned and was in lawful possession of the three guns seized by Officers Thomas, Wennemann, and Doe.

85.     Taylor has never been convicted of a felony.

86.     The guns confiscated by Thomas, Wennemann, and Doe had not been brought into any establishment serving or selling alcohol, and Taylor never entered any establishment that served or sold alcohol with guns in his possession.

87.     Taylor did not violate any of the legal provisions cited on the incident report filed by Officers Thomas and Wennemann.

88.     The presence of Officer Jane Doe, the Baton Rouge Police Department Officer who arrived during the inspection of Taylor's firearms, and the officer-in-training accompanying him is mentioned nowhere in the incident report authored by Thomas, Wennemann, and/or Doe.

89.     Thomas, Wennemann and Doe lacked probable cause to search Plaintiff and his vehicle.

90.     Thomas, Wennemann and Doe lacked any reasonable suspicion that Taylor was armed and dangerous.

91.     Thomas, Wennemann and Doe lacked probable cause to support Taylor's arrest.

92.     Officers Thomas, Wennemann, and/or Doe prepared and submitted an Incident Report and a non-notarized affidavit detailing the encounter with Taylor on October 13, 2012.

93.     The Incident Report and non-notarized affidavit prepared by Thomas, Wennemann, and/or Doe contain numerous material misrepresentations of fact.

94.     Upon information and belief, the misrepresentations of fact appearing in the Incident Report and non-notarized affidavit were made intentionally to make it appear as though Taylor had been uncooperative and deceitful in his interactions with the officers, increasing the likelihood of a later conviction.

95.     After his arrest and release from prison, Taylor filed a complaint with the Baton Rouge City Police Department of Internal Affairs regarding the treatment he had received on October 13, 2012.

96.     Upon information and belief, Thomas, Wennemann and Doe were informed that Taylor had lodged a complaint as a result of the officers' actions.

97.     Taylor has never received any response to the complaint he filed with the Internal Affairs Division of the Baton Rouge Police Department.

98.     No criminal prosecution was ever initiated by the East Baton Rouge Parish District Attorney's Office in connection with the misdemeanor charges for which there purportedly existed a warrant for Taylor's arrest.

99.     Despite Taylor's request for all materials in Defendants' possession relating to his arrest and imprisonment on October 13, 2012, no warrant for Taylor's arrest has ever been provided.

100.     A records request subsequently made to the East Baton Rouge Parish Clerk of Court's Criminal Records Division with respect to the purported warrant for Taylor's arrest did not disclose the existence of a valid arrest warrant.  The sole item contained within the record is a notarized affidavit signed by a member of the East Baton Rouge Parish Sheriff's Department.

101.     Upon information and belief, despite Taylor's filing of a complaint with the Internal Affairs Division, and his subsequent filing of a suit in federal court, no investigation into Corporal Wennemann,  Officer Thomas, Officer Jane Doe, or the events described herein has ever been conducted by the Baton Rouge Police Department or the East Baton Rouge Parish Attorney's Office, or the Baton Rouge City Prosecutor's Office.

<u>The Events Leading Up to April 29, 2014</u>

102.     After his release from Parish Prison, Taylor contacted Chris Glisson ("Glisson"), an attorney and personal friend who had previously represented Taylor in connection with a personal injury claim and in obtaining patent protection for technology Taylor had created.

103.     Despite the lack of a notarized affidavit of probable cause, in addition to an absence of facts which demonstrated a violation of any applicable provision of law, Assistant City Prosecutor Devon Bardon executed a misdemeanor affidavit for the purpose of instituting a criminal prosecution against Taylor.

104.     Bardon's actions were consistent with the policy of the City Prosecutor's Office to institute criminal proceedings on all charges referred by the Baton Rouge Police Department without first reviewing the file to determine if criminal prosecution was warranted.

105.    Glisson enrolled as Taylor's counsel in connection with the criminal charges brought by the City Prosecutor's Officer on behalf of the City of Baton Rouge in Baton Rouge City Court as a result of the events of October 13, 2012.

106.    At his first court appearance representing Taylor in connection with these criminal charges, Glisson informed the Assistant City Prosecutor assigned to Taylor's case of his belief that §13:95.3 was unconstitutional in that it impermissibly infringed upon Taylor's rights as guaranteed by the United States Constitution and the laws of the State of Louisiana, and that Taylor should not be prosecuted under the unenforceable ordinance.

107.    The Assistant City Prosecutor stated to Glisson that he did not disagree that there were Constitutional infirmities present with §13:95.3, but offered to dismiss the charges against Taylor only if Taylor would agree to relinquish ownership of his firearms to the City.

108.    Taylor declined to relinquish ownership of his firearms, and the City Prosecutor's Office continued to prosecute him pursuant to an ordinance known to possess constitutional infirmities.

109.    On July 19, 2013, Glisson sent a letter to Lisa Freeman, Baton Rouge City Prosecutor, again asserting that Taylor's criminal prosecution should be terminated and that Taylor's lawfully-held firearms should be returned to his possession.

110.    Glisson's July 19, 2013 correspondence noted that the ordinance under which Taylor had been arrested, when applied to firearms located inside of vehicles, would prevent hunters from getting gasoline from a convenience store, as well as preventing any Baton Rouge citizen from going to a grocery store while firearms were present in their vehicle.

111.    Glisson's correspondence also indicated that if Taylor's weapons were not returned to his possession, a lawsuit against the City would be filed in federal court pursuant to

42 U.S.C. §1983.

112.    Upon receiving Glisson's correspondence, the City Prosecutor and/or certain Assistant City Prosecutors evaluated the constitutionality of §13:95.3 and determined that the ordinance violated both the Second and Fourth Amendments to the U.S. Constitution.

113.     After determining that §13:95.3 was legally defective, the City Prosecutor's Office again ignored the unconstitutional nature of §13:95.3 and continued to prosecute Taylor and withhold his firearms pursuant to the ordinance.

114.    On September 19, 2013, Taylor filed suit against the City of Baton Rouge, the officers who arrested Taylor and confiscated his firearms on October 13, 2012, the Baton Rouge City Prosecutor, the East Baton Rouge Parish Attorney, and the Chief of the Baton Rouge Police Department in the United States District Court for the Middle District of Louisiana.

115.    Taylor also moved to quash the charges brought against him in Baton Rouge City Court on several grounds.

116.    Taylor's motion to quash asserted that the charge of violating §13:95.3 should be quashed because the ordinance conflicted with provisions of the United States Constitution and the Louisiana Constitution.

117.    Taylor's motion to quash asserted that the description of events provided in the Baton Rouge Police Department Incident Report and the non-notarized affidavit of Corporal Wennemann did not assert facts showing Taylor had violated either §13:108 or §11:283, and that the facts appearing in these documents actually established that no such violations had occurred.

118.    Through his suit in federal court, Taylor sought to prevent the City of Baton Rouge from further enforcement of §13:95.3, sought an order declaring §13:95.3 unconstitutional and unenforceable, sought the return of the firearms confiscated on October 13,

2012, and also sought an award of monetary damages.

119.    Taylor's federal complaint was served upon Lisa Freeman, Baton Rouge City Prosecutor; Mary Roper, East Baton Rouge Parish Attorney; Carl Dabadie, Chief of the Baton Rouge Police Department, in addition to Corporal Wennemann and Officer Thomas.

120.    Upon being served with Taylor's complaint, Defendant Freeman assessed the allegations contained therein and concluded that the City Prosecutor's Office had been, and was continuing to prosecute individuals under §13:95.3 in violation of the U.S. Constitutions and/or other provisions of law.

121.    Freeman also concluded that Taylor's rights under both the United States Constitution and Louisiana law had likely been violated on October 13, 2012.

122.    Instead of dismissing the charges against Taylor and ceasing his prosecution due to §13:95.3's constitutional infirmities and the lack of any support for the other alleged violations, Defendant Freeman continued Taylor's prosecution under the unconstitutional ordinance, and sought to recuse herself and all members of the City Prosecutor's Office from Taylor's criminal prosecution.

123.    The City Prosecutor's Office did not serve Taylor with a copy of its motion to recuse and did not inform Taylor or his counsel of their intention to make such a request.

124.    On the date scheduled for Taylor's trial and the hearing on his motion to quash, the City Prosecutor's Office asked that it be granted a continuance, and that its motion for recusal be heard instead.

125.    While granting the City's motions to continue and its motion for recusal, Judge Yvette Alexander stated she felt the charges against Taylor needed to be resolved, asit was her understanding that §13:95.3 was unconstitutional.

126.    The City Prosecutor's Office was recused from Taylor's criminal case on November 8, 2013.

127.    Upon information and belief, the East Baton Rouge Parish District Attorney's Office declined to assume responsibility for Taylor's criminal prosecution after concluding that §13:95.3 was unconstitutional and that Taylor's rights had been violated.

128.    The Parish Attorney's Office never enrolled or participated in Taylor's criminal case, despite being fully aware that Taylor was being prosecuted and his guns withheld pursuant to an invalid ordinance in derogation of Taylor's rights under the U.S. Constitution and Louisiana law.

129.    Rather than assume responsibility for Taylor's criminal prosecution or dismiss the charges against him, the City Prosecutor and/or Parish Attorney requested that a representative of the Louisiana Attorney General's Office be appointed to actively pursue Taylor's criminal prosecution.

130.    On January 2, 2014, the Louisiana Attorney General's Office accepted appointment to act as prosecutor on the City's behalf with respect to the criminal charges pending against Taylor.

131.    Upon being served with Taylor's complaint, Defendant Roper did not undertake an analysis of the claims appearing therein to determine whether §13:95.3 was unconstitutional and should no longer be enforced, and/or whether the criminal charges against Taylor should be dismissed and his firearms returned to him.

132.    Instead, Defendant Roper opted, as was her policy in any suit in which she had been named as a defendant, to have no involvement with the case.

133.    It is a common and necessary practice to include policymakers, such as the Parish

Attorney and Chief of Police, as defendants in lawsuits seeking to prevent the enforcement of unconstitutional laws, as these individuals exercise the authority to constrain and prevent overreach by governmental actors.

134.    Instead of participating in Taylor's lawsuit and evaluating the allegations appearing therein, Roper delegated the responsibility for Taylor's federal lawsuit to Defendant Gremillion, head of the East Baton Rouge Parish Attorney Office's Litigation Division.

135.    Upon reviewing Taylor's federal complaint, Defendant Gremillion undertook to evaluate the allegations appearing therein, along with the constitutionality of §13:95.3.

136.    Through his evaluation, Gremillion determined that the U.S. District Court for the Western District of Louisiana had declared a law virtually identical to §13:95.3 to be violative of the United States Constitution in 1985 - nearly 30 years prior - and concluded that §13:95.3 was likewise unconstitutional.

137.    Through his evaluation, Gremillion also came to the conclusion that the continued existence of §13:95.3 in the Baton Rouge Code of Ordinances was an oversight, as the Baton Rouge Metropolitan Council had also previously determined that the ordinance was unconstitutional, and in 1986 had enacted §13:95.4 of the Baton Rouge Code of Ordinances to replace §13:95.3 and cure its constitutional infirmities.

138.    With respect to Taylor in particular, Gremillion concluded that Taylor had been, and was continuing to be deprived of rights guaranteed to him by the U.S. Constitution and the laws of the State of Louisiana.

139.    Gremillion was employed by the East Baton Rouge Parish Attorney's Office in 1985 and 1986, and, upon information and belief, possessed first-hand knowledge of the constitutional issues implicated by §13:95.3, along with the Metro Council's passage of §13:95.4

to replace the unconstitutional provision.

140.    Despite having determined that §13:95.3 violated the United States Constitution, and that its continued existence in the Baton Rouge Code of Ordinances was a mistake, Gremillion assigned Assistance Parish Attorney James Hilburn to vigorously defend against Taylor's federal suit.

141.    Upon reviewing the allegations in Taylor's complaint, Defendant Hilburn concluded that §13:95.3 violated the United States Constitution and also various provisions of Louisiana law, and that Taylor had been, and was continuing to be deprived of rights guaranteed to him by the U.S. Constitution and the laws of the State of Louisiana.

142.    Upon information and belief, Gremillion, as Hilburn's supervisor, instructed Hilburn to oppose any attempt to prohibit use of §13:95.3, despite his own belief that the ordinance was unconstitutional and that its continued existence would likely result in additional deprivations of rights held by Baton Rouge citizens.

143.    Upon information and belief, Gremillion also instructed Hilburn to oppose any attempt by Taylor to have his lawfully owned firearms returned to his possession.

144.    Despite receiving requests on behalf of Taylor to do so, and in violation of the Federal Rules of Civil Procedure and the Rules of Court for the Middle District of Louisiana, Hilburn refused to answer Taylor's federal lawsuit, or to provide information in his possession regarding Taylor's arrest on October 13, 2012.

145.    The unwillingness of Roper, Freeman, Hilburn, and/or Gremillion to participate in Taylor's federal suit and/or to halt Taylor's criminal prosecution in Baton Rouge City Court resulted in the continued deprivation of Taylor's lawfully held firearms, the continued enforcement by the Baton Rouge Police Department of an ordinance known to be

unconstitutional, and brought to a halt the process by which Taylor could be made whole for the wrongs visited upon him by the City and its actors.

146.    Based upon Hilburn's failure to participate in Taylor's federal lawsuit, Taylor requested that the Clerk of U.S. Court for the Middle District of Louisiana place all Defendants named in his federal suit in default.  The Clerk granted Taylor's request the same day.

147.    After Taylor placed the Defendants named in his federal suit in default, Tedrick K. Knightshead, an Assistant East Baton Rouge Parish Attorney, assumed primary responsibility for defending against Taylor's federal suit.

148.    Upon reviewing the allegations in Taylor's complaint, Defendant Knightshead concluded that §13:95.3 violated the United States Constitution and also various provisions of Louisiana law, and that Taylor had been, and was continuing to be deprived of rights guaranteed to him by the U.S. Constitution and the laws of the State of Louisiana.

149.    Gremillion, as Knightshead's supervisor, instructed Knightshead to oppose any attempt to prohibit use of §13:95.3, despite his own belief that the ordinance was unconstitutional and would likely result in additional deprivations of rights held by Baton Rouge citizens.

150.    Gremillion also instructed Knightshead to oppose any attempt by Taylor to have his lawfully owned firearms returned to his possession.

151.    Knightshead followed Gremillion's instruction, and took actions designed to permit the continued utilization of §13:95.3 by the City and its actors.

152.    Even after the criminal charges filed by the City against Taylor had been dismissed, Knightshead, acting on behalf of the City, refused to facilitate the return of Taylor's firearms.

153.    On June 18, 2014 a hearing was held before the Honorable Brian Jackson of the U.S. District Court for the Middle District of Louisiana.

154.    During the hearing, the Court declined to set aside the default which had been entered against the defendants in Taylor's federal suit.

155.    Subsequent to the hearing, the Court ordered Defendants Roper, Hilburn, and Knightshead to appear in court to determine whether sanctions should be imposed for the manner in which Taylor's case had been handled.

156.    Fearing the possibility of sanctions, Knightshead arranged for the return of the firearms that had been unlawfully seized from Taylor on October 13, 2012.

157.    Knightshead also hastily arranged with Defendants Roper and Gremillion to have the Parish Attorney's Office recommend the repeal of §13:95.3 to the Baton Rouge Metropolitan Council, and had the item placed on the agenda of an upcoming council meeting.

158.    At Knightshead's request, Defendant Gremillion also drafted a letter to Police Chief Dabadie stating that Baton Rouge Code of Ordinances §13:95.4 suffered from constitutional infirmities, and should no longer be enforced by members of the Baton Rouge Police Department.

159.    Roper's and Gremillion's request that the Metro Council repeal of §13:95.3 was presented to the Baton Rouge Metropolitan Council on June 25, 2014.  Due to the last-minute addition of the item to the Council's agenda, and the lack of information provided by the Parish Attorney's Office in connection with its request, the vote on §13:95.3's repeal was deferred to a later date.

160.    Without explanation, the Parish Attorney's Office subsequently withdrew its request for the Metro Council to repeal §13:95.3, and the issue was never voted upon, nor

considered by the Council again.

161.    Furthermore, upon information and belief, the letter to Defendant Dabadie, drafted by Gremillion at Knightshead's request, was never transmitted to Dabadie.

162.    The actions and/or inaction of the Parish Attorneys described above were motivated solely by financial concerns.

163.    Specifically, the Parish Attorneys feared that ceasing Taylor's criminal prosecution, returning his firearms, and/or admitting the unconstitutionality of §13:95.3 would be an admission of liability that would increase the likelihood of an award of monetary damages and/or the likelihood that the non-City Defendants would be held personally liable for any such award.

<u>The Baton Rouge Police Department Retaliates Against Taylor</u>

164.    As the City and its actors refused to abandon Taylor's criminal prosecution in Baton Rouge City Court, Taylor retained Glisson's firm to defend him against those charges.

165.    Representatives from the Louisiana Attorney General's Office, acting on behalf of the City, reviewed the Motion to Quash the criminal charges filed against Taylor, and determined that §13:95.3 was unconstitutional, and that Taylor had violated no law on October 13, 2012.  As a result, no response to Taylor's Motion to Quash was filed by the City, and no defense of §13:95.3's constitutionality was made.

166.    Taylor's criminal trial and the hearing on his motion to quash were scheduled for April 28, 2014.

167.    Defendants Thomas and Wennemann had been notified and were aware that Taylor's criminal trial was scheduled to be conducted on April 28, 2014.

168.    On April 28, 2014 the Louisiana Attorney General's Office, on behalf of the City,

dismissed all charges brought against Taylor arising from his arrest on October 13, 2012. *See* Order Dismissing Criminal Charges, attached hereto as Exhibit C.

169.    At approximately 10:11 A.M. on April 29 – the day after Taylor's criminal charges were dismissed -- Officer J. Ardoin of the BRPD was dispatched to a residence located on Alliquippa Street in Baton Rouge in response to a report of an armed robbery. *See* Initial Report of J. Ardoin, attached hereto as Exhibit D.

170.    Through his investigation Ardoin determined that an individual identified only as a "black male" had purportedly entered the Alliquippa Street residence with a handgun, and stolen a television set valued at approximately two hundred dollars ($200.00).

171.    After questioning the individual that had reported the alleged robbery, Ardoin took no further action, and drafted an "Initial Report" detailing his actions and findings.

172.    Upon information and belief, at some point prior to 11:23 P.M. on April 29, 2014, Officer Thomas was informed of the dismissal of the criminal charges filed against Taylor as a result of his October 13, 2012 arrest.

173.    Upon information and belief, upon being notified of the dismissal of Taylor's criminal charges, Thomas became concerned about the effect the dismissal might have on Taylor's federal lawsuit, and his continued employment with the Baton Rouge Police Department.

174.    Upon information and belief, Thomas conspired with Ardoin and other members of the Baton Rouge Police Department, including Corporal Wennemann, and/or John Doe #1 - #4 to retaliate against Taylor for submitting a complaint to the internal affairs division, and for his filing of a federal lawsuit.

175.    Upon information and belief Officers Thomas, Ardoin, and Doe #1 -#4 developed

a plan to implicate Taylor as a suspect in a crime he had not committed, then to invade Taylor's home and take him into custody.

176.    Upon information and belief, the plan developed by the officers was intended to make Taylor feel unsafe in his own home, to demonstrate to Taylor that members of the Baton Rouge Police Department could enter his home, harass him, and take him into custody even though he had committed no offense, and to frighten and intimidate Taylor into abandoning his federal civil rights lawsuit.

177.    Upon information and belief, Officers Thomas, Ardoin, and John Doe #1 - #4 decided to execute their plan to intimidate and retaliate against Taylor during the late night hours of April 29, 2014 and the early morning hours of April 30, 2014.

178.    At 11:23 P.M., Officer Thomas was on duty traveling in his marked police cruiser in the 70805 zip code.  *See* April 29, 2014 Incident Report, attached hereto as Exhibit E.

179.    At approximately 11:23 P.M., a female individual phoned 911 and relayed facts virtually identical to those recorded by Officer Ardoin more than twelve hours earlier.

180.    While the individual who had contacted police earlier that day had identified the alleged burglar only as a black male, the individual who called 911 on the night of April 29, 2014, without being asked to make any identification, stated that "Ernest Taylor" was the individual who had stolen her television.

181.    Upon information and belief, the individual making the call to 911 had been previously instructed by Thomas, Ardoin, and/or other member(s) of the Baton Rouge Police Department to call and identify Plaintiff as the perpetrator of a crime on Alliquippa Street.

182.    Taylor was never present at the Alliquippa Street residence, and has never met and is unacquainted with the individual who made the 911 call.

183.   Despite having knowledge that there were numerous individuals answering to the name "Ernest Taylor" in Baton Rouge and the surrounding areas, and lacking any evidence to indicate that Plaintiff herein was involved with the events being reported, upon hearing the 911 call, Thomas immediately concluded that the "Ernest Taylor" referenced in the 911 call was Plaintiff herein.[3]

184.   Even though there were numerous other BRPD officers available in the vicinity, Officer Thomas elected to respond to the 911 call, despite the fact that Thomas was then a defendant in a lawsuit filed by Taylor.

185.   Even though no description had been provided of the individual who allegedly burglarized the Alliquippa Street residence, Officer Thomas informed the other on-duty officers via his police radio that Taylor was the suspect being sought, and attempted to provide them with a physical description matching that of Plaintiff.

186.   While traveling to the Alliquippa Street residence, Thomas informed other officers by radio that Taylor had filed suit against he and other members of the Baton Rouge Police Department.

187.   Without basis or justification, Thomas also informed the other on-duty police officers that Taylor was "very violent."

188.   Upon his arrival at the Alliquippa Street residence, Officer Thomas immediately engaged in an overtly suggestive line of questioning with the female present at the residence in an effort to elicit responses supportive of Thomas' conclusion that the alleged suspect was Plaintiff herein.

189.   Thomas also engaged in an overtly racial line of questioning, asking the

---

[3] The video from Officer Thomas' dashboard camera has been submitted conventionally in Taylor's other suit, *Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB (M.D. La.)

individual at the Alliquippa Street Residence whether the person who allegedly robbed the home "dresses like a pimp" sometimes.

190.    Despite Thomas' attempts, the female present at the Alliquippa Street residence provided no information to corroborate Thomas' belief that the individual that had allegedly stolen her television was, in fact, Plaintiff herein.

191.    Instead, the female present at the Alliquippa Street residence provided information that would exclude Plaintiff herein as a suspect in the alleged burglary, stating that she had personal knowledge of the alleged suspect and that he was "in his thirties."

192.    On April 29, 2014, Plaintiff herein was 54 years old.

193.    Despite receiving information that would eliminate Plaintiff as a suspect in the alleged crime on Alliquippa Street, Officer Thomas resorted to additional suggestive tactics that would elicit a false identification of Plaintiff as the alleged suspect.

194.    Specifically, Officer Thomas indicated to the female at the Alliquippa residence that he was going to show her a picture of Plaintiff to determine whether he was the individual that had perpetrated the alleged crime.

195.    Officer Thomas then retrieved a computer from his vehicle and positioned himself so that his dashboard camera would not be able to record any identification made by the female.

196.    Through the use of techniques designed to do so, or alternatively, via explicit request, Thomas indicated to the female that he wanted her to identify Plaintiff as the individual who purportedly robbed the Alliquippa Street residence.

197.    As a result of Thomas' suggestive techniques, or alternatively, in acquiescence to Thomas' specific request, the female at the Alliquippa Street residence incorrectly identified Plaintiff herein as the individual that had committed the alleged robbery.

198.    Despite the absence of probable cause or any legitimate evidence suggesting that Plaintiff had been involved in any wrongdoing, and despite the lack of any exigent circumstances, Thomas proceeded to Plaintiff's residence for the purpose of placing him under arrest.

199.    Upon information and belief, Thomas did not believe that Taylor had been involved in any criminal activity on the evening of April 29, 2014.

200.    Rather, Thomas saw the television robbery as an opportunity to intimidate Taylor and to retaliate against him for filing a complaint with internal affairs, and for naming Thomas and other members of the Baton Rouge Police Department in his federal lawsuit.

201.    To achieve his goal of intimidation, while en route to Plaintiff's residence, or shortly after arriving, Thomas again conspired with Officers Ardoin and John Does #1 - #3 to conceal Thomas' presence while utilizing false pretenses to summon Plaintiff to the door of his home.

202.    Under the plan devised by the officers, when Plaintiff answered the door to his home, Thomas would not then be present, so as to avoid alerting Plaintiff to any impropriety. Once Thomas was able to confirm Plaintiff's identity, Thomas would then come forward, enter Plaintiff's home, place him in handcuffs, and take him into custody.

203.    The plan was designed to demonstrate to Plaintiff that officers of the Baton Rouge Police Department, and Officer Thomas in particular, were capable of forcing their way into Taylor's home and taking him into custody despite the fact that Taylor had committed no crime.

204.    After deciding upon the actions they would take, the officers, other than Thomas, approached the door to Taylor's residence, knocked, and shouted, "[d]id somebody call 911?"

205.    Eventually, Taylor opened the front door in a state of undress and stepped outside to speak with the officers, indicating that no one at his residence had called 911.

206.    When Taylor stepped outside, Thomas informed the other officers over his police radio that the individual who had exited the home was, in fact, the Taylor he desired to intimidate.

207.    After receiving confirmation of Taylor's identity from Thomas, one of the other officers stated that Taylor needed to speak with another officer, and asked Taylor to step back inside of his home.

208.    Pursuant to the officer's request, Taylor reentered his home.

209.    Without a warrant and in the absence of consent or any exigent circumstance, Thomas immediately followed Taylor and entered his home, asked Taylor if he knew his rights, then began Mirandizing Taylor.

210.    Taylor repeatedly questioned the officers as to why they had come to his home and placed him under arrest.

211.    None of the officers present at Taylor's home provided him with any explanation of their authority to arrest him and search his home, nor did they inform him of the charges for which they believed they had probable cause or provide any other reason for his arrest.

212.    Upon realizing that it was Thomas that had entered his home, Taylor inquired as to whether Thomas was one of the defendants in Taylor's federal lawsuit, to which Thomas responded affirmatively.

213.    Taylor was then handcuffed inside of his residence and led outside where, still in a state of undress, he was placed in the backseat of Thomas' police cruiser.

214.    Without a warrant, and despite Taylor's refusal to consent to a search, the officers

proceeded to search both Taylor's residence and his vehicle.

215.    As Taylor had committed no crime, nothing that would implicate Taylor in any wrongdoing was discovered as a result of the officers' search of Taylor's home and vehicle in the early morning hours of April 30, 2014.

216.    Taylor was eventually taken from the backseat of Thomas' police cruiser, and placed into the backseat of another officer's cruiser, then driven to the First District Precinct where he was placed in a holding cell.

217.    Upon leaving Taylor's residence, Thomas returned to the Alliquippa Street residence, purportedly to locate the female individual with whom he had previously spoken, and to then transport her to the First District Precinct in order to identify Taylor as the alleged robber.

218.    Thomas was unable to locate the female at the Alliquippa Street residence, either because she had wrongfully identified Taylor as the culprit at Thomas' suggestion or alternatively, pursuant to Thomas' explicit instruction that she not be present when Thomas returned from Taylor's home.

219.    Their plan having been successfully executed, after several hours, the BRPD officers eventually released Taylor from the holding cell at First Precinct, and allowed him to return home.

220.    After he was released from custody, Taylor contacted Glisson's firm to inform him of the actions undertaken by officers of the Baton Rouge Police Department.

221.    Upon learning of Taylor's arrest by Officer Thomas and other members of the Baton Rouge Police Department, Taylor's attorney contacted Knightshead to apprise him of the situation and to request an investigation into the officers' actions.

222.    Knightshead agreed that it would be inappropriate for Thomas to have any contact

with Taylor given the pendency of Taylor's federal suit, and indicated that he would look into the matter.

223.    Officers of the Baton Rouge Police Department continued to harass Taylor after April 30, 2014 by regularly parking near Taylor's residence and/or driving by his home in order to make him fear that they might again take him into custody without justification.

224.    Knightshead was informed about this continued harassment of Taylor.

225.    In addition to Knightshead, Defendants Roper, Freeman, and Dabadie were informed of the events of April 29th and 30th, 2014, described above, through filings made in Taylor's federal suit.

226.    Upon information and belief, no investigation of Corporal Wennemann, Officer Thomas, Officer Ardoin, or Officers John Doe #1 - #4, or of the events described above has ever been made by the Baton Rouge Police Department, the Parish Attorney's Office, the City Prosecutor's Office, or any other individual or department within the City of Baton Rouge.

<u>Organization and Policymaking of The City of Baton Rouge</u>

227.    At all times pertinent hereto, defendants acted under color of law pursuant to statutes, ordinances, regulations, policies, customs, practices, and usage of the State of Louisiana and/or the City of Baton Rouge.

228.    The Chief of the Baton Rouge Police Department possesses the authority to direct and control the powers exercised by the officers of the Baton Rouge Police Department pursuant to Baton Rouge City Ordinance Sec. 4:51.

229.    The Chief of the Baton Rouge Police Department exercises the authority granted to him by Baton Rouge City Ordinance §4:51 through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

230.    Officers of the Baton Rouge Police Department are required to "obey absolutely" the orders and directions of the Chief of Police pursuant to Baton Rouge City Ordinance Sec. 4:55.

231.    Section 6.02 of the City's Plan of Government provides that the Chief of Police shall be in direct command of the Police Department, and shall have the power to appoint and remove officers and employees of the department, assign members of the department to their respective posts, and to make rules and regulations concerning the operation of the department, the conduct of its officers and employees, along with matters relating to equipment, training, and discipline.

232.    Baton Rouge Code of Ordinances Sec. 4:50 and Section 6.01 of the City's Plan of Government also vests responsibility with the Baton Rouge Police Department to preserve the rights and property of Baton Rouge citizens with respect to their persons and property, and to uphold the laws of the State of Louisiana.

233.    Donald Dewayne White served as Baton Rouge Chief of Police from May 27, 2011 until on or about February 16, 2013 when he was replaced by Carl Dabadie, Jr.  Dabadie currently still holds the position.

234.    Section 11.01 of the City's Plan of Government provides for the appointment of a Parish Attorney who is to serve as the legal advisor for the City and all of its departments, offices and agencies, and is charged with furnishing opinions regarding questions of law involving the powers and duties of City officials.

235.    The Parish Attorney is charged with the responsibility of ensuring that the laws appearing in the Baton Rouge Code of Ordinances are valid and enforceable, and are not likely to result in the unlawful deprivation of an individual's rights or property, or expose the City to

liability.

236.    To ensure the legal soundness of the Baton Rouge Code of Ordinances and to protect the rights and property of the citizens of Baton Rouge, the Parish Attorney is vested with the authority and responsibility to draft proposed ordinances and recommend the amendment or repeal of ordinances that are outdated or suffer from legal infirmities.

237.    The East Baton Rouge Parish Attorney is authorized to appoint Assistant Parish Attorneys, at least one of whom is to be dedicated to the prosecution of ordinance violations.

238.    The Parish Attorney may delegate her duty to prosecute all ordinance violations in the City Court to an Assistant Parish Attorney, or City Prosecutor.

239.    The Parish Attorney is the head administrator for the Parish Attorney's Office, which includes the City Prosecutor's Office, and possesses the authority to appoint and remove Assistant Parish Attorneys, Assistant City Prosecutors and other employees of the department, to assign members of the department specific duties or tasks, and to make rules and regulations concerning the operation of the department, the conduct of its employees, and matters relating to the execution of the Parish Attorney Office's function.

240.    The Parish Attorney exercises the authority described in the foregoing paragraph through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

241.    The City Prosecutor is the primary administrator within the City Prosecutor's Office and possesses the authority to appoint and remove Assistant City Prosecutors and other employees of the department, to assign members of the department specific duties or tasks, and to make rules and regulations concerning the operation of the department, the conduct of its employees, and matters relating to the execution of the City Prosecutor Office's function.

242.     The City Prosecutor exercises the authority described in the foregoing paragraph through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

243.     The Parish Attorney, City Prosecutor, and all Assistant Parish Attorneys and Assistant City Prosecutors are required to possess a valid license to practice law in the State of Louisiana.

244.     As attorneys licensed in the State of Louisiana, the Parish Attorney, City Prosecutor, and all Assistant Parish Attorneys are sworn to support the Constitution of the United States and the Constitution of the State of Louisiana, and are forbidden from maintaining any suit or proceeding which they believe to be unjust or any defense which they believe to be invalid.[4]

245.     Mary Roper was appointed as East Baton Rouge Parish Attorney in 2008 and remained in that position until September 10, 2014.

246.     After Roper's departure, Lea Anne Batson was appointed Interim East Baton Rouge Parish Attorney.  Batson currently still holds this position.

247.     At all times relevant to the present action up to and including the present, Lisa Freeman has served as Chief City Prosecutor with the primary responsibility for prosecuting ordinance violations in Baton Rouge City Court.

Development and Status of the Rights Guaranteed by Federal and Louisiana Law

248.     On December 15, 1791 the First, Second and Fourth Amendments to the United States Constitution came into effect after having been ratified by three-fourths of the States.

249.     On July 28, 1868, the 14th Amendment to the United States Constitution came into effect after having been ratified by three-fourths of the States.

250.     On April 20, 1974, Louisiana Voters ratified the 1974 Louisiana Constitution,

---

[4] *See* Louisiana Oath of Admission, appearing at: https://www.lascba.org/lawyers_oath.asp

which became effective January 1, 1975.

## 1. The Right to Seek Redress of Grievances

251.    The First Amendment provides, "[c]ongress shall make no law respecting an establishment of religion, or prohibiting the free access thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

252.    The right to petition the government, guaranteed by the First Amendment, is implicit in the very idea of government, republican in form. *United States v. Cruikshank,* 92 U.S. 542 (1876).

253.    The great, indispensable democratic freedoms secured by the First Amendment enjoy a preferred place in our system of laws.  The priority of the First Amendment over other concerns gives these liberties a sanctity and a sanction not permitting dubious intrusions. *Thomas v. Collins,* 323 U.S. 516 (1945).

254.    Abstract discussion is not the only species of communication which the Constitution protects; the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion. *NAACP v. Button,* 371 U.S. 415 (1963).

255.    The freedoms guaranteed by the First Amendment are delicate and vulnerable, as well as extremely precious in our society.  The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. *Id.*

256.    The right of access to the courts via filing of a lawsuit "is an aspect of the First Amendment right to petition the Government for redress of grievances." *See Bill Johnson's Rests. v. NLRB,* 461 U.S. 731, 741 (1983), citing *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972).

257.    Article I, Section 9, of the 1974 Constitution provides, "No law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances."

258.    The right to petition long antedates the existence of the U.S. Constitution, is cut from the same cloth as the other guarantees of the First Amendment, and is an assurance of a particular freedom of expression. *McDonald v. Smith,* 472 U.S. 479 (1985).

## 2.   The Right to Keep and Bear Arms

259.    The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

260.    The Second Amendment did not create a right that was dependent upon the Constitution for its existence, but rather only gave Constitutional protection to a fundamental individual right that preexisted the Constitution's enactment. *See District of Columbia v. Heller,* 554 U.S. 591 (2008).

261.    On July 23, 1879, the Louisiana Constitutional Convention adopted the Louisiana Constitution of 1879. Article 3 of the Constitution largely adopted the language of the federal government's Second Amendment: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed." Earlier versions of the Louisiana Constitution had provided that "free white men of the state shall be armed and disciplined for its defense." *See e.g.,* Louisiana Constitution of 1812, Article III, §22.

262.    In 1951, the City enacted the 1951 Baton Rouge City Code which criminalized certain conduct. In particular, Title 13, §83, with certain limited exceptions, made it illegal for individuals to possess firearms or any other "instrumentality customarily used or intended for probable use as a dangerous weapon, in any premises where alcoholic beverages are sold and/or

consumed on the premises." Subsection (b) of the ordinance provided that police officers "shall confiscate" any firearm or other weapon found on any person "in any place where alcoholic beverages are sold or consumed on the premises." Subsection (c) of the ordinance also provided that "[t]he phrase, '…premises where alcoholic beverages are sold and/or consumed on the premises' shall include all of the licensed premises, including the parking lot." By its clear and unambiguous language, the ordinance forbid possession of any weapon (not just a firearm), on the premises of any establishment that either sold or permitted consumption of alcoholic beverages – even where the weapon was located inside a parked vehicle outside the establishment.

263.    It has never been illegal for an individual to possess a firearm inside their vehicle in the State of Louisiana, and from the moment of its passage, §13:95.3 was unenforceable, as it conflicted with provisions of the Louisiana and U.S. Constitutions.

264.    In 1962 the City enacted the 1962 East Baton Rouge Parish Code, which reenacted Title 13, §83 of the 1951 Baton Rouge City Code, redesignating it as Title 13, §205.

265.    The ordinance first appearing as Title 13, §83 in the 1951 Baton Rouge City Code still exists and has not been amended. It appears in the current version of the Code of Ordinances of the City of Baton Rouge as Title 13, Section 95.3 ("the ordinance").

266.    Article I, Section 11 of the 1974 Constitution made clear that the right to keep and bear arms was one granted to individual citizens: "The right of each citizen to keep and bear arms shall not be abridged, but this provision shall not prevent the passage of laws to prohibit the carrying of weapons concealed on the person."

267.    On January 12, 1979, the Louisiana Supreme Court stated unequivocally that the 1974 Constitution guaranteed to each citizen the right to keep and bear arms. Confronted with a

situation in which an individual was arrested for possessing firearms in the parking lot of a drug store, the Court stated: "The carrying of an unconcealed weapon is not a special privilege or advantage enjoyed by a police officer.  Each citizen is guaranteed the right to keep and bear arms not concealed on his person."  *State v. Nelson*, 367 So. 2d 317, 318 (La. 1979).

268.    On October 9, 1984, the Louisiana First Circuit Court of Appeal struck down Louisiana Revised Statute §56:330 (forbidding possession of firearms while frog hunting) as being in direct conflict with Louisiana Constitution Article I, §11.  The court determined that a prohibition against possessing a firearm while engaged in certain acts bore no rational relationship to any legitimate state interest.  The court also stated that the statute presented a "clear illustration" of the reason for recognizing a broad right of citizens to keep and bear arms – an individual capturing game at night "could be attacked" and "needs to protect himself."  *State v. Chaisson,* 457 So.2d 1257 (La.App. 1 Cir. 1984).

269.    Shortly after the decision in *Ringe v. Romero,* 624 F. Supp. 417 (W.D. La. 1985), the Louisiana Legislature passed Act. No. 765, enacting Louisiana Revised Statute 14:95.5, which applied similar restrictions to the possession of firearms as §13:95.3, but in a much narrower set of circumstances.

270.    Specifically, La. R.S. §14:95.5 limits its application to "firearms" in the possession of persons on the premises of "commercial establishments in which alcoholic beverages … are sold in individual servings for consumption on the premises" and contained no provision that would include areas outside the establishment, such as the parking lot, in the definition of "premises."

271.    Thus La. R.S. §14:95.5 applies only to possession of firearms (not all "instrumentalities customarily used or intended to be used as a weapon") and only where alcohol

was sold for consumption on the premises (not where alcohol was "sold and/or consumed"), and the statute did not include parking lots in the definition of "premises."

272.    On March 12, 1986, the City enacted Ordinance No. 8118, containing Title 13, §95.4, which reproduced verbatim the more narrowly tailored provisions appearing in La. R.S. §14:95.5, and which currently still appears in the City's Code of Ordinances, under the same title and section.

273.    The City enacted §13:95.4 in response to the constitutional deficiencies present in §13:95.3 that had been identified by the federal court in *Ringe v. Romero.*

274.    While §13:95.4 was enacted to cure the legal flaws present in §13:95.3, the unconstitutional ordinance was never repealed.

275.    On June 26, 2008, the United States Supreme Court issued its decision in *District of Columbia v. Heller,* 554 U.S. 570 (2008), wherein it confirmed that, like Article I, Section 11 of Louisiana's Constitution, the Second Amendment to the United States Constitution protects an individual's right to possess firearms.

276.    On July 2, 2008, Louisiana Governor Bobby Jindal signed into law Act 684, codified at La. R.S. 32:292.1, titled "Transportation and Storage of Firearms in Privately Owned Motor Vehicles."   §32:292.1 explicitly provides that "a person who lawfully possesses a firearm may transport or store such firearm in a locked, privately-owned motor vehicle in any parking lot, parking garage, or other designated parking area."

277.    On March 2, 2010, the United States Supreme Court reaffirmed its earlier decision in *Heller,* and determined that "it is clear" that the provisions of the Second Amendment to the United States Constitution are fully applicable to the States by virtue of the Fourteenth Amendment.  *McDonald v. City of Chicago,* 130 S.Ct. 3020 (2010).

278.    On November 6, 2012 the citizens of the State of Louisiana voted to further buttress the protections provided by the State's Constitution with respect to the right of its citizens to keep and bear arms.  In its current form, Art. 1, §11 provides: "The right of each citizen to keep and bear arms is fundamental and shall not be infringed.  Any restriction on this right shall be subject to strict scrutiny."  The provision became effective December 10, 2012.

### 3.   The Right to be Free From Unreasonable Searches and Seizures

279.    The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

280.    The Fourth Amendment's requirement of probable cause was enacted to stem "the oppressive practice of allowing the police to arrest and search on suspicion."  *Henry v. United States,* 361 U.S. 98, 100 (1959).

281.    In 1964 the United States Supreme Court made clear that the existence of probable cause could not be established through the utilization of overly suggestive techniques. *Beck v. Ohio,* 379 U.S. 89 (1964).  The court determined that probable cause exists when "the facts and circumstances within the arresting officer's knowledge, and of which he has reasonable and trustworthy information, are sufficient to justify a man of average caution in the belief that the person to be arrested has committed, or is committing an offense."  *See also, Gibson v. State,* 758 So.2d 782, 788 (La. 2000).

282.    As early as 1967, the United States Supreme Court recognized that "[t]he practice of showing suspects singly to persons for the purpose of identification has been widely condemned."  *See Stovall v. Denno,* 388 U.S. 293, 302 (1967) (citations omitted).

283.    Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot.  *Terry v. Ohio,* 392 U.S. 1, 21 (1968)

284.    On January 12, 1971, the United States Supreme Court made clear that police could not enter an individual's home without a warrant in the absence of certain limited situations.  *See Coolidge v. New Hampshire,* 403 U.S. 443 (1971).  In the words of the Court, "a search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'" *See also, Payton v. New York,* 445 U.S. 573 (1979).

285.    Article I, Section 5 of the Louisiana Constitution of 1974 provides, "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches and seizures, or invasions of privacy.  No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the person or things to be seized, and the lawful purpose or reason for the search."

286.    "The Fourth Amendment and the specific mandate of the Louisiana Constitution guaranty immunity from unreasonable searches and seizures by the police.  The right protected is that of privacy, which has been described as 'one of the unique values of our civilization.'  The keystone of protection is the search warrant, which requires judicial endorsement of the need to invade private premises.  *State v. Kuhlman,* 293 So.2d 159, 160-161 (La. 1974), quoting *James v. Louisiana,* 382 U.S. 36 (1965).

287.    "The search of a home without a warrant is banned notwithstanding probable cause to believe that it contains contraband or other seizable articles.  Such a search, moreover, is not validated by what it brings to light.  The tradition of time immemorial sustains this firm

constitutional policy protecting the privacy of the home." *Id.*

288.    "The substantive restriction against the invasion of private homes without a search warrant … forms a sacred feature of our American heritage.  Curtailing the substantive restriction … impairs the protection of the right of privacy of all the homes in our state – those of both the just and the unjust." *Id., see also, Vale v. Louisiana,* 399 U.S. 30 (1970).

289.    On March 29, 1976, the Louisiana Supreme Court held that Article I, Section 5, of the Louisiana Constitution prevents police officers within the state from conducting searches of an individual's person or vehicle when the person is detained for a traffic violation and there is no reasonable suspicion that he is armed and dangerous.  *See State v. Breaux,* 329 So.2d 696 (La. 1976).

290.    In 1977, the United States Supreme Court, echoing its determination in *Stovall v. Denno,* condemned the use of a single photograph for purposes of identifying a suspect as "impermissibly suggestive" in the absence of exigent circumstances.  *See Manson v. Braithwaite,* 432 U.S. 98 (1977).

291.    On October 9, 1978, the Louisiana Supreme Court reaffirmed its holding in *State v. Breaux,* adding that searches of an individual's person or vehicle in connection with a traffic violation violated the Fourth Amendment to the U.S. Constitution, in addition to Article I, Section 5, of the Louisiana Constitution.  *See State v. Daigre,* 364 So.2d 902 (La. 1978).

292.    On September 4, 1979 the Louisiana Supreme Court clearly stated that the existence of a firearm inside of a motorist's vehicle could not provide probable cause for police to search the vehicle.  *See State v. Blanchard,* 374 So.2d 1248 (La. 1979).  In the Court's words, "[i]t is not a criminal offense to carry a weapon in a vehicle, unless the possessor happens to be a convicted felon."

293.    On December 28, 1984, the Louisiana First Circuit Court of Appeal determined that reliance upon subsection (b) of the Baton Rouge Code Sec. 13:95.3 (the ordinance), when applied to individuals who were located on the "premises", but not actually inside the establishment that served or sold alcoholic beverages, violated the individual's rights under the Fourth and Fourteenth Amendments to the United States Constitution.  *State v. Garrett,* 461 So.2d 651 (La. App. 1 Cir. 1984).

294.    On December 23, 1985, the United States District Court for the Western District of Louisiana declared La. R.S. §14:95.4(A) and Lafayette Code of Ordinances §§10-74 – 10-74 – provisions of law with provisions identical to those appearing in §13:95.3 of the Baton Rouge Code of Ordinances – as facially unconstitutional and violative of the Fourth and Fourteenth Amendments to the U.S. Constitution.  *Ringe v. Romero,* 624 F. Supp. 417 (W.D. La. 1985).

295.    Force used by a law enforcement officer while conducting an arrest or investigatory stop is evaluated under the Fourth Amendment, and the use of excessive or unnecessary force during an arrest or stop is considered an "unreasonable" seizure that violates the Fourth Amendment.  *Graham v. Conner,* 490 U.S. 386, 394 (1989).

296.    Under limited circumstances, an officer may briefly search a detained individual for weapons incident to a valid *Terry* stop.  *See Maryland v. Buie,* 494 U.S. 325, 332-334 (1990). A *Terry* weapons search must be premised on "individualized suspicion" derived from "specific and articulable facts" that a suspect "is armed and dangerous" or "may gain immediate control of weapons."  *Id.  See also, Arizona v. Johnson,* 129 S. Ct. 781, 784-786 (2009); *United States v. Rideau,* 969 F.2d 1572, 1575 (5th Cir. 1992).

297.    In 1993 the United States Court of Appeals for the Fifth Circuit stated, "[t]he Supreme Court, in *Manson v. Brathwaite,* made clear that exhibiting a single photograph for

identification purposes is impermissibly suggestive." *United States v. Sanchez,* 988 F.2d 1384, 1389 (5th Cir. 1993). The *Sanchez* decision reiterated that, in the absence of other factors providing an indicia of reliability, the identification of a suspect using a single photograph is insufficient to support the existence of probable cause. *Id.; see also, In re Extradition of Gonzales,* 52 F.Supp.2d 725 (W.D. La. 1999).

298.    In order to provide probable cause sufficient to warrant a search or arrest, the suspected activity must constitute an actual violation of the law. *See United States v. Lopez-Valdez,* 178 F.3d 282, 288 (5th Cir. 1999). If a police officer incorrectly interprets the law in seizing a person, a Fourth Amendment violation has occurred even if the officer's factual observations were correct or the officer's interpretation of the law was made in good faith. *Id.*

299.    On March 22, 2006 the United States Supreme Court issued its decision in *Georgia v. Randolph,* 547 U.S. 103 (2006), holding that one occupant may not give effective consent to search shared premises against a co-tenant who is present and refuses the search.

300.    On April 4, 2008, the United States District Court for the Western District of Louisiana determined that an officer's search for and seizure of firearms from an individual who was in lawful possession constituted a violation of the U.S. Constitution's Fourth and Fourteenth Amendment's protection against unwarranted searches and seizures sufficient to sustain a cause of action under 42 U.S.C. §1983. *Club Retro, L.L.C. v. Hilton*, 2008 U.S. Dist. LEXIS 35231, 39 (W.D. La. 2008).

301.    On May 6, 2009 the United States Court of Appeals for the Fifth Circuit upheld the district court's decision in the *Club Retro LLC* case identified above. The Fifth Circuit stated that the defendant police actors had "wisely conceded" at oral argument that the searches, seizures, and arrests made pursuant to gun possession charges "violated clearly established

constitutional rights of which a reasonable person would have known." *Club Retro LLC v. Hilton,* 568 F.3d 181, 203, n.17 (5th Cir. 2009).

### 4. The Right Against Self-Incrimination

302.    The Fifth Amendment provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself, nor deprived of life, liberty, or property without due process of law."[5]

303.    On June 13, 1966 the United States Supreme Court issued its decision in *Miranda v. Arizona,* 384 U.S. 436 (1966), "to give concrete constitutional guidelines for law enforcement agencies and courts to follow" with respect to police interrogations.  The decision imposed the requirement that "prior to any questioning, the [arrested] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, either retained or appointed."

304.    Article I, Section 13 of the Louisiana Constitution of 1974 incorporates the requirements announced in *Miranda v. Arizona* into substantive Louisiana law.  In addition to the requirements announced in *Miranda,* Section 13 also imposes a duty upon police officers to "fully advise" any person who has been arrested or detained of "the reason for his arrest or detention."

### 5. The Right to Equal Protection of the Laws

305.    Section 1 of the Fourteenth Amendment provides, in pertinent part, "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

306.    The Equal Protection Clause of the Fourteenth Amendment prohibits selective or

---

[5] The Fourteenth Amendment also establishes the right to due process of law.

discriminatory enforcement of the law. *Whren v. United States,* 517 U.S. 806, 813 (1996). Discriminatory policing may arise from an explicit classification or a facially neutral law or policy. *Id.*

307.    To assess discriminatory intent, courts consider direct and circumstantial evidence, including contemporaneous statements by decision makers, the impact of a challenged policy or action on different groups, patterns of conduct, historical background, substantive departures from normal procedure, and the sequence of events leading up to the policy or action. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265-266 (1977).  The Fourteenth Amendment does not require proof that the government actor was motivated solely by a discriminatory purpose, but only that such purpose was a contributing factor.

308.    Evidence of discriminatory effect may include evidence of similarly situated individuals who were not subjected to the enforcement action, statistical evidence, or both. *United States v. Armstrong,* 517 U.S. 456, 467 (1996).

309.    As demonstrated above, the particular contours of a Louisiana citizen's rights to: (1) seek a redress of grievances from the government, (2) to keep and bear arms, (3) to be free from unreasonable searches and seizures, (4) to be free from compelled self-incrimination, and (5) to equal protections of the law, were sufficiently defined at all times relevant to this complaint such that no reasonable law enforcement officer or attorney would have been unaware of the existence of these rights.

310.    Since the very formation of the United States government and the adoption of the Louisiana Constitution, both Federal and Louisiana courts have repeatedly reinforced the fundamental nature and high level of protection afforded by both state and federal law to the rights described above, making any infringement upon these rights by a government actor

cloaked in the color of law patently unreasonable.

## 6. Other Provisions of Law

311.   La. C.Cr.P. Art. 211(C)(1) provides:

When a peace officer has reasonable grounds to believe a person has committed an offense of driving without a valid drivers' license in his possession, the officer shall make every practical attempt based on identifying information provided by the person to confirm that the person has been issued a valid driver's license.  If the officer determines that the person has been issued a valid driver's license which is not under revocation, suspension, or cancellation, but that the license is not in his possession, the officer shall issue a written summons to the offender in accordance with the law, commanding him to appear and answer the charge.

312.   La. C.Cr.P Art. 215.1(D) states, in pertinent part:

During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity.

313.   La. C.Cr.P. Art. 218 states, in pertinent part:

A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of his arrest.

314.   La. C.Cr.P. Art. 218.1 provides:

When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest and detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel and, if indigent, his right to court-appointed counsel.

315.   La. R.S. §32:391(A) states, in pertinent part:

Whenever any person is arrested for a violation of any provision of this Chapter or any regulation of the department or secretary of the Department of Public Safety and Corrections adopted pursuant thereto, except as otherwise provided in this Section, the arresting officer shall take his name, address, the license number of his motor vehicle, and the number of his operator's license, and shall issue a summons or otherwise

notify him in writing to appear at a time and place to be specified in such summons and notice.

316.     La. R.S. §32:411.1(A)(4) states, in pertinent part:

Whenever any person who resides in this state is arrested and charged with a violation of the Louisiana Highway Regulatory Act or any municipal or parish ordinance regulating traffic in any parish or municipality such person shall be released on his own recognizance upon the signing of a promise to appear section of the traffic citation.

*See also, Hebert v. Maxwell,* 214 Fed.Appx. 451, 455 (5th Cir. 2007)(unpublished)

317.     La. R.S. §32:411.1(C)(1) provides:

When an officer or agent of the department or any police officer of the state, or any parish or municipality has reasonable grounds to believe a person has committed an offense of driving without a valid driver's license in his possession, the police officer shall make every practical attempt based on identifying information provided by the person to confirm that the person has been issued a valid driver's license.  If the police officer determines that the person has been issued a valid driver's license which is neither under revocation, suspension, or cancellation, but the license is not in his possession, the peace officer shall issue a written summons to the offender in accordance with the law, commanding him to appear and answer the charge.

318.     Under Louisiana law, a person commits the offense of "resisting arrest" only if he resists a "lawful arrest"; that is, an arrest supported by probable cause.  *Deville v. Marcantel,* 567 F.3d 156 (5th Cir. 2009), citing *State v. Lindsay,* 388 So.2d 781, 782 (La. 1980) ("It is a long-established principle in Louisiana law that a citizen has the right to resist an unlawful arrest").

**<u>Recognition of National and Regional Problems and Recommendations for Reform</u>**

319.     In the early 1960's there was growing recognition of problems relating to the United States Criminal Justice system, including police overreach in violation of individuals' constitutional rights.

320.     In response to these problems, on March 8, 1965 then-President Lyndon B. Johnson delivered an address to Congress titled "Special Message to Congress on Law

Enforcement and the Administration of Justice."[6]

321.    The President's address called for "a fair and efficient system of law enforcement" and identified, among other problems, "a great need … for improved training of policemen."

322.    President Johnson indicated that the citizens of the United States were "not prepared in our democratic system to pay for improved law enforcement by unreasonable limitations on the individual protections which ennoble our system," and quoted Justice Frankfurter for the proposition that, "[a] democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process."

323.    In order to assist the state and local governments – the entities bearing primary responsibility for law enforcement in the United States – in conducting their functions, President Johnson established the President's Commission on Law Enforcement and Administration of Justice.

324.    President Johnson charged the newly created commission with furnishing guidance on certain "important and troubling questions" to state and local law enforcement agencies, and directed the commission to create a "comprehensive report" upon which basis recommendations for improvement in law enforcement practices could be made.

325.    Specifically, President Johnson requested guidance regarding the steps that could be taken "to create greater understanding by those involved in the administration of justice at the state and local level of the efforts of federal courts to ensure protection of individual rights."

326.    The President further directed that "[t]he commission should seek understanding of the needs of those responsible for carrying out our criminal laws and the relationship to these needs of the historic protection our Nation has accorded to the accused."

---

[6] Text available at: http://www.presidency.ucsb.edu/ws/?pid=26800

327.   President Johnson also requested guidance on whether, as a whole, the law enforcement agencies within the United States were "providing adequate education and training opportunities for those who administer the criminal laws."

328.   The President further instructed the commission to "evaluate the programs and institutions now available for law enforcement officers, correctional personnel and both prosecution and defense attorneys and make recommendations on necessary additions."

329.   In developing its guidance, President Johnson directed the commission to "work closely with representatives of state and local government; with such groups as the American Bar Association, the American Law Institute, state and local bar groups and appropriate law enforcement organizations; and with universities and other institutions and individuals engaged in important work in the social sciences, mental health and related areas."

330.   The commission fulfilled the directive issued to it by President Johnson, and in 1967 issued several reports identifying problem areas and recommending actions that could be taken in order to ensure the protection of rights guaranteed to individuals by the U.S. Constitution while more effectively preventing crime.  *See* The President's Commission on Law Enforcement and the Administration of Justice Task Force Report: The Police[7]; and The President's Commission on Law Enforcement and the Administration of Justice Task Force Report: The Courts[8] (hereinafter referred to collectively as "Commission Reports").

331.   The Commission Reports made numerous observations, identified many problem areas, and recommended actions to be taken for the improvement of the American criminal justice system as operated by state and local governments.

332.   Among the observations, problems, and recommendations appearing in the

---

[7] Available at: https://www.ncjrs.gov/pdffiles1/Digitization/147374NCJRS.pdf
[8] Available at: https://www.ncjrs.gov/pdffiles1/Digitization/147397NCJRS.pdf

Commission Reports were the following:

<u>Task Force Report: The Police</u>

a. "[m]any police administrators are caught in a conflict between their desire for effective, aggressive police action and the requirements of law and propriety.  Direct confrontation of policy issues would inevitably require the police administrator to face the fact that some police practices, although considered effective, do not conform to constitutional, legislative or judicial standards.  By adopting a "let sleeping dogs lie" approach, the administrator avoids a direct confrontation and thus is able to support "effective" practices without having to decide whether they meet the requirements of the law.

b. "[t]he judiciary has played and will undoubtedly continue to play an important role in the determination of what are proper law enforcement practices.  It is a proper and traditional function of courts to listen to complaints from citizens alleging abuse of power by governmental agencies.  And through their interpretation of the Constitution, courts have defined the limitations upon the proper exercise of governmental power."

c. "[t]he prosecutor has an important responsibility in the development of appropriate law enforcement policies."

d. "[t]he obvious need is for training related to the important problems which the officer will face in the field, training which will not only inform him of the limits of his formal authority but will also inform him of the department's judgment as to what is the most desirable administrative practice to follow in the implementation of his formal authority."

e. "[i]f the present trend continues, it is not at all unlikely that current investigative practices thought by police to be proper and effective will be held to be unconstitutional or subject to increasingly specific rules.  This has occurred with respect to in-custody interrogation which is now specifically controlled by *Miranda*."

f. "[t]op police officials have been quite outspoken in registering their opposition to recent decisions of the U.S. Supreme Court.  Personnel within an agency are fully aware of the public pronouncements of their superiors.  They recognize that an order which purports to urge compliance with a recent decision is necessitated by the decision and is reluctantly issued by their superior.  Without a special effort on the part of the administrator to distinguish between his right to enter the public debate over the wisdom of court decisions and the need for compliance with court decisions, it is likely that departmental policies which simply mirror the requirements of an appellate decision will be largely disregarded.

A somewhat similar situation exists when operating personnel believe that a change in departmental policy reflects a somewhat reluctant effort on the part of the administration to appease some community group that has made a complaint against the department."

g.  "[t]he most complicated situations that arise in current practice are those in which the actions of an officer are clearly illegal or improper but are consistent with prevailing practices of a department.  Such practices are commonly found in the police agencies serving large urban areas, where the practices constitute part of the informal response which the police have developed for dealing with problems of a recurring nature.  It is, for example, common for police officers to search the interior of a vehicle without legal grounds in high crime areas.  It is similarly common for police to search gamblers or arrest known prostitutes without adequate grounds.  Since such actions are generally encouraged by superior officers, it is inconceivable that the officer would be administratively criticized or disciplined upon the filing of a complaint."

h.  "[s]ome of the problems of achieving control over the conduct of individual police officers would be simplified if there was a commitment by the police administrator to a systematic policy-formulation process.  This would require specific attention to present unarticulated policies which are clearly illegal and as a consequence would create administrative pressure to reject them or develop alternatives rather than assume the indefensible position of formally adopting illegal practices as official departmental policy.  The development of adequate policy statements would afford the individual police officers greater guidance with respect to important decisions like the use of force, and the decision to arrest or search."

i.  "[t]he success of internal controls as applied to such matters appears to be dependent upon two major factors: (1) the attitude and commitment of the head of the agency to the policies being enforced and (2) the degree to which individual officers and especially supervisory officers have a desire to conform."

j.  "… the police administrator is typically ambivalent over the responsibility he has for controlling the activities of his force in the exercise of discretionary power in dealing with crime or potential crime situations.  While he views the physical appearance of his men as his concern, he often sees the methods by which the law is enforced as involving matters which are the primary responsibility of others outside the police establishment.  This deference may, in part, be attributable to the sharing of responsibilities with other agencies – particularly the courts.  Unlike internal matters over which the police administrator has complete control, much of what the police do relating to crime and criminals is dependent for approval upon the decisions of nonpolice agencies."

k.  Strengthening of administrative control requires the creation of the same sense of personal responsibility on the part of the police administrator for the implementation of proper law enforcement policies as he presently has for implementing policies relating to internal matters.  This will require that the administrator be given the education, training, and resources necessary to fulfill the role."

l.  "[s]ystematic review of all cases [by a prosecutor] prior to their presentation in court tends to result in the adoption of standards that are informally and sometimes formally communicated to the police agency."

m.  "[w]here there is no prior review, the staff of the prosecutor in large cities often routinely presents in court cases in which the practices by the police were clearly illegal, apparently feeling no responsibility for reacting to the police practice, either in the form of a refusal to prosecute or in the form of a communication through appropriate superiors to the administration of the police force."

n.  "[i]t seems obvious that judicial decisions, whenever possible, ought to be effectively communicated to the police department whose policy was an issue.  Yet it is common in current practice for the police administrator to have to rely primarily upon the newspaper as a source of information about judicial decisions, even those involving an officer of his own department."

o.  "[i]t is very important that [police contacts with citizens on the street] be the subject of careful administrative policymaking and be subject to appropriate methods of external control."

p.  "[w]here a police policy deals with an issue such as investigative practices, which have impact on the arrest, prosecution, and conviction of offenders, it would seem desirable to involve those other criminal justice agencies which also have policymaking responsibility.  This will require, in practice, a greater interest by the prosecutor who often today conceives of his role as limited to the trial and appeal of criminal cases rather than the development of enforcement policies which anticipate many of the issues before they arise in a litigated case."

q.  "[i]n recent years the criminal law has become increasingly complex.  The appellate courts have dramatically enlarged their supervision over law enforcement agencies in opinions that reflect a heightened concern with the detail and routine of policing.  These opinions have narrowed the range of police behavior and demanded more refined judgments at the earliest stages of an investigation."

r.  "[a] necessary response, now more than ever before, is police departments and policemen that are better trained in the law and more sensitive to

current judicial pronouncements."

s.   "[m]ore generally, a need exists to anticipate trends in the law and develop operating procedures to cope with them."

t.   "… the greatest potential and need is in the use of the law-trained man to assist the police administrator in the formulation of policies relating to enforcement and to the processing of the offender."

u.   "[s]ome department or squad practices have survived over time only because of insufficient familiarity with the case law."

v.   "[e]qually important is the need to translate judicial decisions into standard operating procedures.  The recent Miranda decision, for example, requires that substantial time and skill be devoted to the preparation of orders detailing interrogation policy.  Since most prosecutors' offices do not consider it their responsibility to translate appellate decisions into operating procedures, the task falls to police agencies themselves who typically perform this considerable task without legal assistance, or abandon the effort entirely."

w.   "[t]he routine use [by a police department] of a legal advisor in this capacity would also aid in the identification of practices which are contrary to law or inefficient, or both."

### Task Force Report: The Courts

a.   "[t]he decision whether to file formal charges is a vitally important stage in the criminal process.  It provides an opportunity to screen out cases in which the accused is apparently innocent, and it is at this stage that the prosecutor must decide in cases of apparent guilt whether criminal sanctions are appropriate."

b.   "… the police decision whether to arrest must usually be made hastily, without relevant background information, and often under pressure of a pending disturbance.  There is ordinarily no opportunity for considered judgment until the time when formal charges must be filed, usually the next stage of the proceedings."

c.   "… the system for making the charge decision remains generally inadequate.  Prosecutors act without the benefit of direction or guidelines from either the legislature or higher levels of administration; their decisions are almost entirely free from judicial supervision.  Decisions are to a great degree fortuitous because they are made on inadequate information about the offense, the offender, and the alternatives available."

d.   "[j]ustice is most seriously threatened when prejudice distorts its capacity

to operate fairly and equally, whether the prejudice that blinds judgment operates purposefully, as in discrimination in jury selection or sentencing based on racial factor, or unintentionally, through substantially disadvantaging the poor."

e.   "[i]t also is evident that the treatment of the poor is often disproportionately harsh in the courts, principally because of the litigation disadvantages which they suffer.  They lack resources demanded by an adversary procedure, and there is a relatively restricted range of dispositional possibilities available for poor defendants. These problems mirror the disadvantages to which the poor are subject in almost every aspect of social and economic life."

f.   "[t]he unfairness of the disadvantages which poor persons accused of crime often suffer because they are poor is a discrete and obvious major flaw."

g.   "[w]hile government may not be required to relieve the accused of his poverty, it may properly be required to minimize the influence of poverty on its administration of justice."

h.   "[t]he decisions [the prosecutor] makes influences and often determine the disposition in all cases brought to him by the police.  The prosecutor's decisions also significantly affect the arrest practices of the police, the volume of cases in the courts, and the number of offenders referred to the correctional system.  Thus, the prosecutor is in the most favorable position to bring about needed coordination among the various law enforcement and correctional agencies in the community."

i.   "… frequently the prosecutor and his assistants are part-time officials.  Their official duties are to prosecute all criminal cases, and in most jurisdictions to represent the local government in civil cases, but when not engaged on a case, they are free to practice law privately.  This pattern of outside practice is common in the rural counties and smaller cities, although it may be found in our largest cities."

j.   "… while direct conflicts of interest between the prosecutor's public office and his private practice are clearly unlawful and, we may assume, rare, there are many indirect conflicts that almost inevitably arise."

k.   "Political considerations make some prosecutors overly sensitive to what is safe, expedient, and in conformity with law enforcement views that are popular rather than enlightened.  Political ambition does not encourage a prosecutor to take the risks that frequently inhere in reasoned judgments.  In dealing with offenders, with the police, and other law enforcement agencies, and with the courts, the prosecutor is safer sticking to the familiar and most limited connotation of his job."

l.  "[i]n most city offices, there is little apparent justification for the continuation of part-time prosecutors.  These offices are faced with very heavy workloads that require the fullest attention from men who are not distracted by other obligations and interests."

m.  "[t]he substantive criminal law is of fundamental and pervasive importance to law enforcement and the administration of justice.  In defining criminal conduct and authorizing punishment it constitutes the basic source of authority, directing and controlling the State's use of power.  It has a profound effect upon the functioning of law enforcement."

n.  "… the absence of sustained legislative consideration of criminal codes has resulted in the perpetuation of anomalies and inadequacies which have complicated the duties of police, prosecutor, and court and have hindered the attainment of a rational and just penal system."

o.  "[h]igh priority should be given by the States to comprehensive revision of their penal laws through an adequately financed project with a qualified, professional staff."

p.  "[w]hatever views one holds about the penal law, no one will question its importance in society.  This is the law on which men place their ultimate reliance for protection against all the deepest injuries that human conduct can inflict on individuals and institutions.  By the same token, penal law governs the strongest force that we permit legal agencies to bring to bear on individuals.  Its promise as an instrument of safety is matched only by its power to destroy.  If penal law is weak or ineffective, basic human interests are in jeopardy.  If it is harsh or arbitrary in its impact, it works a gross injustice on those caught within its toils.  The law that carries such responsibilities should surely be as rational and just as the law can be. Nowhere in the entire legal field is more at stake for the community or for the individual."[9]

333.   In response to the findings of the President's Commission, numerous organizations involved in the administration of criminal justice began to promulgate standards of practice that would protect individual rights in an increasingly complex system.

334.   One organization promulgating such standards was the American Bar Association, which issued standards in relation to the urban police function and the prosecutorial

---

[9] Quoting Wechsler, *The Challenge of a Model Penal Code,* 65 Harv. L. Rev. 1097, 1098 (1952).

function, among others.  *See* ABA Standards on Urban Police Function[10]; ABA Standard for Criminal Justice Prosecution Function and Defense Function[11].

335.   The principles announced in the ABA Standards include the following:

### ABA Standards on Urban Police Function

a.   "[t]he highest duties of government, and therefore the police, are to safeguard freedom, to preserve life and property, to protect the constitutional rights of citizens and maintain respect for the rule of law by proper enforcement thereof, and, thereby, to preserve democratic processes."

b.   "[g]iven the awesome authority of the police to use force and the priority that must be given to preserving life, however, government should firmly establish the principle that the police should be restricted to using the amount of force reasonably necessary in responding to any situation."

c.   "[p]olice discretion can best be structured and controlled through the process of administrative rule making by police agencies.  Police administrators should, therefore, give the highest priority to the formulation of administrative rules governing the exercise of discretion, particularly in the areas of selective enforcement, investigative techniques, and enforcement methods."

d.   Since a principal function of police is the safeguarding of democratic processes, high priority must be given for ensuring that the police are made fully accountable to their police administrator and to the public for their actions."

e.   "[g]iven the nature of the police function, police administrators should be provided with in-house police legal advisers who have the personal orientation and expertise necessary to equip them to play a substantial role in the planning and in the development and continual assessment of administrative policies and training programs."

f.   "[t]he police legal adviser should provide independent legal advice based upon a full understanding of the police function and upon legal expertise, and should anticipate as well as react to legal problems and needs."

---

[10] Available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_urbanpolice.html

[11] Available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pfunc_toc.html

g.  Among the range of tasks that may be performed by police legal advisers, priority should be given to assisting police administrators in:

- formulating the types of administrative policies that are recommended in [the ABA's] standards;

- developing law-related training programs pertinent to increased understanding of the nature of the police function, of departmental policies, of judicial trends and their rationale, and of the significant role of the police in preserving democratic processes;

- formulating legislative programs and participating in the legislative process;

- maintaining liaison with other criminal justice and municipal agencies on matters primarily relating to policy formulation and policy review, and assessing the effectiveness of various agencies in responding to common legal problems; and

- developing liaison with members of the local bar and encouraging their participation in responding to legal problems and the needs of the police agency."

h.  "… among other things, police effectiveness should be measured in accordance with the extent to which the police:

- safeguard freedom, preserve life and property, protect the constitutional rights of citizens, and maintain respect for the rule of law by proper enforcement thereof, and, thereby, preserve democratic processes;

- develop a reputation for fairness, civility, and integrity that wins the respect of all citizens, including minority or disadvantaged groups;

- use only the amount of force reasonably necessary in responding to any given situation;

- conform to rules of law and administrative rules and procedures, particularly those which specify proper standards of behavior in dealing with citizens."

<u>Prosecution Function</u>

i.  "[t]he duty of the prosecutor is to seek justice, not merely convict."

j.  "[i]t is an important function of the prosecutor to seek reform and improve the administration of criminal justice.  When inadequacies or

injustices in the substantive or procedural law come to the prosecutor's attention, he or she should stimulate efforts for remedial action."

k. "[s]ince the prosecutor bears a large share of the responsibility for determining which cases are taken into the courts, the character, quality, and efficiency of the whole system is shaped in great measure by the manner in which the prosecutor exercises his or her broad discretionary matters."

l. "[a]s the public official in constant contact with the day-to-day administration of criminal justice, the prosecutor occupies a unique position to influence the improvement of the law."

m. "[t]he participation of a responsible public officer in the decision to prosecute and in the prosecution of the charge gives greater assurance that the rights of the accused will be respected."

n. "[i]n all states, there should be coordination of the prosecution policies of local prosecution offices to improve the administration of justice and assure the maximum practicable uniformity in the enforcement of the criminal law throughout the state."

o. "[e]ach prosecutor's office should develop a statement of (i) general policies to guide the exercise of prosecutorial discretion and (ii) procedures of the office.   The objectives of these policies as to discretion and procedures should be to achieve a fair, efficient, and effective enforcement of the criminal law."

p. "[t]he articulation of policies and procedures should be preserved in a handbook or manual that also reflects current rules, statutes, and judicial decisions."

q. "[t]he prosecutor should provide legal advice to the police concerning police functions and duties in criminal matters."

r. "[t]he prosecutor should cooperate with police in providing the services of the prosecutor's staff to aid in training police in the performance of their function in accordance with the law."

s. "[t]he necessity to develop methods of guidance to keep the police apprised of the meaning of new provisions of law or court decisions that affect their duties and powers is apparent."

t. "[m]any of the problems that have plagued the police – and indeed the public – in recent years can be traced to mistakes of the police, often entirely inadvertent, in carrying out such duties as securing warrants, making arrests, executing warrants, interrogating persons in custody, and conducting lineups for identification purposes.   It is imperative

that every police official, especially the police officer on the beat, be trained carefully as to the limits of police authority and the applicability of exclusionary rules.  This training cannot be casual or occasional but must be carefully organized and presented.  Few lawyers are as well qualified to perform this function as is the prosecutor, who lives with the judicial response to police action on a day-to-day basis."

u. "[t]he decision to institute criminal proceedings should be initially and primarily the responsibility of the prosecutor… The prosecutor should establish standards and procedures for evaluating complaints to determine whether criminal proceedings should be instituted."

v. "… a prosecutor should not institute, or cause to be instituted, or permit the continued pendency of criminal charges when the prosecutor knows that the charges are not supported by probable cause.  A prosecutor should not institute, cause to be instituted, or permit the continued pendency of criminal charges in the absence of sufficient admissible evidence to support a conviction."

w. "[t]he charging decision is the heart of the prosecution function.  The broad discretion given to a prosecutor in deciding whether to bring charges and in choosing the particular charges to be brought requires that the greatest effort be made to see that this power is used fairly and uniformly."

336.    The ABA Standards described have been characterized by the United States Supreme Court as reflecting "prevailing norms of practice" and "guides to determining what is reasonable."  *See Strickland v. Washington,* 466 U.S. 668, 688 (1984).[12]

337.    The National District Attorney's Association has also issued national prosecution standards in order to provide guidance to criminal prosecutors.[13]

338.    The National Prosecution Standards issued by  the National District Attorneys' Association include the following observations and recommendations:

a. "[a] prosecutor should seek to reform criminal laws whenever it is appropriate and necessary to do so."

---

[12] *See also,* Marcus, M., "The Making of the ABA Criminal Justice Standards – Forty Years of Excellence," *Criminal Justice,* vol. 23, no. 4 (2009) (describing the overwhelming and uniform acceptance of the standards in the American criminal justice system).
[13] Available at: http://www.ndaa.org/pdf/NDAA%20NPS%203rd%20Ed.%20w%20Revised%20Commentary.pdf

b. "[t]he chief prosecutor should encourage, cooperate with, and, where possible, assist in law enforcement training."

c. "[t]he chief prosecutor should assist in the on-going training of law enforcement officers by conducting periodic classes, discussions, or seminars to acquaint law enforcement agencies within their jurisdiction with recent court decisions, legislation, and changes in the rules of criminal procedure."

d. "[t]he chief prosecutor should recognize and emphasize the importance of the initial charging decision and should provide appropriate training and guidance to prosecutors regarding the exercise of their discretion."

e. "[i]n the event that the prosecutor learns of previously unknown information that could affect a screening decision previously made, the prosecutor should reevaluate that earlier decision in light of the new information."

f. "[i]t is the ultimate responsibility of the prosecutor's office to determine which criminal charges should be prosecuted and against whom."

g. "[t]he prosecutor should only file those charges that are consistent with the interests of justice."

339. In addition to the standards issued by the organizations discussed above, the Louisiana Supreme Court has enacted the Louisiana Rules of Professional Conduct, provisions of substantive law applicable to members of the legal profession within the State of Louisiana which are designed to protect the integrity of the criminal justice system, and legal proceedings in general.

340. The Rules of Professional Conduct cited below were enacted by the Louisiana Supreme court in 2004.

341. Rule 1.7 of the Louisiana Rules of Professional Conduct provides, in pertinent part:

A lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or

more clients will be materially limited by the lawyer's responsibility to another client.

342.    As relevant here, paragraph (b) of Rule 1.7 provides that a lawyer may represent a client in a situation where there is a concurrent conflict of interest if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; and (2) each affected client gives informed consent, confirmed in writing.

343.    The acknowledged consequences of failing to abide by Rule 1.7's provisions are "additional cost, embarrassment and recrimination."

344.    Rule 1.13 of the Louisiana Rules of Professional Conduct provides, in pertinent part:

(a) A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents.

(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and that it is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization.  Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law.

(f) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer knows or reasonably should know that the organization's interests are adverse to those of the constituents with whom the lawyer is dealing.

(g) A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7.  If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the

organization other than the individual who is to be represented, or by the shareholders.

345.     The comments to Rule 1.13 further provide:

In determining how to proceed under paragraph (b), the lawyer should give due consideration to the seriousness of the violation and its consequences, the responsibility of the organization and the apparent motivation of the person involved, the policies of the organization regarding such matters, and any other relevant considerations. Ordinarily, referral to a higher authority would be necessary.  In some circumstances, however, it may be appropriate for the lawyer to ask the constituent to reconsider the matter; for example, if the circumstances involve a constituent's innocent misunderstanding of the law and subsequent acceptance of the attorney's advice, the lawyer may reasonably conclude that the best interest of the organization does not require the matter to be referred to a higher authority.  If a constituent persists in conduct contrary to the lawyer's advice, it will be necessary for the lawyer to take steps to have the matter reviewed by a higher authority in the organization.  If the matter is of sufficient seriousness and importance or urgency to the organization, referral to higher authority in the organization may be necessary even if the attorney has not consulted with the constituent.

346.     The duties defined by Rule 1.13 are applicable to attorneys employed by governmental organizations, such as the City.

347.     The comments to Rule 1.13 also state:

Moreover, in a matter involving the conduct of government officials, a government lawyer may have authority under applicable law to question such conduct more extensively than that of a lawyer for a private organization in similar circumstances.  Thus, when the client is a governmental organization, a different balance may be appropriate between maintaining confidentiality and assuring that the wrongful act is prevented or rectified, for public business is involved.

348.     The comments to Rule 1.13 provide an example of a situation in which a lawyer representing an organization may "very well" have a conflict of interest.  It is where a lawyer representing a corporation in a criminal or administrative environmental matter also represents employees of the organization who may have engaged in a potentially unlawful toxic waste discharge.

349.    The annotations to Rule 1.13 further clarify the duties imposed upon lawyers with organizational clients such as a municipality:

> Paragraphs (b), (c) and (d) address the lawyer's obligations when the lawyer learns that an organizational constituent is acting in an unlawful manner that will likely cause substantial harm to the organizational client. Paragraph (b) counsels, consistent with the core principles set out in paragraph (a), that the lawyer in this situation must act to protect the interests of the organization rather than those of its constituents.

350.    Rule 3.1 of the Louisiana Rules of Professional Conduct provides, in pertinent part:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

351.    The annotations to Rule 3.1 indicate that the rule arises from the premise that "[l]awyers owe duties not only to their clients (such as competence, diligence, loyalty and confidentiality), but also to the legal system."

352.    Rule 3.3 of the Louisiana Rules of Professional Conduct provides, in pertinent part:

> (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

353.    The comments to Rule 3.3 note that "[a] lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities."

354.    Rule 3.8 of the Louisiana Rules of Professional Conduct provides, in pertinent part:

> The prosecutor in a criminal case shall: (a) refrain from prosecuting a

charge that the prosecutor knows is not supported by probable cause.

355.    Additionally, the annotations to Rule 3.8 explicitly reference the standards announced in the ABA and NDAA standards, referenced above, as applicable to Louisiana prosecutors:

> Unlike other litigating lawyers, prosecutors are not merely advocates and officers of the court, but also administrators of justice who have a duty to "seek justice, [and] not merely to convict." *See* ABA Stds. Relating to the Admin of Crim. Justice – The Prosec. Function std. 3-1.2 (3d ed. 1992). For other standards addressing the special responsibilities of prosecutors, *see* ABA Standards on Prosecutorial Investigations (2008); National Dist. Attorneys' Assoc. Prosec. Stds. (2d ed. 1991).

356.    In the late 1990's the United States Department of Justice ("DOJ") opened an investigation into certain practices of the New Orleans Police Department ("NOPD").

357.    In the course of its investigation, the DOJ found that many New Orleans Police Officers could not articulate proper legal standards for stops, searches or seizures, and recommended that the City of New Orleans provide annual in-service training on this "critical topic."

358.    In May of 2010, the Mayor of New Orleans invited another investigation of the city's police department by the DOJ's Civil Rights Division so that recommendations could be made to effect "a complete transformation" of the police department that was "necessary and essential to ensure safety for the citizens of New Orleans."

359.    On March 16, 2011, the DOJ issued a report detailing the findings from its investigation of the NOPD.

360.    Among other things, the DOJ found that:

- officers of the NOPD could not articulate proper legal standards for stops, searches or seizures, just as they had been unable to during the DOJ's previous investigation ten years earlier;

- officers of the NOPD routinely used unnecessary and unreasonable force in

violation of the U.S. Constitution;

- officers of the NOPD engaged in a pattern of stops, searches, and arrests that violate the Fourth Amendment;

- NOPD engaged in a pattern or practice of discriminatory policing in violation of constitutional and statutory law

- NOPD's failure to provide sufficient guidance, training, and support to its officers, as well as its failure to implement systems to ensure officers were wielding their authority effectively and safely, had created an environment that permitted and promoted constitutional harm;

- there existed "direct links" between NOPD's inadequate training of its officers and serious, systemic problems in use of force; stops, searches, and arrests; supervision; interacting with and building partnerships with members of the community; and racial, ethnic, and gender bias in policing;

- NOPD's system for receiving, investigating, and resolving misconduct complaints did not function as an effective accountability measure;

- NOPD's custodial interrogation practices reflected many of the same problems found throughout NOPD: inadequate policies, poor or non-existent training, and weak supervision and accountability

361.    Most, if not all of the deficiencies identified by the DOJ in its investigation of the NOPD have, at all times relevant to this complaint, also been present within the Baton Rouge Police Department.

362.    In response to the DOJ's investigative report, the City of New Orleans entered into the most expansive Consent Decree then in existence with the U.S. Department of Justice, reflecting a shared commitment by those agencies to effective, constitutional, and professional law enforcement.

363.    Despite the presence of the same systemic flaws in the Baton Rouge criminal justice system as existed in New Orleans, the City and its actors took no measures to alleviate the inevitable effects of the BRPD's unconstitutional policing.

364.    The City and its actors ignored the recommendations of President Johnson's

Commission, the American Bar Association, the National District Attorney's Association, and the Department of Justice, in addition to the requirements of the Louisiana Rules of Professional Conduct, not only permitting, but tacitly condoning the unconstitutional police practices routinely used by officers of the BRPD.

## The Existence and Enforcement of Unconstitutional Laws in Baton Rouge

365.     The existence of unconstitutional and invalid laws in the legal provisions enforced by the Baton Rouge Police Department and prosecuted by the Baton Rouge City Prosecutor's Office has been common knowledge both within the criminal justice system and in the community at large since long before the events involving Taylor described herein.

366.     On March 14, 1991, The Baton Rouge Advocate published an article entitled "Antiquated Statutes Clutter Law Books," which discussed the existence of outdated and legally unenforceable provisions of law which had never been repealed.

367.     The article quoted one Louisiana lawmaker as stating that "[p]ortions of Louisiana's criminal code are outdated and should be purged from the law books."

368.     The East Baton Rouge District Attorney was also quoted within the article as stating that situations regarding outdated laws "seldom, if ever arise."

369.     The article goes on to state that "[t]he chance of someone actually being prosecuted for violating one of the state's outdated statutes is negligible."

370.     The article acknowledged that, "statutes, even those more recently adopted by the Legislature, can become legally outdated and rendered unenforceable by state and federal courts that declare them wholly or partially unconstitutional."

371.     One cited example of a law still in existence that had been declared unconstitutional was Louisiana's criminal defamation statute.

372.    The article noted that the criminal defamation statute "has been invalidated by numerous court decisions that said it abridged First Amendment rights… It is unconstitutional in that it punishes public expression about public officials as well as expressions about deceased officials and their job performance, according to the rulings."

373.    The 1991 article also recognized that the Louisiana Legislature has no procedure in place for "purging antiquated and unenforceable laws from the books."

374.    Another Louisiana lawmaker was quoted as stating, "Once it's passed and gets on the books, unless someone looks at it closely, then it falls through the cracks."

375.    The 1991 article noted that the last organized effort by the Louisiana Legislature to eliminate antiquated "and occasionally offensive" laws from Louisiana's Criminal Statutes had occurred more than ten years ago.

376.    Among the criminal statutes that were done away with at that time was the State's miscegenation statute, which criminalized interracial relationships and marriage.

377.    Another Louisiana lawmaker was quoted as stating his surprise "at the amount of garbage that was still on the books."

378.    Yet another lawmaker stated that the outdated laws were "unenforceable" and "meaningless" and that, as a result, "[t]here's no harm in these things being there."

379.    Among the outdated and unenforceable criminal laws still "on the books" at the time of the events described in this complaint, up to and including the present, are the following:

     a.    Baton Rouge Code of Ordinances §13:95.3 (Possession of Weapons Where Alcoholic Beverages Are Sold and/or Consumed), *see State v. Blanchard,* 374 So.2d 1248 (La. 1979) ("[i]t is not a criminal offense to carry a weapon in a vehicle, unless the possessor happens to be a convicted felon"); *State v. Garrett,* 461 So.2d 651 (La. App. 1 Cir. 1984) (holding search performed pursuant to §13:95.3 violated the Fourth Amendment); *Ringe v. Romero,* 624 F.Supp. 417 (W.D. 1985) (declaring similar Lafayette ordinance and state statute

unconstitutional on their face); La. R.S. 32:292.1 ("a person who lawfully possesses a firearm may transport or store such firearm in a locked, privately-owned motor vehicle in any parking lot, parking garage, or other designated parking area"); *Taylor v. City of Baton Rouge,* 2014 U.S. Dist. LEXIS 117919 (M.D. La. 2014) (permanently enjoining the enforcement of §13:95.3 and prosecutions for its violation);

b.   Baton Rouge Code of Ordinances §13:106.1 (Profanity), *see Cox v. Louisiana,* 379 U.S. 536 (1964) (striking down Louisiana's "breach of the peace statute" as violative of the First Amendment); *Gooding v. Wilson,* 405 U.S. 518 (1972) (striking down similar Georgia ordinance as violative of the First Amendment); *Lewis v. New Orleans,* 415 U.S. 130 (1973) (same); *City of Baton Rouge v. Ewing,* 308 So.2d 776 (La. 1975) (declaring previous version of ordinance unconstitutional because it was not limited to the prohibition of "fighting words"); *United States v. Hicks,* 980 F.2d 963 (5th Cir. 1992) ("[t]he Supreme Court has long held that, as a general rule, simple profanity or vulgarity – not rising to the level of 'fighting words' or obscenity – is constitutionally protected speech");

c.   La. R.S. §14:47 (Defamation), *see Garrison v. Louisiana,* 379 U.S. 64 (1964) ("the Louisiana statute … incorporates constitutionally invalid standards in the context of criticism of the official conduct of public officials"); *State v. Snyder,* 277 So.2d 660 (La. 1973) ("[i]n unequivocal language the United States Supreme Court in Garrison v. Louisiana declared our statutory scheme for control of defamatory expression unconstitutional"); *State v. Defley,* 395 So.2d 759 (La. 1981); *see also, Simmons v. City of Mamou,* 2012 U.S. Dist. LEXIS 36081 (W.D. La. 2012); *McLin v. Ard,* 2014 U.S. Dist. LEXIS 17876 (M.D. La. 2014);

d.   La. R.S. §14:89 (Crime Against Nature), *see Lawrence v. Texas,* 539 U.S. 558 (2003) (declaring the sodomy laws then existent in 13 states, including Louisiana to be unconstitutional); *Louisiana Electorate of Gays and Lesbians, Inc. v. Connick,* 902 So.2d 1090 (La. App. 5 Cir. 2005), *writ denied,* 2005 La. LEXIS 2677 (La. 2005) (upholding trial court's permanent injunction prohibiting prosecution for sodomy under §14:89 pursuant to *Lawrence v. Taylor,* and reforming the statute to prohibit only prostitution and bestiality);

e.   La. R.S. 14:95.4 (Consent to Search; Alcoholic Beverage Outlet), *see Ringe v. Romero,* 624 F. Supp. 417 (W.D. La. 1985) (declaring the statute to be unconstitutional on its face); *see also, State v. Garrett,* 461 So.2d 651 (La. App. 1 Cir. 1984) (holding search performed pursuant to identical provision of municipal ordinance violated the Fourth Amendment).

380.    The provisions of law cited above do not comprise the entirety of the unenforceable provisions of law which remain "on the books."

381.    Despite the fact that numerous and varied courts have declared the foregoing provisions of law to be in violation of rights guaranteed to citizens of Louisiana and the United States – a fact known to its City and its actors – the Baton Rouge Police Department has at all times relevant to this complaint, up to and including the present time, had a policy of enforcing all laws "on the books," including those found to be unenforceable by courts of competent jurisdiction.

<u>Baton Rouge Code of Ordinances §13:95.3</u>

382.    In April of 2010, various members of federal, state and local law enforcement authorities, including the Baton Rouge Chief of Police, formed a task force to investigate several high-profile murders that remained unsolved in the city of Baton Rouge.

383.    The task force's efforts were successful, and on October 29, 2010, law enforcement officials, including the Baton Rouge Chief of Police, announced plans to create a permanent unit dedicated to the prevention of violent crime within the City of Baton Rouge and the Parish of East Baton Rouge.

384.    In announcing the creation of the permanent unit, named the "East Baton Rouge Violent Crimes Unit," the various law enforcement officials also stated various goals they hoped to achieve by the year 2014.

385.    Among the stated goals of the East Baton Rouge Violent Crimes Unit were to reduce the number of murders and violent crimes occurring in East Baton Rouge Parish by 15%, to increase "clearance rates" for violent crimes by 20%, and to "aggressively focus on removing firearms from the hands of violent offenders."

386.    While the Violent Crimes Unit included members of several agencies working cooperatively, each agency was also charged with working independently within his or her own agency to further the goals of the Unit.

387.    Within a discrete agency, such as the Baton Rouge Police Department, the agency's head was charged with conducting bi-weekly meetings with their division commanders to discuss crime trends, enforcement activities, and crime planning solutions – including the use of crime mapping, graphs, and statistical analysis.

388.    The information described in the preceding paragraph was to be disseminated to law enforcement personnel so that they might deploy "proactive enforcement strategies" that furthered the Unit's stated goals.

389.    Upon information and belief, the Baton Rouge Chief of Police made attainment of the goals set by the Violent Crimes Unit a priority among officers under his command.

390.    To attain the Violent Crimes Unit's goals, the Baton Rouge Police department instituted, or, in the alternative, continued a policy of enforcing any laws that "were on the books," even if the law had been previously rendered unenforceable as a result of judicial decree.

391.    One such law the officers were instructed to utilize was §13:95.3 of the Baton Rouge Code of Ordinances.

392.    In accordance with departmental policy, Officers of the Baton Rouge Police Department thus set out to seize lawfully held firearms in furtherance of the Unit's stated goals.

393.    For example, as reported in the Baton Rouge Advocate's Police and Fire Briefs, on December 29, 2010, members of the Baton Rouge Police Department used §13:95.3 to arrest an individual and seize firearms located inside his vehicle because the vehicle was located in the parking lot of an establishment that sold alcohol.

394.   To further confront the issue of gun violence within the Parish of East Baton Rouge, officials of the City created the "Baton Rouge Area Violence Elimination" initiative, referred to as "BRAVE".

395.   One of the goals of the BRAVE initiative was to remove as many guns as possible from high crime areas.

396.   At its inception, the BRAVE initiative was to apply only within a specified area of the City of Baton Rouge – the area bearing zip code 70805.

397.   The enforcement of §13:95.3 by officers patrolling the 70805 zip code was specifically encouraged by the administrators and supervisors of the Baton Rouge Police Department so that they could cite seizure of the firearms as proof of the BRAVE initiative's success.

398.   The City of Baton Rouge sought and received federal funding to implement its BRAVE initiative in the 70805 zip code.

399.   As part of the BRAVE initiative, the Baton Rouge Police Department instituted, or in the alternative, continued a policy of violating the rights of individuals located within the designated area through the use of unnecessary force, the performance of unlawful searches and seizures, the enforcement of invalid laws, inducing non-voluntary confessions, and the like.

400.   Upon information and belief, the efforts of the BRPD, described above, resulted only in the arrests of African-American individuals within the 70805 zip code.

401.   During the times relevant to this complaint, the Baton Rouge City Prosecutor's Office had a policy of prosecuting all charges referred to it by the Baton Rouge Police Department, even if the charges were brought pursuant to unenforceable provisions of law, or the evidence supporting the charge had been obtained illegally and was thus inadmissible.

402.    On July 7, 2014, a local media outlet inquired whether the Baton Rouge Police Department's continued utilization of §13:95.3 was legal and complied with constitutional requirements.

403.    In response to the question regarding the Baton Rouge Police Department's enforcement of §13:95.3, a spokesman for the department stated, "[t]he officers acted in good faith when this ordinance was enforced and we will continue to use it as long as it is a law that is on the books."

404.    The spokesman's statement was consistent with the policy, procedure, practice, or custom of the Baton Rouge Police Department to enforce any and all laws that were "on the books" without regard to the legality or enforceability of the provisions.

405.    During the times relevant to this complaint, the Baton Rouge Police Department also had in place a policy, practice or custom of taking no action, performing no investigation, and imposing no discipline when it was notified of unlawful actions taken by members of the department which were consistent with departmental policy.

406.    On August 25, 2014, the City and its actors were permanently enjoined from continued enforcement of §13:95.3 in order issued by the Hon. Brian A. Jackson, Chief Judge of the U.S. District Court for the Middle District of Louisiana.

407.    In response, Chief Dabadie issued the following statement to media outlets reporting on the injunction, "[a]t the time of the arrest of Ernest Taylor, the ordinance was on the books … even though the judge has determined the ordinance to be unconstitutional, we have already had 13:95.3 repealed."

408.    Contrary to Dabadie's representation, §13:95.3 has never been repealed, and remains "on the books" in Baton Rouge's Code of Municipal Ordinances.

409.    Upon information and belief, no efforts have been made to instruct officers of the Baton Rouge Police Department that they should no longer enforce §13:95.3.

410.    In addition to failing to communicate the unenforceability of §13:95.3 to officers of the Baton Rouge Police Department, Dabadie has continued to maintain a policy by which all laws appearing "on the books" are to be enforced by officers within his department.

<u>La. R.S. §14:47</u>

411.    In approximately August of 2012, the Livingston Parish Council and Livingston Parish Sheriff received media attention resulting from their use of Louisiana's unenforceable criminal defamation statute, La. R.S. §14:47, to obtain a search warrant in connection with comments posted about certain council members on a social networking website.

412.    Upon receiving the charges from the Sheriff, the Livingston Parish Attorney declined to prosecute the charges.

413.    In an order dismissing civil rights claims brought by the individual made subject to the unlawful search, the Honorable Judge Shelley Dick of the Middle District of Louisiana stated, "[t]he Court is mindful that the Defendant movants seemingly get a 'pass' because the justice system worked as it should, in that the Plaintiff was not detained, the charges, which were based on an unconstitutional statute, were ultimately dismissed, and there is no allegation that the Plaintiff incurred costs to defend the questionable charges." *McLin v. Ard,* 2013 U.S. Dist. LEXIS 154600, *15 (M.D. La. Oct. 28, 2013).

414.    Despite the fact that Louisiana's criminal defamation statute had repeatedly been held to be unconstitutional, the fact that extensive media coverage had been given to the unlawful use of the statute by officials in neighboring Livingston Parish, and despite a ruling from the federal district court sitting in Baton Rouge, the BRPD continued to use the provision to

conduct illegal searches of individuals who had levied criticism against members of the BRPD, as set forth below.

415.    In May of 2014, the Baton Rouge Police Department began investigating a photograph received by the Mayor's office which showed two Baton Rouge Police Department Officers, one of whom appeared to be sleeping.

416.    The focus of the investigation was not on the officer who appeared to be sleeping, but rather upon the individual who had furnished the information to the Mayor's office.

417.    In conjunction with the investigation, officers from the Baton Rouge Police Department sought and obtained a warrant from the Nineteenth Judicial District Court of Louisiana based upon the officers' representation that there existed probable cause to believe the individual supplying the information had violated La. R.S. §14:47.

418.    The news media became aware of the Baton Rouge Police Department's unlawful obtainment and execution of the warrant in November of 2014 and multiple news stories were published on the topic.

419.    In an article published November 12, 2014, one news media outlet indicated that a spokesman for the Baton Rouge Police Department "didn't deny the charge was unconstitutional, but emphasized: 'it's still on the books.'"

420.    The spokesman also indicated that the Baton Rouge Police Department "commonly uses the threat of defamation charges as an investigative tool."

421.    The cited justification for the continued utilization of the unenforceable statute by the Baton Rouge Police Department was "the seriousness in which BRPD takes complaints against officers."

422.    Another article detailing the actions of the police department cited a different

spokesman for the Baton Rouge Police Department as stating that as long as legislators didn't repeal the law, the department would continue to enforce it as they would any other state law.

423.    The spokesman was quoted as stating, "[i]f it's on the books, we're going to enforce the law."[14]

<u>La. R.S. §14:89</u>

424.    Shortly after the United States Supreme Court issued its decision in *Lawrence v. Texas,* invalidating Louisiana's prohibition on uncompensated consensual sodomy between adults, then Louisiana Attorney General Richard Ieyoub issued a statement indicating that the invalid law should no longer be enforced.

425.    Despite this fact, the Baton Rouge Police Department conducted undercover investigations designed to enforce La. R.S. §14:89 after the United States Supreme Court had declared the statute to authorize an unconstitutional deprivation of rights in violation of the U.S. Constitution.

426.    For instance, on January 19, 2007, the Baton Rouge Police Department issued a press release identifying an undercover investigation operation which resulted in the arrests of five individuals under La. R.S. §14:89.

427.    In a news article published on October 2, 2007, a spokesman for the Baton Rouge Police Department indicated that BRPD conducted undercover sting operations for the purpose of enforcing La. R.S. 14:89 "a couple times a year."

428.    The spokesman also stated that the majority of the individuals identified by these sting operations were arrested, booked into East Baton Rouge Parish Prison, and charged with either obscenity or attempted crimes against nature.

---

[14] This statement was made approximately 2 ½ months after §13:95.3 had been declared unconstitutional, and the Baton Rouge Police Department had been permanently enjoined from its continued use in connection with Taylor's federal lawsuit.

429.    Ignoring the judicial decisions which had declared La. R.S. §14:89 unconstitutional and unenforceable, the article also states, "[i]f two consenting adults engage in sexual activity other than intercourse, they are committing a crime against nature.  Crimes against nature include all acts of sodomy and oral sex."

430.    The Baton Rouge Police Department issued another press release on May 23, 2008 identifying the arrest of three additional individuals resulting from another undercover investigation designed to enforce the unconstitutional statute.

431.    Prior to August, 2013, the East Baton Rouge Sheriff's Department shared the Baton Rouge Police Department's policy of enforcing all laws then in existence, even those known to be unenforceable as a result of judicial decisions.

432.    Pursuant to this policy, the East Baton Rouge Sheriff's Department also conducted multiple undercover operations between 2011 and 2013 designed to enforce Louisiana's unconstitutional sodomy law, La. R.S. §14:89.

433.    As a violation of La. R.S. §14:89 is a felony, removing its prosecution from the jurisdiction of Baton Rouge City Court, the prosecution of alleged violations are not handled by the Parish Attorney's Office or the City Prosecutor's Office.

434.    Rather, the prosecution of individuals charged with violating La. R.S. §14:89 is referred to the East Baton Rouge Parish District Attorney, who is empowered to institute criminal proceedings in the 19th Judicial District Court of Louisiana.

435.    Upon information and belief, at all times relevant to this complaint the East Baton Rouge District Attorney's Office had a system in place whereby the constitutionality and enforceability of the provisions of law underlying the charges recommended to them by enforcement officers were evaluated prior to instituting formal proceedings.

Complaint and Request for Jury Trial                                                      78

436.    Upon information and belief, at all times relevant to this complaint, the East Baton Rouge District Attorney's Office also had a system whereby the evidence underlying the charges referred by enforcement agencies are evaluated prior to the institution of formal proceedings to determine whether it would be admissible at trial, and whether there existed sufficient admissible evidence to justify bringing formal charges.

437.    Upon information and belief, during the times relevant to this complaint, the only law enforcement officers within the state of Louisiana who continued to enforce §14:89 were members of the East Baton Rouge Parish Sheriff's Department and the Baton Rouge Police Department.

438.    In contrast to the East Baton Rouge District Attorney's Office, neither the East Baton Rouge Parish Attorney's Office nor the Baton Rouge City Prosecutor's Office has any system or procedure such as that utilized by the East Baton Rouge Parish District Attorney, as described in the preceding paragraphs.

439.    As a result of the systems and procedures in place at the East Baton Rouge Parish District Attorney's Office, no formal charges or criminal proceedings were filed against individuals subjected to unlawful arrests by the East Baton Rouge Parish Sheriff's Department pursuant to La. R.S. §14:89.

440.    In July of 2013, the story of the East Baton Rouge Sheriff Department's unconstitutional enforcement of La. R.S. §14:89 made local and national news, drawing attention to the practice of those charged with enforcing the laws in Baton Rouge to ignore judicial precedent limiting the scope of their authority.

441.    Similar media attention had been directed to the Raleigh, North Carolina Police Department's enforcement of that state's unconstitutional sodomy law in 2008.  In that instance,

the Police Chief indicated that enforcement was appropriate because "[t]he law is still on the books." The district attorney in that case also declined to pursue formal charges under the invalid provision due to the Supreme Court's decision in *Lawrence v. Texas*.

442. In response to the media attention, a spokesman for the East Baton Rouge Parish Sheriff echoed the same policy in use by the Baton Rouge Police Department, stating that "[La. R.S. §14:89] is a law that is currently on the Louisiana books, and the sheriff is charged with enforcing the laws passed by the Louisiana Legislature."

443. The spokesman also indicated that enforcement of La. R.S. §14:89, while unconstitutional, was appropriate, because the practices for which the individuals had been arrested were "unseemly."

444. Another spokesman for the Sheriff's Department indicated that "when a deputy [sheriff] is hired and trained, they are given the [Louisiana Criminal Code] as the laws to enforce."

445. Upon information and belief, as a result of the negative media attention surrounding the Sheriff Department's unlawful enforcement of La. R.S. 14:89, the East Baton District Attorney's Office informed the Sheriff that the law should no longer be enforced.

446. After consultation with the East Baton Rouge District Attorney, the Sheriff's Office discontinued its policy of enforcing all laws that remain "on the books," and took measures to ensure that the rights of individuals present in East Baton Rouge Parish would not continue to be infringed through the enforcement of invalid laws.

447. Among the steps taken by the Sheriff to remedy the problem of enforcing invalid provisions of law were the following:

- admitting that the unlawful arrests made by members of his department had been a mistake, and apologizing to the individuals

arrested, and the community at large for the actions of his deputies;

- publicly committing to learn from the mistakes of his department and to undertake measures to ensure that such unlawful arrests were not made in the future;

- meeting with the East Baton Rouge Parish District Attorney to discuss ways of improving communication between the two agencies to ensure that arrests were not made on the basis of unenforceable laws;

- approaching the East Baton Rouge District Attorney, Louisiana legislators, and the Louisiana Sheriff's Association about having unconstitutional and unenforceable provisions removed from the Louisiana Criminal Code;

- communicating to his deputies and other employees of his office that they were no longer to enforce La. R.S. 14:89;

- undertaking to evaluate the procedures under which individuals had been unlawfully arrested and committing to make changes to ensure better supervision, training and guidance; and

- meeting with public interest groups concerned about the unlawful actions taken by the Sheriff's Department in order to "further the dialogue."

448.    In response to the media attention surrounding the Sheriff Department's unlawful arrests pursuant to La. R.S. 14:89, one Louisiana legislator drafted a bill that would remove the unconstitutional provision from the Louisiana Criminal Code.

449.    In response to the proposed legislation to repeal La. R.S. §14:89, members of the Baton Rouge Metropolitan Council drafted a resolution that would recommend removal of the unconstitutional ordinance as proposed by the state legislation.

450.    The Baton Rouge Metro Council commonly votes on resolutions supporting or opposing bills in the Louisiana legislature.

451.    The criticism levied at the Sheriff's Department for its unlawful enforcement of La. R.S. §14:89 prompted one reporter to remark, "[r]emoving the law from the books would make no difference at this stage anyway.  Now that [the Sheriff] has been pilloried from coast to

coast, nobody else would dare make an arrest under it."

452. A public hearing on the resolution before the Metro Council was held on or about February 13, 2014.

453. The resolution to recommend repeal of the unconstitutional law failed by a vote of 3 to 7.

454. A member of the public in attendance at the metro council's meeting was quoted as saying, "[t]his sends the wrong message to the city about the importance of following the law…"

455. As with the Metro Council's resolution recommending repeal of La. R.S. §14:89, the state bill proposing the unlawful statute's repeal ultimately failed in the Louisiana Legislature by a vote of 27 to 67.

456. Despite the attention given to the unconstitutionality of La. R.S. §14:89 in 2013 and 2014, the Baton Rouge Police Department continued to enforce the statute pursuant to its policy of enforcing all laws that are "on the books."

457. On February 12, 2015, pursuant to the Baton Rouge Police Department's policy of enforcing invalid laws, officers from the department arrested two individuals for violating La. R.S. §14:89.

458. As a result of the Baton Rouge Police Department's unlawful enforcement of La. R.S. §14:89, the City of Baton Rouge received more negative media attention for its staunch refusal to incorporate binding judicial decisions circumscribing the authority wielded by police into its law enforcement policies.

<u>The City of Baton Rouge's History of Discrimination</u>

459. Baton Rouge has a long history of resisting the rule of law so that it might engage

in activities that actively discriminate against minority individuals.

460.    In 1953, Baton Rouge was the site of the first bus boycott by African Americans of the civil rights movement.   The boycott lasted eight days, and was staged to protest the segregation policies of the City's bus system.

461.    The Baton Rouge bus boycott would later serve as a model for the famous Montgomery Bus Boycott of 1955-1956.

462.    On March 28, 1960, seven students from Southern University were arrested for sitting at the segregated lunch counter in the Kress Building of downtown Baton Rouge.   The following day, nine more students were arrested for sitting-in at the Greyhound bus terminal.

463.    The students were prosecuted and convicted in the 19th Judicial District Court for the State of Louisiana  of the crime of disturbing the peace, convictions which were upheld by the Louisiana Supreme Court.

464.    In *Garner v. Louisiana,* 368 U.S. 157 (1961) a unanimous Supreme Court reversed the convictions of the students, finding that "the police who arrested the petitioners were left with nothing to support their actions except their own opinions that it was a breach of the peace for the petitioners to sit peacefully in a place where custom decreed they should not sit."

465.    In December, 1961, Mr. B. Elton Cox, a black civil rights leader, was leading a group of approximately 2000 students in peaceful protest against Baton Rouge's policy of segregation and discrimination, and also the prior arrest of 23 students from Southern University who had been picketing eating establishments in downtown Baton Rouge that maintained segregated lunch counters.

466.    In response to Cox's peaceful protest, the Chief of the Baton Rouge Police

Department, the East Baton Rouge Parish Sheriff, 75-80 police officers from the BRPD, Sheriff's Office, and Louisiana State Police, along with members of the Baton Rouge Fire Department disbanded the demonstration through uses of force and by exploding several tear gas canisters in the crowd of demonstrators.

467.    The Louisiana Supreme Court upheld Mr. Cox's conviction for breaching the peace.

468.    In *Cox v. Louisiana,* decided in 1965, the United States Supreme Court reversed Cox's conviction, and also struck down Louisiana's breach of the peace statute as facially unconstitutional finding it to be "repugnant to the guaranty of liberty contained in the Fourteenth Amendment." *Cox,* 379 U.S. at 552, quoting *Stromberg v. California,* 283 U.S. 359, 369 (1931).

469.    In 1972, two African-American students from Southern University were killed by white Sheriff's deputies while engaged in peaceful protest.

470.    The students had been protesting the arrest of other demonstrators who had challenged certain administrative policies of the university and who had called for the resignation of certain university administrators.

471.    During the students' protest, officers of the Louisiana State Police and East Baton Rouge Sheriff's Department stormed the Southern University Administration Building with firearms and tear gas, killing the two students in the process.

472.    In November, 1976, an Assistant Attorney General in the Civil Rights Division of the Department of Justice wrote a letter to the Attorney General for the State of Louisiana, informing him of the results of an investigation into the employment practices of municipal and parish fire and police departments within the State of Louisiana, including those located in the City of Baton Rouge.  *See United States v. Alexandria,* 614 F.2d 1358 (5th Cir. 1980).

473.     The letter spelled out in detail the racial and sexual composition of the labor force of the municipalities involved in the study, and stated that the DOJ was convinced of the existence of a pattern and practice of discriminatory employment practices in the fire and police departments involved in the study.

474.     On June 29, 1977, the DOJ filed suit in the United States District Court for the Eastern District of Louisiana alleging that certain Louisiana municipalities, including the City of Baton Rouge, "have traditionally pursued and continued to pursue policies and practices which discriminate against blacks and females and which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of race or sex."

475.     Along with its complaint, the DOJ also submitted a consent decree, signed by officials of the City of Baton Rouge which spelled out a detailed plan to insure that blacks and women would not be unlawfully discriminated against in the future.

476.     In 1980, after the district court declined to enter the consent decree, the U.S. Fifth Circuit Court of Appeals reversed the lower court's decision and directed it to enter the decree as agreed to by the parties.

477.     In 1996, two African-American officers within the BRPD filed a lawsuit against the City alleging racial discrimination and racial harassment during their employment with the department, the majority of which had occurred during a time where the above-referenced consent decree was in effect.  *See Alcorn v. City of Baton Rouge,* 851 So.2d 1194 (La. App. 1 Cir. 2003).

478.     The evidence introduced during the *Alcorn* trial illustrates the pervasive racial discrimination that was rampant throughout the BRPD from the 1970s through the mid-1990s, including common usage of racial slurs by all ranks of officers within the department.  *Id.*

479.    In January, 2002, a jury awarded more than $1 million to the plaintiffs in the *Alcorn* case.

480.    On September 13, 2005, Major Daniel Lopez of the New Mexico State Police, Investigations Bureau sent a letter to the Baton Rouge Police Department, Office of Internal Affairs, detailing instances of misconduct committed by BRPD officers that had been observed by New Mexico State Police Officers while providing assistance in the wake of Hurricane Katrina.  *See* September 13, 2005 Letter from Major Daniel Lopez with attachments, attached hereto as Exhibit F.

481.    The letter detailed various concerns voiced by members of the New Mexico State Police Department with respect to the actions of BRPD officers.

482.    Among the stated concerns were the following:

- No probable cause for contact and enforcement;

- Physical and unnecessary mistreatment of prisoners and the public;

- Inappropriate and unprofessional language;

- Questionable police practices relative to the location of evidence;

- Racially motivated enforcement;

- Offering to let out-of-state officers beat a prisoner as a "thank-you" for helping out with relief efforts;

- Destruction of private/civilian property;

- Forced entry into private residence, followed by the arrest, physical mistreatment of a prisoner and subsequent unarresting of said prisoner;

- General treatment of citizenry based on neighborhood and perceived societal class;

- Miscellaneous stops, searches and contacts absent cause.

483.    In response to the reports he received from the New Mexico State Police Officers,

Major Lopez immediately pulled his men from their assignment in Baton Rouge, and informed the BRPD that, "[a]t current, the New Mexico State Police will not place its personnel in a working environment with the Baton Rouge Police Department."

484.    Along with Major Lopez's letter, the New Mexico State Police also submitted statements from several of its officers who had personally observed the misconduct of BRPD officers. *See* Exhibit F.

485.    The officer's statements describe clear constitutional violations and discriminatory practices being employed with impunity by officers of the BRPD.  The reports contain the following statements:

- "I observed what appeared to be several questionable traffic/pedestrian stops, searches, arrests, and uses-of-force."

- "I observed numerous stops where BRPD officers did not appear to have probable cause.  Officers routinely searched people and vehicles when they did not appear to have probable cause."

- "Officer King is a good officer but does seem to handle black people differently than he would a pretty Caucasian woman.  Each time Officer King would make contact with a Caucasian person he would be friendly and pleasant.  But when he spoke to a black person he was very loud, rude and demeaning."

- "Officer Cutter turned on his lights and stopped the vehicle without probable cause that I had seen."

- "I don't know if [BRPD officers] have been given any type of direction as to what is right or wrong as each officer is doing things his own way."

- "I do feel that most of the night officers that I had contact with had some type of comment or attitude towards black people in general."

- "At this time the [BRPD] officer began telling me about how they have gone into the black neighborhoods and have been beating them down since the hurricane happened."

- "At this time I began to notice the officer pointing his spot light in the faces of black civilians telling them, 'What are you doing standing in

the road, Are you stupid, Get out of the road' and would then drive off. The black civilians were on the sidewalks and were not bothering anyone. The officer continued to describe the residents in these neighbors as basically animals."

- "The officer began to stop vehicles for no apparent reason and would treat the subjects very rude and would begin to search the vehicle with no probable cause and without permission from the driver."

- "The officer and I began to patrol in the 1st district where again the officer would stop vehicles for no apparent violations and would treat the subjects in the vehicle very rude and would search the vehicle with no probable cause and tell them 'To get the hell out of here.'"

- "We began to patrol the area when the officer began to spot light black civilians telling them, 'Are you stupid, get out of here.'"

- "Both nights I noticed subjects being stopped for no reason, searches being performed with no probable cause and people['s] civil rights being violated. I witnessed officers referring [to] African Americans as animals and that they needed to be beaten down."

- "Officer Lampleyrouse did not indicate why he searched the vehicle and lacked reasonable suspicion and probable cause, in my opinion."

- "Officer Browning made contact with these subjects with no reasonable suspicion or probable cause, performed pat downs and extracted items from the pockets of these individuals. Officer Browning referred to these subjects as 'heathens.'"

- "On approximately four separate occasions I observed searches of vehicles and personal property with no probable cause. Officers at these incidents made contact with black civilians and had them exit the vehicles or personal property without consent from the owner."

486. When one local news media outlet learned that certain officers of the BRPD had been disciplined as a result of complaints received by out-of-state officers in the wake of hurricane Katrina, a public records request was issued to the BRPD for disclosure of the files. *See City of Baton Rouge v. Capital City Press, LLC,* 4 So.3d 807 (La. App. 1 Cir. 2008).

487. The BRPD refused to turn over the files, asserting that they were confidential and could be embarrassing to the officers involved, and to the BRPD as a whole.

488.    Siding with the BRPD and its officers, Defendant Roper undertook to maintain the secrecy of the BRPD with respect to the illegal actions of its officers, vigorously defending against the disclosure of the records establishing the BRPD's routine practice of committing constitutional violations.

489.    Ignoring the rights of the individuals who had been victimized by officers of the BRPD, Roper asserted in court filings that releasing the reports of the officers misconduct would be a violation of the *officers'* rights under Article I, Section 5 of the Louisiana Constitution.

490.    Jeff LeDuff, then Chief of the Baton Rouge Police Department, testified that as a matter of course in all Internal Affairs investigations, the officers being investigated sign a "Garrity Declaration" which guarantees that the officer will not be criminally prosecuted on the basis of any testimony he provides to the investigations from internal affairs.

491.    Such a practice had been denounced by the DOJ in its report on the New Orleans Police Department, because of the likelihood that such practices would insulate officers that committed crimes from prosecution, conviction, or even disclosure of the facts underlying the crime.

492.    The 19th Judicial District Court for the State of Louisiana refused to require disclosure of the documents detailing the officers' misconduct, finding, in part, "that the conduct at issue in the internal affairs investigation was not of such a serious or heinous nature so as to require serious discipline…"

493.    The Louisiana First Circuit Court of Appeal reversed the decision of the lower court, and ordered the City to disclose the IAD files, with certain sensitive information redacted.

494.    Roper continued to vigorously fight against disclosure of the records, first seeking a stay of the order, which was granted by the First Circuit.

495.    Once the stay issued by the First Circuit had been lifted, Roper sought another stay from the Louisiana Supreme Court, which was denied.

496.    Subsequent to the denial of the City's request for a stay, Roper filed four separate writs with the Louisiana Supreme Court, each of which was denied.

497.    In October of 2011, Police Chief DeWayne White candidly stated that at least 10 percent of the Baton Rouge Police Department had a problem with "racial profiling."

498.    To combat the practice of racial profiling by officers of the Baton Rouge Police Department, Chief White made it a priority to locate racists within the ranks of the BRPD, and take action to ensure that these individuals were not engaging in discriminatory police tactics.

499.    In February of 2013, Mayor Kip Holden removed DeWayne White as Chief of the Baton Rouge Police Department.

500.    City officials admitted at the time that the decision to remove White as Chief of the BRPD was made, in part, because of White's comments regarding the presence of racism within the Baton Rouge Police Department.

501.    At a public hearing before the Baton Rouge Metro Council regarding his termination, also in February, 2013, White stated that there exists "a serious race relations problem between [BRPD] officers and the public we serve. I'm personally aware of racial insensitivities and so are you."

502.    At the hearing, White recounted an instance in which an officer under his command had responded to the location of a homicide and stated -- within earshot of the victim's family -- "I'm here on my wife's birthday, and I'm standing over a dead n-----."

503.    White also stated at the hearing that the U.S. Justice Department had expressed "grave concern" over the BRPD's failure to recruit more minorities and females into the

department, and that as a result, the City would likely not be released from the consent decree regarding BRPD hiring practices that had been in effect since 1980.

504.    In response, officials speaking on behalf of the City characterized White's remarks as "hyperbole," stating that the DOJ "have never raised a question as to the hiring practices of the city."  The official went on to state, that contrary to White's assessment, the City was "meeting the expectation of the Justice Department on this particular issue."

505.    Contrary to the City official's representations, the U.S. Justice Department had in fact declined to release the City from the requirements of the 1980 Consent Decree when it released twenty other Louisiana municipalities and parishes from its requirements in late 2012.

506.    According to a spokesman for the DOJ, the requirements of the consent decree continued to apply to the City of Baton Rouge because the city was "found to need additional time to meet the requirements of the decree."

507.    In commenting on the continued application of the consent decree, a former BRPD officer who had served as the department's first black female captain stated, "Over the years, they haven't been as blatant as they were when I went through.  I feel that if they could have, I never would have went up the ladder.  If they had a choice, they never would have promoted me."

508.    In response to White's firing and the information he had provided during the public hearing, at least one Baton Rouge Metro Council Member submitted a formal request to the U.S. Justice Department to investigate the discriminatory practices of the BRPD.

509.    In September, 2014, the Baton Rouge Police Department's troubles with race relations continued, when several racist text messages sent by a BRPD officer were discovered by the media.

510.     One of the texts sent by an officer of the BRPD stated, "I wish someone would pull a Ferguson on them and take them out.  I hate looking at those African monkeys at work … I enjoy arresting those thugs with their saggy pants."  Another text stated, "[t]hey are nothing but a bunch of monkeys."

511.     After receiving attention from the media, the officer who authored the racist text messages resigned from the BRPD, even though Chief Dabadie had not spoken with him, and no request for his resignation had been made.

512.     Subsequently, Chief Dabadie permitted the officer to alter his departure paperwork to indicate that the officer had retired, instead of resigning as a result of the scandal.

513.     Members of the Baton Rouge community, including members of the Metro Council, decried Dabadie's decision as too lenient given the seriousness of the officer's offense.

514.     As described above, the Baton Rouge Police Department has had a consistent and unbroken pattern of tolerating and promoting discriminatory behavior among the members of its force for many decades.

515.     The Baton Rouge Police Department's pattern of tolerating and promoting discriminatory behavior was in effect at all times relevant to this complaint, and has continued unabated, with neither the City or its actors having put systems in place to discourage and eliminate such activity.

<u>Defendants' Wrongful Conduct</u>

516.     Defendants are charged at all relevant times with the knowledge of the law as it existed with respect to Taylor's rights under the Constitution of the United States and Louisiana law.

517.     During all times relevant to this complaint, no reasonable law enforcement officer

or attorney would believe that Defendant Thomas' search of Taylor's person on October 13, 2012, during a routine traffic stop, was appropriate as there was no articulable basis to believe Taylor had dangerous weapons on his person.

518.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Defendant Thomas and Wennemann's use of force against Taylor in the early morning hours of October 13, 2012 would be authorized or justified.

519.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that information obtained from an arrested individual would be admissible in a court of law where the officers did not advise the individual of his *Miranda* rights prior to questioning.

520.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the storage and transportation of firearms by a non-felon in a vehicle located on any street or in any parking lot in the State of Louisiana was a criminal act.

521.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the search of Taylor's vehicle on October 13, 2012 was justified or within the scope of the authority granted to the officers.

522.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the existence of an affidavit of probable cause signed only by a law enforcement officer would provide sufficient authority to perform an arrest.

523.     During all times relevant to this complaint, any reasonable law enforcement officer or attorney would believe that the actions of the Defendant Police Officers on October 13, 2012 and April 29-30, 2014 were not only unauthorized, but also constituted violations of both civil and criminal law.

524. Specifically, the information available to Defendants at all relevant times indicated that some or all Defendants had committed the following crimes:

<u>Baton Rouge Code of Municipal Ordinances</u>

    a.  §13:26 (Criminal Conspiracy)

    b.  §13:33 (Battery)

    c.  §13:36 (Assault)

    d.  §13:40 (Intimidation by Officers)

    e.  §13:46 (False Imprisonment)

    f.  §13:59 (Criminal Mischief)

    g.  §13:68 (Unauthorized Use of a Movable)

<u>Louisiana Criminal Code</u>

    h.  La. R.S. §14:26 (Criminal Conspiracy)

    i.  La. R.S. §14:33 (Battery)

    j.  La. R.S. §14:40.2 (Stalking)

    k.  La. R.S. §14:45 (Simple Kidnapping)

    l.  La. R.S. §14:46 (False Imprisonment)

    m.  La. R.S. §14:59 (Criminal Mischief)

    n.  La. R.S. §14:62.3 (Unauthorized Entry of an Inhabited Dwelling)

    o.  La. R.S. §14:63 (Criminal Trespass)

    p.  La. R.S. §14:68 (Unauthorized Use of a Movable)

    q.  La. R.S. §14:128.1 (Terrorism)

    r.  La. R.S. §14:129.1 (Intimidating, Impeding, or Injuring Witnesses)

    s.  La. R.S. §14:133 (Filing or Maintaining False Public Records)

t.    La. R.S. §14:134 (Malfeasance in Office)

525.    During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the identification of a suspect through the display of a single photograph would provide probable cause sufficient to perform an arrest or search.

526.    During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Taylor's arrest on April 30, 2014 was justified or authorized by law.

527.    During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Officer Thomas should be permitted to interact with or exercise control over Taylor, when Thomas had been named as a defendant in a lawsuit filed by Taylor, and any such interaction was unnecessary due to the availability of other officers and the lack of exigent circumstances.

528.    During all times relevant to this complaint, no reasonable prosecuting attorney would believe the information available regarding the events of October 13, 2014 justified the bringing of criminal charges against Taylor.

529.    During all times relevant to this complaint, any reasonable attorney would realize that the unconstitutional legal provisions identified within this complaint were legally infirm and unenforceable.

530.    Through the enforcement of unlawful provisions of law and the prosecution of individuals alleged to have violated these provisions, Defendants created and/or maintained a policy whereby they would enjoy virtually unfettered discretion to deprive individuals of their constitutionally protected rights.

531.    The City of Baton Rouge, through the Metro Council, encouraged the

enforcement and prosecution of individuals pursuant to unenforceable and legally infirm provisions of law by retaining such provisions in the Baton Rouge Code of Municipal Ordinances and through its failure to recommend removal of such provisions from the Louisiana Criminal Code.

532.    In light of the stated policy of the Baton Rouge Police Department to enforce all laws that were "on the books," the Metro Council's retention of unenforceable provisions in the Baton Rouge Code of Ordinances, and its failure to recommend repeal of unlawful provisions appearing in the Louisiana Criminal Code communicated a desire to have its policymakers and employees enforce the illegal provisions of law and prosecute individuals who had engaged in no criminal conduct.

533.    Police Chief Dabadie has a policy of directing the police officers under their command to enforce all laws that "were on the books" despite having knowledge that many of these legal provisions were unenforceable and constitutionally infirm.

534.    The BRPD lacks any system to inform or train the police officers under their command regarding the limits placed on the scope of their authority, and/or the actions required of them in order to protect the fundamental rights of individuals within their jurisdiction, as dictated by rulings from both Louisiana and Federal Courts.

535.    Dabadie particularly encourages the use of police tactics which have long been condemned and the enforcement of unconstitutional provisions of law in high crime areas such as the 70805 zip code as a means to confiscate weapons that were being lawfully possessed, and for which they lacked any authority to seize.

536.    Through training programs controlled, instituted and/or maintained by Dabadie, Baton Rouge City Police officers are instructed to enforce illegal provisions of law in situations

where it would clearly violate an individual's rights under the United States and Louisiana Constitutions.

537.   Defendant Dabadie had a policy of refusing to return firearms that had been seized by them under color of law, but with no legal authority, despite requests for their return.

538.   Defendant Dabadie knew or should have known that the unenforceable legal provisions cited herein violate the U.S. Constitution and/or the Louisiana Constitution.

539.   The East Baton Rouge Parish Sheriff's Department and Louisiana State Police have jurisdiction to exercise the same authority as the Baton Rouge City Police with respect to the enforcement of provisions of Louisiana law.

540.   Neither the Sheriff's Department nor the Louisiana State Police have ever had a policy of enforcing Baton Rouge Code §13:95.3, as they are not charged with the enforcement of municipal ordinances.

541.   Thus, only those individuals encountering a Baton Rouge City Police officer were subject to losing firearms located inside their vehicle solely because they were in the parking lot of an establishment that sold alcohol.

542.   On information and belief, the decision of the City and its policymakers to actively enforce and prosecute unconstitutional laws and engage in inappropriate investigation tactics, in conjunction with the admitted practice of profiling individuals on the basis of their race and the concentration of these tactics in the 70805 zip code, has resulted primarily in the deprivation of rights held by minorities such as Plaintiff.

543.   On the evening of October 13, 2012 Officers Thomas and Wennemann were training Officer Doe regarding the procedures utilized by the Baton Rouge City Police in high crime areas populated primarily by African-Americans.

544.    Defendant police officers used illegal tactics and unenforceable provisions of law as a means of harassing and intimidating individuals, including Plaintiff, by performing unlawful searches, violating or attempting to violate their right against self-incrimination, and depriving them of their property and/or liberty in situations where the individuals were abiding by the law and where there existed no legal authority under which such actions could be taken.

545.    Defendant police officers knew or should have known that their tactics and the laws they purported to enforce violated Taylor's rights under both the U.S. Constitution and the Louisiana Constitution.

546.    Chief Dabadie also instituted or continued in effect of policy of protecting police officers made the subject of citizen complaints, and of permitting the use of illegal and unconstitutional means to discourage aggrieved citizens from seeking redress.

547.    Defendants Roper, Batson and Freeman have/had a policy of prosecuting individuals, like plaintiff, cited with violating unenforceable provisions of law despite the fact that the individuals had not violated any state or Federal law.

548.    Defendants Roper, Batson and Freeman have/had a policy of refusing requests for the return of property seized from individuals lawfully exercising their rights under the United States and Louisiana Constitutions, notwithstanding the lack of any legal authority to do so.

549.    Defendants Roper, Batson and Freeman lack(ed) any system whereby the tactics used by the police officers recommending the institution of criminal proceedings were evaluated for compliance with the law.

550.    Defendants Roper, Batson and Freeman lack(ed) any system whereby the laws that were "on the books" and which were being enforced by the Baton Rouge Police Department were evaluated for their legality and enforceability.

551.    Defendants Roper, Batson and Freeman have/had a policy of instituting criminal charges and prosecuting individuals for all violations referred to them by the Baton Rouge Police Department.

552.    Defendants Roper, Batson and Freeman have/had a policy of prosecuting individuals under the color of law through legally infirm statutes and ordinances, with the knowledge that these provisions of law violate the United States Constitution and/or the Louisiana Constitution both on their face, and as they are being applied.

553.    Defendants Roper, Batson and Gremillion have/had a policy of concealing the misconduct of BRPD officers, of which they became aware, from the public, permitting the officers to continue such misconduct without any accountability or consequence.

554.    Defendants Roper, Batson and Gremillion have/had a policy of ignoring conflicts of interest in cases where the City has been sued as a result of the actions of one or more of its actors.

555.    Pursuant to Roper, Batson and Gremillion's policy of ignoring potential or actual conflicts of interest, it has been the practice of the Parish Attorney's office to assign only a single Assistant Parish Attorney to handle lawsuits against the City based upon the illegal actions of one of its policymakers or employees, despite the existence of apparent conflicts of interest.

556.    Defendants Roper, Batson and Gremillion have/had a policy of failing to disclose these conflicts of interest to the City and any individual actors involved, and neither seek nor obtain written consent from the parties to proceed despite the existence of a conflict.

557.    Defendants Roper and Batson have instituted and/or continued a policy of permitting attorneys within the East Baton Rouge Parish Attorney's Office to engage in the private practice of law in addition to the work the attorney's perform on behalf of the City.

558.     Roper and/or Batson's policy of permitting outside employment within the Parish Attorney's Office has disincentivized employees of the department from devoting proper time and attention from critically important City business, and encouraged the performance of outside work that could potentially provide income in addition to the employees' City salary.

559.     The policies of the Parish Attorney's Office, described herein, directly resulted in the City's failure to provide any response to the complaint appearing in Taylor's federal lawsuit, the entry of default against the City, and the continued deprivation of constitutional rights at the hands of the City's actors.

560.     Through the continued existence, enforcement, and prosecution of unconstitutional and illegal provisions of law, the City of Baton Rouge and its individual actors repeatedly and systematically deprived citizens of the State of Louisiana and the United States of America of their constitutional rights under the color of state law.

561.     The legally infirm provisions of law utilized by the city were targeted against the most vulnerable and disadvantaged members of society in order to lessen the likelihood of reprisal or recrimination.

562.     The City and its actors created and implemented a plan or policy which gave them virtually unfettered discretion to detain individuals, perform illegal searches, seize their property, and place them under arrest for conduct which was protected by the Louisiana and U.S. Constitutions.

563.     The City and its actors knew that they lacked any legal authority to enforce or prosecute violations of the legal provisions cited herein, and that doing so would deprive citizens of their constitutionally protected rights.   Despite this fact, Defendants' unwarranted, unconstitutional, and illegal acts continue to this day.

564.    Each of the public officials and/or policymakers named within this complaint established or continued in effect a policy of not only tolerating the continued existence of unenforceable provisions in the Baton Rouge Code of Ordinances and Louisiana Criminal Code, but actively enforcing the unlawful provisions and prosecuting individuals for their violation.

565.    Each of the non-public governmental actors named within this complaint acted in accordance with the official policies, procedures, practices, and/or customs then (and currently) in effect.

566.    In addition to the policies, practices, and/or customs described above, the deficiencies within the City's operations and the Baton Rouge Police Department include, but are not limited to: (1) failure to adopt and enforce appropriate policies; (2) failure to properly recruit, train, and supervise law enforcement officers; (3) adequately review and investigate officer uses of force; (4) failure to fully investigate allegations of officer misconduct; (5) failure to identify and respond to patterns of at-risk officer behavior; and (6) failure to enact appropriate performance review and promotional systems.

567.    As a direct result of the official policies, procedures, practices and/or customs described above, Plaintiff Ernest Taylor was denied of significant rights guaranteed him by the United States and/or Louisiana Constitutions, in addition to other applicable provisions of law.

568.    At all times relevant to this complaint, the Baton Rouge Police Department ("BRPD") has lacked the basic elements of effective policing – clear policies, training, accountability, and confidence of the citizenry.

569.    Officers of the BRPD regularly show a lack of respect for the civil rights and dignity of the people of Baton Rouge, particularly those segments that have historically been marginalized.

570.    Officers of the BRPD, at every rank, either do not understand or choose to ignore the boundaries of constitutional policing.

571.    The BRPD's failure to ensure that its officers routinely respect the United States and Louisiana Constitutions and the rule of law undermines trust within the very communities whose cooperation the department most needs to enforce the law and prevent crime.

572.    The City and its actors have encouraged or have been indifferent to widespread violations of law by officers of the BRPD.

573.    In the absence of mechanisms to protect and promote the civil rights of individuals subject to its authority, officers of the BRPD regularly use unnecessary or excessive force, and conduct illegal stops, searches, interrogations, and arrests with impunity.

574.    The City and BRPD have failed to institute systems designed to prevent and detect the use of unnecessary or unreasonable uses of force by officers of the BRPD, have failed to provide training on the appropriate use of force, have failed to provide the supervision necessary to oversee the use of force by BRPD officers, and have failed to develop policies to provide BRPD officers with clear and consistent guidance on when and how to use and report force.

575.    The City and BRPD have failed to collect and/or monitor data on the use of force by BRPD officers which would enable the identification and prevention of unlawful uses of force before they result in significant or widespread harm.

576.    The City and BRPD have a policy, practice, or custom of tolerating widespread underreporting or non-reporting of uses of force by BRPD officers.

577.    The failure of BRPD officers to report uses of force is the result of a systemic failure to hold the officers accountable for not reporting uses of force, or to even acknowledge

the extent to which BRPD officers use force.

578.    The City and BRPD have failed to institute a policy making clear that all employees have a responsibility to ensure that constitutional violations inflicted by BRPD officers are reported and investigated.

579.    The City and BRPD have a policy, practice, or custom of failing to perform adequate investigations of any violations of BRPD officers that are reported.

580.    By tolerating the failure to investigate constitutional violations made by BRPD officers, the City and BRPD forego the chance to correct dangerous behavior, instead sending the message that there is little institutional oversight or concern about officers' constitutional violations.

581.    The City and BRPD have condoned the pattern or practice of BRPD officers to engage in stopping, searching, and arresting individuals, along with seizing their property in the absence of reasonable suspicion or probable cause.

582.    The City and BRPD's policies and training on warrantless searches and seizures are non-existent or highly inadequate, leaving BRPD officers with little guidance regarding the constitutional limitations on their authority to detain, search, interrogate, and arrest.

583.    The Unites States Attorney's Office has offered in the past to provide free training to law enforcement officers on the constitutional limits of their authority, but neither the City nor BRPD has ever requested or inquired about such training.

584.    The City and BRPD have a policy of utilizing field training officers to instruct new officers on the appropriate procedures to be used when interacting with members of the public.  By failing to provide accurate and up-to-date training by legally trained experts on the protection of citizens' constitutional rights, new officers are trained by individuals who lack

knowledge of current legal requirements, and who suffer from misconceptions of law and the proper scope of police authority.

585.   The inadequate policies and training provided to officers of the BRPD by the City and the BRPD leave officers without the basic foundation to perform their duties within constitutional boundaries, increasing the likelihood that officers, unable to perceive and articulate reasonable suspicion and probable cause, may either stop individuals arbitrarily or rely on impermissible factors such as an individual's race or ethnicity.

586.   The City and its actors have failed to institute systems designed to prevent, detect, and respond to discriminatory policing, and to ensure that officers of the BRPD are conducting themselves in accordance with constitutional guarantees of equal protection.

587.   The City and its actors have failed to take reasonable steps to counteract and eradicate bias based on factors such as race, ethnicity, and sexual orientation in its policing practices.

588.   BRPD's use of force practices present a significant threat to the safety of Plaintiff, the public in general, and officers of the BRPD, and create a substantial obstacle to strong community-police partnerships.

589.   The City has failed to provide officers of the BRPD with adequate and sufficient training on how to properly carry out stops, searches, seizures, interrogations, and arrests.

590.   The training that the City and BRPD has provided to its law enforcement officers is out of date and conflicts with current legal requirements.

591.   The City's failure to train officers of the BRPD or otherwise provide guidance on the limits and requirements of the U.S. and Louisiana Constitutions contributed directly to the deprivation of Plaintiff's rights described herein.

592.     The City's and BRPD's failure to provide sufficient guidance, training, and support to officers within the BRPD, as well as their failure to implement systems to ensure officers are wielding their authority effectively and safely, have created an environment that permits and promotes constitutional harm.

593.     The City and BRPD have failed to provide the supervision necessary to prevent or detect misconduct by its officers and ensure effective policing.

594.     Supervisors within the BRPD, as a matter of course, fail to hold officers engaged in violations of individuals' civil rights accountable for their actions.   These supervisors regularly approve the use of unnecessary or excessive force, conduct flawed investigations, sign off on materially deficient arrest reports, and/or simply do not perform any supervision of their subordinates.

595.     The City's and BRPD's focus on statistics such as number of arrests and number of firearms seized, particularly in combination with poor training and policies, encourages BRPD officers to violate individuals' rights by conducting illegal stops, searches, seizures, interrogations, and arrests.

596.     The BRPD has engaged and is engaged in a pattern or practice of discriminatory policing in violation of constitutional and statutory law.

597.     The City and its actors have failed to implement adequate policies and provide appropriate training regarding the limits of the authority exercised by law enforcement officers with respect to conducting stops, searches, seizures, interrogations, and arrests.

598.     The City's lack of policies and training on the limits of police authority, combined with a general failure to acknowledge and address the potential for stereotypes and bias in BRPD officers' decision-making has cultivated an atmosphere in which discriminatory policing occurs

unchecked.

599.    The City has no system in place that is capable of tracking allegations and complaints of racial profiling, and does not collect, analyze, or report race or ethnicity data for most citizen encounters with police.

600.    Collectively, the actions of the Defendants, described above, have had a substantial chilling effect on the exercise of constitutionally protected activity by individuals within the City of Baton Rouge.

### CLAIMS FOR DECLARATORY RELIEF AND MONETARY DAMAGES

601.    Each of the foregoing paragraphs is incorporated as if set forth fully herein.

### COUNT 1

### 42 U.S.C. §1983 (1st and 14th Amendments)

602.    The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of aggressively pursuing individuals who voiced complaints against officers of the BRPD, and condoning the efforts of BRPD officers to violate the civil rights of such individuals through intimidation, the use of unconstitutional searches and seizures, and/or making arrests in the absence of probable cause.

603.    This policy, practice or custom was utilized by officers Thomas, Wennemann and/or John Doe #1 - #4 to retaliate against Taylor for exercising his rights to seek redress from the government for his grievances with the City and its actors.

604.    Defendant Dadabie's explicit stated policy of ignoring judicial precedent and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force.

605.    Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

606.    Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights in pursuit of protecting members of the BRPD directly resulted in retaliation against individuals who exercised their right under the First Amendment to criticize governmental actors and seek redress for their wrongdoings.

607.    Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD in retaliation for Taylor's filing of a lawsuit in federal court.

608.    Defendants Roper, Freeman, Batson and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

609.    It is/was Roper's, Freeman's, Batson's and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully in contravention of an individual's rights under the First Amendment to the U.S. Constitution.

610.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

611.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office,

Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the retaliatory tactics employed by members of the BRPD against Taylor, as described above.

612.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn, and/or Knightshead failed to inform any City official of the deficiencies exhibited by the department or recommend training in constitutional policing.

613.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted for exercising their First Amendment rights.

614.    The policies, practices, and/or customs described above have had a profound chilling effect on individuals' exercise of their right under the First Amendment to voice criticism of government actors who have engaged in misdeeds.

615.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to seek from the government a redress of grievances as guaranteed by the First Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

616.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the First Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

<u>COUNT 2</u>

<u>42 U.S.C. §1983 (4th and 14th Amendments)</u>

617.     The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of condoning BRPD officers routine engagement in unlawful searches and seizures pursuant to unenforceable provisions of law that remain "on the books."

618.     This policy, practice or custom was utilized by officers Thomas, Wennemann, Ardoin and/or John Doe #1 - #4 in performing unlawful searches and seizures with respect to Taylor in violation of his rights under the Fourth Amendment to the U.S. Constitution.

619.     Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force.

620.     Dadabie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

621.     Dadabie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights under the guise of outdated and unenforceable laws directly resulted in the performance of unlawful searches and seizures by officers of the BRPD.

622.     Specifically, Dadabie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on October 13, 2012 and April 29-30, 2014.

623.     Defendants Roper, Freeman, Batson and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency

of the evidence presented.

624.    It is/was Roper's, Freeman's, Batson's and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully in contravention of an individual's rights under the Fourth Amendment to the U.S. Constitution.

625.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

626.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

627.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn, and/or Knightshead failed to inform any City official of the deficiencies exhibited by the department or recommend training in constitutional policing.

628.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted pursuant to evidence acquired through unconstitutional searches and seizures in violation of individuals' Fourth Amendment rights.

629.    The policies, practices, and/or customs described above have had a profound chilling effect on individuals' exercise of their right to travel unmolested, free from unreasonable searches and seizures, guaranteed by the Fourth Amendment to the U.S. Constitution.

630.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to be free from unreasonable searches and

seizures as guaranteed by the Fourth Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

631.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fourth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

<u>COUNT 3</u>

<u>42 U.S.C. §1983 (5th and 14th Amendments)</u>

632.    The City of Baton Rouge, and its individual actors also instituted and/or maintained a policy, practice, or custom of condoning BRPD officers routine engagement in unlawful interrogation practices by failing to advise individuals of their rights under the Fifth Amendment.

633.    This policy, practice or custom was utilized by officers Thomas, Wennemann, Ardoin and/or John Doe #1 - #4 in performing unlawful interrogation techniques with respect to Taylor in violation of his rights under the Fifth Amendment to the U.S. Constitution.

634.    Defendant Dadabie's explicit stated policy of ignoring judicial precedent, and his accompanying failure to properly train his officers, has resulted in a complete ignorance of the constitutional requirements applicable to custodial interrogations impose by the Fifth Amendment.

635.    Dabadie's policy of permitting and encouraging unlawful interrogations expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis

of unenforceable laws or when the actions of individuals within his department are challenged.

636.    Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights by ignoring requirements placed upon the BRPD by virtue of judicial precedent has directly resulted in the performance of unlawful interrogation techniques by officers of the BRPD.

637.    Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal questioning performed by officers of the BRPD with respect to Taylor on October 13, 2012 and April 29-30, 2014.

638.    Defendants Roper, Freeman, Batson and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

639.    It is/was Roper's, Freeman's, Batson's and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully in contravention of an individual's rights under the Fifth Amendment to the U.S. Constitution.

640.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

641.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

642.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn, and/or Knightshead failed to inform any City official of the deficiencies exhibited by the department or recommend training in constitutional policing.

643.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted pursuant to confessions or other information subject to the exclusionary rule as stated in *Miranda v. Arizona* in violation of individuals' Fifth Amendment rights.

644.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

645.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fifth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

<u>COUNT 4</u>

<u>42 U.S.C. §1983 (14th Amendment – Equal Protection)</u>

646.    The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of promoting, encouraging and/or condoning BRPD officers routine use of discriminatory police tactics, selective enforcement of laws, and racist mentalities.

647.    This policy includes the maintenance and enforcement of illegal provisions of law that have historically been used to marginalize minority individuals such as Taylor.

648.    The City and its actors instituted and/or maintained a policy whereby BRPD officers were instructed to utilize aggressive tactics, perform unconstitutional searches and seizures, and otherwise violate the constitutional rights of individuals living in poor, black communities such as the 70805 zip code.

649.    Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force, and has fostered and cultivated the use of discriminatory policing tactics by members of the BRPD.

650.    Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws, when the actions of individuals within his department are challenged, or when an officer's prejudices lead him or her to steroptype minority individuals.

651.    Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights under the guise of outdated and unenforceable laws directly resulted in the performance of unlawful searches and seizures by officers of the BRPD, primarily on minority members of the community.

652.    The rate at which illegal provisions of law were enforced against minority individuals cannot be explained by any other reasoning than the utilization of discriminatory policing tactics by members of the BRPD.

653.    Dabadie's policy of ignoring and/or encouraging the discriminatory tactics used by members of the BRPD directly resulted in the illegal actions taken by officers of the BRPD

with respect to Taylor on October 13, 2012 and April 29-30, 2014.

654.    Defendants Roper, Freeman, Batson and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

655.    It is/was Roper's, Freeman's, Batson's and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully and discriminatorily in contravention of an individual's rights under the Fourteenth Amendment to the U.S. Constitution.

656.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result, and that entire segments of Baton Rouge's population would be subjected to unlawful and criminal activity solely as a result of their race.

657.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

658.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights and engaged in discriminatory police tactics, Roper, Freeman, Batson, Gremillion, Hilburn, and/or Knightshead failed to inform any City official of the deficiencies exhibited by members of the BRPD or recommend training in constitutional policing.

659.    The policies, practices, and/or customs described above directly resulted in black

individuals being arrested, prosecuted, and convicted for activity that white individuals engaged in without interference from the BRPD, in violation of these individuals' Fourteenth Amendment rights.

660.    The policies, practices, and/or customs described above have had a profound chilling effect on minority individuals' exercise of their constitutional rights due to fear that they will be subjected to discriminatory police practices on account of their race.

661.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution.

662.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fourteenth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

## COUNT 5

### 42 U.S.C. §1985 and §1986

663.    Defendants Thomas, Wennemann, Ardoin, and/or John Doe #1 - #4 conspired to deter Taylor, by force, intimidation, or threat, from further prosecution of his lawsuit against the City of Baton Rouge and certain of its actors in violation of 42 U.S.C. §1985(1).

664.    Defendants Thomas, Wennemann, Ardoin, and/or John Doe #1 - #4 also violated 42 U.S.C. §1985(1) by conspiring for the purpose of impeding, hindering, obstructing, and/or defeating the due course of justice, with the intent to deny Taylor the equal protection of the laws and/or injure Taylor for lawfully attempting to enforce his right to equal protection of the laws.

665.    Defendants Ardoin, and/or John Doe #1 - #4 neglected and/or refused to prevent

or aid in preventing the unlawful acts of Defendant Thomas and/or Wennemann in intimidating and retaliating against Taylor for the filing of his federal lawsuit in violation of 42 U.S.C. §1986.

666.    The above-named Defendants' violations of 42 U.S.C. §1985 and §1986 entitle Taylor to an award of monetary damages.

<u>COUNT 6</u>

<u>42 U.S.C. §1988</u>

667.    As Plaintiff has brought this proceeding pursuant to 42 U.S.C. §1983, §1985, and §1986, Plaintiff is entitled to an award of reasonable attorney's as part of the costs awarded for vindicating his constitutional rights, pursuant to 42 U.S.C. §1988(b).

<u>COUNT 7</u>

<u>Louisiana Constitution Article I, § 3</u>

668.    The protections afforded by Article I, § 3 of the Louisiana Constitution are coextensive with those afforded by the Fourteenth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 4 also violate Article 1, § 9 of the Louisiana Constitution.

669.    Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages.

<u>COUNT 8</u>

<u>Louisiana Constitution Article I, § 5</u>

670.    The protections afforded by Article I, §5 of the Louisiana Constitution are coextensive with those afforded by the Fourth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 2 violate Article 1, §5 of the Louisiana Constitution.

671.    Defendants' deprivation of rights guaranteed to Taylor by the Louisiana

Constitution entitles Taylor to an award of monetary damages.

COUNT 9

Louisiana Constitution, Article I, § 9

672.     The protections afforded by Article I, § 9 of the Louisiana Constitution are coextensive with those afforded by the First Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 1 violate Article 1, § 9 of the Louisiana Constitution.

673.     Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages.

COUNT 10

Louisiana Constitution, Article I, § 11

674.     The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of utilizing unconstitutional and unenforceable laws that remained "on the books" to deprive individuals, primarily minorities, of their lawfully held firearms.

675.     This policy, practice or custom was utilized by officers Thomas, Wennemann and/or Jane Doe when seizing Taylor's lawfully-held firearms on October 13, 2012.

676.     Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force, particularly with respect to an individual's right to keep and bear arms.

677.     Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of

individuals within his department are challenged.

678.   Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights under the guise of outdated and unenforceable laws directly resulted in the performance of unlawful seizures of lawfully held firearms by officers of the BRPD.

679.   Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on October 13, 2012.

680.   Defendants Roper, Freeman, Batson and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

681.   It is/was Roper's, Freeman's, Batson's and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors engaged in unlawful activity in contravention of an individual's rights under Article I, Section 11 of the Louisiana Constitution.

682.   The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

683.   Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

684.   In the face of clear evidence that officers of the BRPD regularly violated

individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn, and/or Knightshead failed to inform any City official of the deficiencies exhibited by members of the department or recommend training in constitutional policing.

685.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, convicted, and permanently deprived of their lawfully-held firearms for exercising the rights granted to them by Article I, Section 11 of the Louisiana Constitution.

686.    The policies, practices, and/or customs described above have had a substantial chilling effect on individuals' exercise of their right to keep and bear arms, as provided by Article I, Section 11 of the Louisiana Constitution.

687.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to keep and bear arms as guaranteed by Article I, Section 11 of the Louisiana Constitution.

688.    Defendants' deprivation of  rights guaranteed to Taylor in the Louisiana Constitution entitles him to an award of monetary damages.

## COUNT 11

### Louisiana Constitution, Article I, § 13

689.    The protections afforded by Article I, § 13 of the Louisiana Constitution are coextensive with those afforded by the Fifth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 3 violate Article 1, § 13 of the Louisiana Constitution.

690.    Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages.

<u>COUNT 12</u>

<u>La. C.C. Art. 2315, 2316, 2317 and 2320</u>

691.    Louisiana Civil Code Article 2315 requires that every act of man that causes damage to another obliges him by whose fault it happened to repair it.

692.    Louisiana Civil Code Article 2316 provides that every person is responsible for the damage he occasions not merely by his act, but also by his negligence, his imprudence, or his want of skill.

693.    Louisiana Civil Code Article 2317 provides that individuals are responsible not only for the damage occasioned by their own acts, but also for damage caused by the acts of persons for whom the individual is answerable, or of the things which the individual has in his custody.

694.    Louisiana Civil Code Article 2320 provides that employers are answerable for the damage occasioned by their  employees in the exercise of the functions in which they are employed.

695.    Defendants are obligated to make good the injuries they caused Plaintiff to suffer as a result of their illegal deprivation of Taylor's constitutional rights, liberty, and property pursuant to La. C.C. Arts. 2315 and 2316.

696.    Under the facts described above, all or some Defendants may be held liable under La. C.C. 2315 for torts including, but not necessarily limited to: (1) assault, (2) battery, (3) unnecessary/excessive force, (4) false arrest, (5) false imprisonment, and (6) malicious prosecution

697.    The City of Baton Rouge may also be held liable by virtue of La. C.C. Arts. 2317 and 2320 for the actions of its employees described herein.

698.    Pursuant to the above-cited provisions of the Louisiana Civil Code, Defendants are liable to Taylor for an award of monetary damages.

## DAMAGES

699.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

700.    As a result of the events of October 13, 2012 and April 29-30, 2014, Plaintiff Ernest Taylor has suffered and continues to suffer damages including, but not limited to the following:

(a)    Conscious physical pain and suffering in the past;

(b)    Conscious physical pain and suffering likely to be experienced in the future;

(c)    Mental anguish in the past;

(d)    Mental anguish likely to be experienced in the future;

(e)    Loss of earnings;

(f)    Deprivation of his property;

(g)    Deprivation of his liberty through false arrest and forced confinement;

(h)    Accrual of legal fees in connection with criminal charges.

701.    Plaintiff also seeks punitive damages against all defendants for the knowing and willful deprivation of Plaintiff's constitutional rights.

702.    Plaintiff further seeks an award of reasonable attorney's fees pursuant to 42 U.S.C. §1988, and any other applicable statute which provides for the award of reasonable attorney's fees in actions vindicating an individual's constitutional rights.

## PRAYER

WHEREFORE Plaintiff Ernest Taylor prays that upon final determination of these causes of action Plaintiff receives a judgment against Defendants The City of Baton Rouge; Baton

Rouge Chief of Police Carl Dabadie, Jr.; East Baton Rouge Parish Attorney Mary E. Roper; Baton Rouge City Prosecutor Lisa Freeman; East Baton Rouge Assistant Parish Attorney Frank J. Gremillion; East Baton Rouge Assistant Parish Attorney James L. Hilburn; East Baton Rouge Assistant Parish Attorney Tedrick K. Knighthead; Baton Rouge Police Officer James Thomas; Baton Rouge Police Officer Patrick Wennemann; Baton Rouge Police Officer Jane Doe; Baton Rouge Police Officer Jeremiah A. Ardoin, and Baton Rouge Police Officers John Doe #1 - #4 as follows:

(a) Declaring the Baton Rouge Policy Department's policy of enforcing all provisions of law that are "on the books" to be in violation of the Constitutions of the United States and Louisiana.

(b) Awarding actual damages as proven at trial, jointly and/or solidarily, against all defendants;

(c) Awarding Punitive Damages as proven at trial, jointly and/or solidarily against all defendants;

(d) Awarding costs of court and reasonable attorney fees necessary for preparing the case for trial;

(e) Awarding prejudgment interest at the highest rate permitted by law;

(f) Awarding interest on the judgment at the highest rate of legal interest from the date of judgment until collected; and

(g) Awarding all such other and further relief at law or in equity to which Plaintiff may show himself to be justly entitled.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Complaint and Request for Jury Trial

Respectfully Submitted,


  s/ Ernest Taylor   

Ernest Taylor, Plaintiff

SUBSCRIBED AND SWORN TO BEFORE ME on the 13th day of March, 2015, to certify which witness my hand and official seal

  s/  Terrence J. Donahue, Jr.  

Terrence J. Donahue, Jr., Notary Public, LA Bar Roll # 32126
My commission expires at death.


  s/ Terrence J. Donahue, Jr.   

CHRISTOPHER D. GLISSON
Louisiana State Bar No. 20200
TERRENCE J. DONAHUE, JR.
Louisiana State Bar No. 32126
**MCGLYNN, GLISSON & MOUTON**
340 Florida Street
Baton Rouge, LA   70801
Telephone (225) 344-3555
Facsimile (225) 344-3666
Email: chris@mcglynnglisson.com
Email: joe@mcglynnglisson.com

**ATTORNEYS FOR PLAINTIFF**