## UNITED STATES DISTRICT COURT

## FOR THE MIDDLE DISTRICT OF LOUISIANA

**ERNEST TAYLOR**                                        **CIVIL ACTION**

**VERSUS**

**THE CITY OF BATON ROUGE, ET AL**              **NO.: 3:15-CV-00153-BAJ-RLB**

## PLAINTIFF'S AMENDED COMPLAINT

NOW BEFORE THE COURT comes Plaintiff, Ernest Taylor, by and through undersigned counsel, and for his Amended Complaint in this matter states as follows:

1.

Plaintiff, Ernest Taylor, through undersigned counsel, submits this Amended Complaint against Defendants (1) The City of Baton Rouge; (2) Baton Rouge Chief of Police Carl Dabadie, Jr.; (3) Baton Rouge Police Officer James Thomas; (4) Baton Rouge Police Officer Jeremiah A. Ardoin; and (5 - 8) Baton Rouge Police Officers John Doe #1 - #4 (hereinafter referred to collectively as "Defendants").

2.

Through this action Plaintiff seeks all relief to which he may be entitled, including, but not limited to monetary damages from Defendants for abrogating Plaintiff's rights under the United States Constitution and Louisiana law.  Plaintiff asserts that Defendants created and/or maintained policies, procedures, practices, and/or customs which contravene the rights guaranteed to Plaintiff under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, while also violating various provisions of Louisiana law.

3.

At the present time, Plaintiff does NOT assert claims against Defendants pursuant to the Second Amendment to the U.S. Constitution, as those claims are currently being adjudicated in a separate case – Ernest Taylor v. City of Baton Rouge, et al., Case No. 13-579-BAJ-RLB, currently pending in this Court.

4.

Plaintiff specifically reserves the right to incorporate a claim for monetary damages arising from Defendants' violation of Plaintiff's rights under the Second Amendment to the U.S. Constitution in the event that claim is dismissed from the proceeding identified above.

5.

At the present time, Plaintiff is not seeking any injunctive or declaratory relief, but specifically reserves the right to amend this complaint to assert the necessity of such relief in the future.

6.

Plaintiff specifically asserts the applicability of La. C.C. Art. 2324(C) to the claims asserted herein.

JURISDICTION AND VENUE

7.

This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. This action is also brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 alleging violations of Plaintiff's First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

8.

Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. §1391.

9.

This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367, including, but not limited to, claims asserted pursuant to Louisiana Civil Code Articles 2315, 2316, 2317 and 2320, and for violations of Article I, Sections 3, 5, 9, 11 and 13 of the Louisiana Constitution.

PARTIES

Plaintiff

10.

Plaintiff Ernest Taylor ("Taylor") is a resident and domiciliary of The City of Baton Rouge, East Baton Rouge Parish, Louisiana, and is a citizen of the United States of America and the State of Louisiana. Taylor resides within the 70805 zip code.

11.

Taylor has previously been arrested and prosecuted pursuant to outdated and unconstitutional laws for engaging in activities that are lawful and constitutionally protected.

12.

In the future, Taylor intends to engage in constitutionally protected activities that are prohibited by unconstitutional laws enforced by the Baton Rouge Police Department Defendants

13.

Defendant The City of Baton Rouge ("City") is a municipality and political subdivision of the State of Louisiana.  For purposes of this complaint, references to the City include

both the City of Baton Rouge and the Parish of East Baton Rouge, as appropriate. Reference to departments or subdivisions within the City such as "Baton Rouge City Police," "Baton Rouge Police Department" and "BRPD" include the City, and the individuals acting within the department or subdivision, as appropriate.  The City may be served through its agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

14.

Defendant Carl Dabadie, Jr. ("Dabadie") is the current Baton Rouge Chief of Police, and is sued both in his individual capacity, and in his official capacity as a policymaker for the City.  Dabadie may be served through his agent, Mayor-President Melvin "Kip" Holden, 222 St. Louis Street, 3rd Floor, City Hall.

15.

Defendant James Thomas ("Thomas") is an officer with the Baton Rouge Police Department, and is sued solely in his individual capacity.  Thomas may be served at the Baton Rouge Police Department, 704 Mayflower Street, Baton Rouge, LA 70802.

16.

Defendant Jeremiah A. Ardoin ("Ardoin") is an officer with the Baton Rouge Police Department, and is sued solely in his individual.  Ardoin may be served at the Baton Rouge Police Department, 704 Mayflower Street, Baton Rouge, LA 70802.

17.

Defendants John Doe #1 - #4 are officers with the Baton Rouge Police Department who accompanied Officer Thomas to Plaintiff's residence on the evening of April 29, 2014 and/or early morning hours of April 30, 2014.  Officers Doe #1 - #4 are being sued solely

in their individual capacities.  Plaintiffs will amend this complaint to include the names of all officers present at Taylor's home once this information has been provided by Defendants.

FACTS

18.

Each of the foregoing paragraphs is incorporated as if fully set forth herein.

19.

On October 13, 2012 Taylor was arrested for an alleged violation of § 13:95.3, a municipal ordinance which was unconstitutional.  Firearms belonging to Taylor were confiscated from him.  Thereafter, criminal charges were filed against Taylor in Baton Rouge City Court by the Baton Rouge City Prosecutor.

19.

On September 19, 2013, Taylor filed suit against the City of Baton Rouge, the officers who arrested Taylor and confiscated his firearms on October 13, 2012, the Baton Rouge City Prosecutor, the East Baton Rouge Parish Attorney, and the Chief of the Baton Rouge Police Department in the United States District Court for the Middle District of Louisiana.

20.

Taylor also moved to quash the charges brought against him in Baton Rouge City Court on several grounds.

21.

Taylor's motion to quash asserted that the charge of violating §13:95.3 should be quashed because the ordinance conflicted with provisions of the United States Constitution

and the Louisiana Constitution.

22.

Taylor's motion to quash asserted that the description of events provided in the Baton Rouge Police Department Incident Report and the non-notarized affidavit of the arresting officer did not assert facts showing Taylor had violated either §13:108 or §11:283, and that the facts appearing in these documents actually established that no such violations had occurred.

23.

Through his suit in federal court, Taylor sought to prevent the City of Baton Rouge from further enforcement of §13:95.3, sought an order declaring §13:95.3 unconstitutional and unenforceable, sought the return of the firearms confiscated on October 13, 2012, and also sought an award of monetary damages.

24.

Taylor's criminal trial and the hearing on his motion to quash were scheduled for April 28, 2014.

25.

Defendant Thomas had been notified and were aware that Taylor's criminal trial was scheduled to be conducted on April 28, 2014.

26.

On April 28, 2014 the Louisiana Attorney General's Office, on behalf of the City, dismissed all charges brought against Taylor arising from his arrest on October 13, 2012.

27.

At approximately 10:11 A.M. on April 29 – the day after Taylor's criminal charges

were dismissed -- Defendant Officer J. Ardoin of the BRPD was dispatched to a residence located on Alliquippa Street in Baton Rouge in response to a report of an armed robbery. Through his investigation Ardoin determined that an individual identified only as a "black male" had purportedly entered the Alliquippa Street residence with a handgun, and stolen a television set valued at approximately two hundred dollars ($200.00).

28.

After questioning the individual that had reported the alleged robbery, Ardoin took no further action, and drafted an "Initial Report" detailing his actions and findings.

29.

Upon information and belief, at some point prior to 11:23 P.M. on April 29, 2014, Officer Thomas was informed of the dismissal of the criminal charges filed against Taylor as a result of his October 13, 2012 arrest.

30.

Upon information and belief, upon being notified of the dismissal of Taylor's criminal charges, Thomas became concerned about the effect the dismissal might have on Taylor's federal lawsuit, and his continued employment with the Baton Rouge Police Department.

31.

Upon information and belief, Thomas conspired with Ardoin and other members of the Baton Rouge Police Department, including the arresting officer from the earlier arrest and/or John Doe #1 - #4 to retaliate against Taylor for submitting a complaint to the internal affairs division, and for his filing of a federal lawsuit.

32.

Upon information and belief Officers Thomas, Ardoin, and Doe #1 -#4 developed

a plan to implicate Taylor as a suspect in a crime he had not committed, then to invade Taylor's home and take him into custody.

33.

Upon information and belief, the plan developed by the officers was intended to make Taylor feel unsafe in his own home, to demonstrate to Taylor that members of the Baton Rouge Police Department could enter his home, harass him, and take him into custody even though he had committed no offense, and to frighten and intimidate Taylor into abandoning his federal civil rights lawsuit.

34.

Upon information and belief, Officers Thomas, Ardoin, and John Doe #1 - #4 decided to execute their plan to intimidate and retaliate against Taylor during the late night hours of April 29, 2014 and the early morning hours of April 30, 2014.

35.

At 11:23 P.M., Officer Thomas was on duty traveling in his marked police cruiser in the 70805 zip code.

36.

At approximately 11:23 P.M., a female individual phoned 911 and relayed facts virtually identical to those recorded by Officer Ardoin more than twelve hours earlier.

37.

While the individual who had contacted police earlier that day had identified the alleged burglar only as a black male, the individual who called 911 on the night of April 29, 2014, without being asked to make any identification, stated that "Ernest Taylor" was the individual who had stolen her television.

38.

Upon information and belief, the individual making the call to 911 had been previously instructed by Thomas, Ardoin, and/or other member(s) of the Baton Rouge Police Department to call and identify Plaintiff as the perpetrator of a crime on Alliquippa Street.

39.

Taylor was never present at the Alliquippa Street residence, and has never met and is unacquainted with the individual who made the 911 call.

40.

Despite having knowledge that there were numerous individuals answering to the name "Ernest Taylor" in Baton Rouge and the surrounding areas, and lacking any evidence to indicate that Plaintiff herein was involved with the events being reported, upon hearing the 911 call, Thomas immediately concluded that the "Ernest Taylor" referenced in the 911 call was Plaintiff herein.

41.

Even though there were numerous other BRPD officers available in the vicinity, Officer Thomas elected to respond to the 911 call, despite the fact that Thomas was then a defendant in a lawsuit filed by Taylor.

42.

Even though no description had been provided of the individual who allegedly burglarized the Alliquippa Street residence, Officer Thomas informed the other on-duty officers via his police radio that Taylor was the suspect being sought, and attempted to provide them with a physical description matching that of Plaintiff.

43.

While traveling to the Alliquippa Street residence, Thomas informed other officers by radio that Taylor had filed suit against he and other members of the Baton Rouge Police Department.

44.

Without basis or justification, Thomas also informed the other on-duty police officers that Taylor was "very violent."

45.

Upon his arrival at the Alliquippa Street residence, Officer Thomas immediately engaged in an overtly suggestive line of questioning with the female present at the residence in an effort to elicit responses supportive of Thomas' conclusion that the alleged suspect was Plaintiff herein.

46.

Thomas also engaged in an overtly racial line of questioning, asking the individual at the Alliquippa Street Residence whether the person who allegedly robbed the home "dresses like a pimp" sometimes.

47.

Despite Thomas' attempts, the female present at the Alliquippa Street residence provided no information to corroborate Thomas' belief that the individual that had allegedly stolen her television was, in fact, Plaintiff herein.

48.

Instead, the female present at the Alliquippa Street residence provided information that would exclude Plaintiff herein as a suspect in the alleged burglary, stating that she had

personal knowledge of the alleged suspect and that he was "in his thirties."

49.

On April 29, 2014, Plaintiff herein was 54 years old.

50.

Despite receiving information that would eliminate Plaintiff as a suspect in the alleged crime on Alliquippa Street, Officer Thomas resorted to additional suggestive tactics that would elicit a false identification of Plaintiff as the alleged suspect.

51.

Specifically, Officer Thomas indicated to the female at the Alliquippa residence that he was going to show her a picture of Plaintiff to determine whether he was the individual that had perpetrated the alleged crime.

52.

Officer Thomas then retrieved a computer from his vehicle and positioned himself so that his dashboard camera would not be able to record any identification made by the female.

53.

Through the use of techniques designed to do so, or alternatively, via explicit request, Thomas indicated to the female that he wanted her to identify Plaintiff as the individual who purportedly robbed the Alliquippa Street residence.

54.

As a result of Thomas' suggestive techniques, or alternatively, in acquiescence to Thomas' specific request, the female at the Alliquippa Street residence incorrectly identified Plaintiff herein as the individual that had committed the alleged robbery.

55.

Despite the absence of probable cause or any legitimate evidence suggesting that Plaintiff had been involved in any wrongdoing, and despite the lack of any exigent circumstances, Thomas proceeded to Plaintiff's residence for the purpose of placing him under arrest.

56.

Upon information and belief, Thomas did not believe that Taylor had been involved in any criminal activity on the evening of April 29, 2014.

57.

Rather, Thomas saw the television robbery as an opportunity to intimidate Taylor and to retaliate against him for filing a complaint with internal affairs, and for naming Thomas and other members of the Baton Rouge Police Department in his federal lawsuit.

58.

To achieve his goal of intimidation, while en route to Plaintiff's residence, or shortly after arriving, Thomas again conspired with Officers Ardoin and John Does #1 - #3 to conceal Thomas' presence while utilizing false pretenses to summon Plaintiff to the door of his home.

59.

Under the plan devised by the officers, when Plaintiff answered the door to his home, Thomas would not then be present, so as to avoid alerting Plaintiff to any impropriety.  Once Thomas was able to confirm Plaintiff's identity, Thomas would then come forward, enter Plaintiff's home, place him in handcuffs, and take him into custody.

60.

The plan was designed to demonstrate to Plaintiff that officers of the Baton Rouge Police Department, and Officer Thomas in particular, were capable of forcing their way into Taylor's home and taking him into custody despite the fact that Taylor had committed no crime.

61.

After deciding upon the actions they would take, the officers, other than Thomas, approached the door to Taylor's residence, knocked, and shouted, "[d]id somebody call 911?"

62.

Eventually, Taylor opened the front door in a state of undress and stepped outside to speak with the officers, indicating that no one at his residence had called 911.

63.

When Taylor stepped outside, Thomas informed the other officers over his police radio that the individual who had exited the home was, in fact, the Taylor he desired to intimidate.

64.

After receiving confirmation of Taylor's identity from Thomas, one of the other officers stated that Taylor needed to speak with another officer, and asked Taylor to step back inside of his home.

65.

Pursuant to the officer's request, Taylor reentered his home.

66.

Without a warrant and in the absence of consent or any exigent circumstance, Thomas immediately followed Taylor and entered his home, asked Taylor if he knew his rights, then began Mirandizing Taylor.

67.

Taylor repeatedly questioned the officers as to why they had come to his home and placed him under arrest.

68.

None of the officers present at Taylor's home provided him with any explanation of their authority to arrest him and search his home, nor did they inform him of the charges for which they believed they had probable cause or provide any other reason for his arrest.

69.

Upon realizing that it was Thomas that had entered his home, Taylor inquired as to whether Thomas was one of the defendants in Taylor's federal lawsuit, to which Thomas responded affirmatively.

70.

Taylor was then handcuffed inside of his residence and led outside where, still in a state of undress, he was placed in the backseat of Thomas' police cruiser.

71.

Without a warrant, and despite Taylor's refusal to consent to a search, the officers proceeded to search both Taylor's residence and his vehicle.

72.

As Taylor had committed no crime, nothing that would implicate Taylor in any

wrongdoing was discovered as a result of the officers' search of Taylor's home and vehicle in the early morning hours of April 30, 2014.

73.

Taylor was eventually taken from the backseat of Thomas' police cruiser, and placed into the backseat of another officer's cruiser, then driven to the First District Precinct where he was placed in a holding cell.

74.

Upon leaving Taylor's residence, Thomas returned to the Alliquippa Street residence, purportedly to locate the female individual with whom he had previously spoken, and to then transport her to the First District Precinct in order to identify Taylor as the alleged robber.

75.

Thomas was unable to locate the female at the Alliquippa Street residence, either because she had wrongfully identified Taylor as the culprit at Thomas' suggestion or alternatively, pursuant to Thomas' explicit instruction that she not be present when Thomas returned from Taylor's home.

76.

Their plan having been successfully executed, after several hours, the BRPD officers eventually released Taylor from the holding cell at First Precinct, and allowed him to return home.

77.

After he was released from custody, Taylor contacted Glisson's firm to inform him of the actions undertaken by officers of the Baton Rouge Police Department.

78.

Officers of the Baton Rouge Police Department continued to harass Taylor after April 30, 2014 by regularly parking near Taylor's residence and/or driving by his home in order to make him fear that they might again take him into custody without justification.

Organization and Policymaking of The City of Baton Rouge

79.

At all times pertinent hereto, defendants acted under color of law pursuant to statutes, ordinances, regulations, policies, customs, practices, and usage of the State of Louisiana and/or the City of Baton Rouge.

80.

The Chief of the Baton Rouge Police Department possesses the authority to direct and control the powers exercised by the officers of the Baton Rouge Police Department pursuant to Baton Rouge City Ordinance Sec. 4:51.

81.

The Chief of the Baton Rouge Police Department exercises the authority granted to him by Baton Rouge City Ordinance §4:51 through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

82.

Officers of the Baton Rouge Police Department are required to "obey absolutely" the orders and directions of the Chief of Police pursuant to Baton Rouge City Ordinance Sec. 4:55.

83.

Section 6.02 of the City's Plan of Government provides that the Chief of Police shall

be in direct command of the Police Department, and shall have the power to appoint and remove officers and employees of the department, assign members of the department to their respective posts, and to make rules and regulations concerning the operation of the department, the conduct of its officers and employees, along with matters relating to equipment, training, and discipline.

84.

Baton Rouge Code of Ordinances Sec. 4:50 and Section 6.01 of the City's Plan of Government also vests responsibility with the Baton Rouge Police Department to preserve the rights and property of Baton Rouge citizens with respect to their persons and property, and to uphold the laws of the State of Louisiana.

85.

Donald Dewayne White served as Baton Rouge Chief of Police from May 27, 2011 until on or about February 16, 2013 when he was replaced by Carl Dabadie, Jr.  Dabadie currently still holds the position.

Municipality's Prior Notice Of Pervasive and Customary Improper Police Actions

86.

On September 13, 2005, Major Daniel Lopez of the New Mexico State Police, Investigations Bureau sent a letter to the Baton Rouge Police Department, Office of Internal Affairs, detailing instances of misconduct committed by BRPD officers that had been observed by New Mexico State Police Officers while providing assistance in the wake of Hurricane Katrina.

87.

The letter detailed various concerns voiced by members of the New Mexico State

Police Department with respect to the actions of BRPD officers, including stopping persons without probable cause, the physical mistreatment of members of the public, the use of unprofessional and inappropriate language, the racially-motivated enforcement of laws, the forced entry into private residences, and other incidents of lawless behavior by members of the Baton Rouge Police Department.

89.

In response to the reports he received from the New Mexico State Police Officers, Major Lopez immediately pulled his men from their assignment in Baton Rouge, and informed the BRPD that, "[a]t current, the New Mexico State Police will not place its personnel in a working environment with the Baton Rouge Police Department."

90.

Along with Major Lopez's letter, the New Mexico State Police also submitted statements from several of its officers who had personally observed the misconduct of BRPD officers.

91.

The officer's statements describe clear constitutional violations and discriminatory practices being employed with impunity by officers of the BRPD.  The reports contain the following statements:

1. "I observed what appeared to be several questionable traffic/pedestrian stops, searches, arrests, and uses-of-force."

2. "I observed numerous stops where BRPD officers did not appear to have probable cause.  Officers routinely searched people and vehicles when they did not appear to have probable cause."

3.  "Officer King is a good officer but does seem to handle black people differently than he would a pretty Caucasian woman.  Each time Officer King would make contact with a Caucasian person he would be friendly and pleasant.  But when he spoke to a black person he was very loud, rude and demeaning."

4.  "Officer Cutter turned on his lights and stopped the vehicle without probable cause that I had seen."

5.  "I don't know if [BRPD officers] have been given any type of direction as to what is right or wrong as each officer is doing things his own way."

6.  "I do feel that most of the night officers that I had contact with had some type of comment or attitude towards black people in general."

7.  "At this time the [BRPD] officer began telling me about how they have gone into the black neighborhoods and have been beating them down since the hurricane happened."

8.  "At this time I began to notice the officer pointing his spot light in the faces of black civilians telling them, 'What are you doing standing in the road, Are you stupid, Get out of the road' and would then drive off.  The black civilians were on the sidewalks and were not bothering anyone.  The officer continued to describe the residents in these neighbors as basically animals."

9.  "The officer began to stop vehicles for no apparent reason and would treat the subjects very rude and would begin to search the vehicle

with no probable cause and without permission from the driver."

10.    "The officer and I began to patrol in the 1st district where again the officer would stop vehicles for no apparent violations and would treat the subjects in the vehicle very rude and would search the vehicle with no probable cause and tell them 'To get the hell out of here.'"

11.    "We began to patrol the area when the officer began to spot light black civilians telling them, 'Are you stupid, get out of here."

12.    "Both nights I noticed subjects being stopped for no reason, searches being performed with no probable cause and people['s] civil rights being violated.  I witnessed officers referring [to] African Americans as animals and that they needed to be beaten down."

13.    "Officer Lampleyrouse did not indicate why he searched the vehicle and lacked reasonable suspicion and probable cause, in my opinion."

14.    "Officer Browning made contact with these subjects with no reasonable suspicion or probable cause, performed pat downs and extracted items from the pockets of these individuals. Officer Browning referred to these subjects as 'heathens.'"

15.    "On approximately four separate occasions I observed searches of vehicles and personal property with no probable

cause.  Officers at these incidents made contact with black civilians and had them exit the vehicles or personal property without consent from the owner."

92.

In October of 2011, Police Chief DeWayne White candidly stated that at least 10 percent of the Baton Rouge Police Department had a problem with "racial profiling."

93.

To combat the practice of racial profiling by officers of the Baton Rouge Police Department, Chief White made it a priority to locate racists within the ranks of the BRPD, and take action to ensure that these individuals were not engaging in discriminatory police tactics.

94.

In February of 2013, Mayor Kip Holden removed DeWayne White as Chief of the Baton Rouge Police Department.

95.

City officials admitted at the time that the decision to remove White as Chief of the BRPD was made, in part, because of White's comments regarding the presence of racism within the Baton Rouge Police Department.

96.

At a public hearing before the Baton Rouge Metro Council regarding his termination, also in February, 2013, White stated that there exists "a serious race relations problem between [BRPD] officers and the public we serve. I'm personally aware of racial insensitivities and so are you."

97.

At the hearing, White recounted an instance in which an officer under his command had responded to the location of a homicide and stated -- within earshot of the victim's family -- "I'm here on my wife's birthday, and I'm standing over a dead –-----."

98.

White also stated at the hearing that the U.S. Justice Department had expressed "grave concern" over the BRPD's failure to recruit more minorities and females into the department, and that as a result, the City would likely not be released from the consent decree regarding BRPD hiring practices that had been in effect since 1980.

99.

In response, officials speaking on behalf of the City characterized White's remarks as "hyperbole," stating that the DOJ "have never raised a question as to the hiring practices of the city."  The official went on to state, that contrary to White's assessment, the City was "meeting the expectation of the Justice Department on this particular issue."

100.

Contrary to the City official's representations, the U.S. Justice Department had in fact declined to release the City from the requirements of the 1980 Consent Decree when it released twenty other Louisiana municipalities and parishes from its requirements in late 2012.

101.

According to a spokesman for the DOJ, the requirements of the consent decree continued to apply to the City of Baton Rouge because the city was "found to need additional time to meet the requirements of the decree."

102.

In commenting on the continued application of the consent decree, a former BRPD officer who had served as the department's first black female captain stated, "Over the years, they haven't been as blatant as they were when I went through.  I feel that if they could have, I never would have went up the ladder.  If they had a choice, they never would have promoted me."

103.

In response to White's firing and the information he had provided during the public hearing, at least one Baton Rouge Metro Council Member submitted a formal request to the U.S. Justice Department to investigate the discriminatory practices of the BRPD.

104.

In September, 2014, the Baton Rouge Police Department's troubles with race relations continued, when several racist text messages sent by a BRPD officer were discovered by the media.

105.

One of the texts sent by an officer of the BRPD stated, "I wish someone would pull a Ferguson on them and take them out.  I hate looking at those African monkeys at work … I enjoy arresting those thugs with their saggy pants."  Another text stated, "[t]hey are nothing but a bunch of monkeys."

106.

After receiving attention from the media, the officer who authored the racist text messages resigned from the BRPD, even though Chief Dabadie had not spoken with him, and no request for his resignation had been made.

107.

Subsequently, Chief Dabadie permitted the officer to alter his departure paperwork to indicate that the officer had retired, instead of resigning as a result of the scandal.

108.

Members of the Baton Rouge community, including members of the Metro Council, decried Dabadie's decision as too lenient given the seriousness of the officer's offense.

109.

As described above, the Baton Rouge Police Department has had a consistent and unbroken pattern of tolerating and promoting discriminatory behavior among the members of its force for many decades.

110.

The Baton Rouge Police Department's pattern of tolerating and promoting discriminatory behavior was in effect at all times relevant to this complaint, and has continued unabated, with neither the City or its actors having put systems in place to discourage and eliminate such activity.

Defendants' Wrongful Conduct

111.

Defendants are charged at all relevant times with the knowledge of the law as it existed with respect to Taylor's rights under the Constitution of the United States and Louisiana law.

112.

During all times relevant to this complaint, no reasonable law enforcement officer would believe that information obtained from an arrested individual would be admissible

in a court of law where the officers did not advise the individual of his Miranda rights prior to questioning.

113.

During all times relevant to this complaint, no reasonable law enforcement officer would believe that the existence of an affidavit of probable cause signed only by a law enforcement officer would provide sufficient authority to perform an arrest.

114.

During all times relevant to this complaint, any reasonable law enforcement officer would believe that the actions of the Defendant Police Officers on April 29-30, 2014 were not only unauthorized, but also constituted violations of both civil and criminal law.

115.

During all times relevant to this complaint, no reasonable law enforcement officer would believe that the identification of a suspect through the display of a single photograph would provide probable cause sufficient to perform an arrest or search.

116.

During all times relevant to this complaint, no reasonable law enforcement officer would believe that Taylor's arrest on April 30, 2014 was justified or authorized by law.

117.

During all times relevant to this complaint, no reasonable law enforcement officer would believe that Officer Thomas should be permitted to interact with or exercise control over Taylor, when Thomas had been named as a defendant in a lawsuit filed by Taylor, and any such interaction was unnecessary due to the availability of other officers and the lack of exigent circumstances.

118.

Through their allowing police officers to engage in unlawful entries of private homes and searches, and their allowing officers to fail to advise individuals of their constitutional rights as required by law, Defendants created and/or maintained a policy whereby they would enjoy virtually unfettered discretion to deprive individuals of their constitutionally protected rights.

119.

The BRPD lacks any system to inform or train the police officers under their command regarding the limits placed on the scope of their authority, and/or the actions required of them in order to protect the fundamental rights of individuals within their jurisdiction, as dictated by rulings from both Louisiana and Federal Courts.

120.

On information and belief, the decision of the City and its policymakers to engage in inappropriate investigation tactics, in conjunction with the admitted practice of profiling individuals on the basis of their race and the concentration of these tactics in the 70805 zip code, has resulted primarily in the deprivation of rights held by minorities such as Plaintiff.

121.

Defendant police officers used illegal tactics and unenforceable provisions of law as a means of harassing and intimidating individuals, including Plaintiff, by performing unlawful searches, violating or attempting to violate their right against self-incrimination, and depriving them of their property and/or liberty in situations where the individuals were abiding by the law and where there existed no legal authority under which such actions could be taken.

122.

Defendant police officers knew or should have known that their tactics and the laws they purported to enforce violated Taylor's rights under both the U.S. Constitution and the Louisiana Constitution.

123.

Chief Dabadie also instituted or continued in effect of policy of protecting police officers made the subject of citizen complaints, and of permitting the use of illegal and unconstitutional means to discourage aggrieved citizens from seeking redress.

124.

The City and its actors created and implemented a plan or policy which gave them virtually unfettered discretion to detain individuals, perform illegal searches, seize their property, and place them under arrest without probable cause and/or for conduct which was protected by the Louisiana and U.S. Constitutions.

125.

In addition to the policies, practices, and/or customs described above, the deficiencies within the City's operations and the Baton Rouge Police Department include, but are not limited to: (1) failure to adopt and enforce appropriate policies; (2) failure to properly recruit, train, and supervise law enforcement officers; (3) adequately review and investigate officer uses of force; (4) failure to fully investigate allegations of officer misconduct; (5) failure to identify and respond to patterns of at-risk officer behavior; and (6) failure to enact appropriate performance review and promotional systems.

126.

As a direct result of the official policies, procedures, practices and/or customs

described above, Plaintiff Ernest Taylor was denied of significant rights guaranteed him by the United States and/or Louisiana Constitutions, in addition to other applicable provisions of law.

127.

At all times relevant to this complaint, the Baton Rouge Police Department ("BRPD") has lacked the basic elements of effective policing – clear policies, training, accountability, and confidence of the citizenry.

128.

Officers of the BRPD regularly show a lack of respect for the civil rights and dignity of the people of Baton Rouge, particularly those segments that have historically been marginalized.

129.

Officers of the BRPD, at every rank, either do not understand or choose to ignore the boundaries of constitutional policing.

130.

The BRPD's failure to ensure that its officers routinely respect the United States and Louisiana Constitutions and the rule of law undermines trust within the very communities whose cooperation the department most needs to enforce the law and prevent crime.

131.

The City and its actors have encouraged or have been indifferent to widespread violations of law by officers of the BRPD.  The City and the BRPD have been notified of the widespread and blatant violations of citizens' rights by credible sources, including following Hurricane Katrina.

132.

In the absence of mechanisms to protect and promote the civil rights of individuals subject to its authority, officers of the BRPD regularly use unnecessary or excessive force, and conduct illegal stops, searches, interrogations, and arrests with impunity.

133.

The City and BRPD have failed to institute systems designed to prevent and detect the use of unnecessary or unreasonable uses of force by officers of the BRPD, have failed to provide training on the appropriate use of force, have failed to provide the supervision necessary to oversee the use of force by BRPD officers, and have failed to develop policies to provide BRPD officers with clear and consistent guidance on when and how to use and report force.

134.

The City and BRPD have failed to collect and/or monitor data on the use of force by BRPD officers which would enable the identification and prevention of unlawful uses of force before they result in significant or widespread harm.

135.

The City and BRPD have a policy, practice, or custom of tolerating widespread underreporting or non-reporting of uses of force by BRPD officers.

136.

The failure of BRPD officers to report uses of force is the result of a systemic failure to hold the officers accountable for not reporting uses of force, or to even acknowledge the extent to which BRPD officers use force.

137.

The City and BRPD have failed to institute a policy making clear that all employees have a responsibility to ensure that constitutional violations inflicted by BRPD officers are reported and investigated.

138.

The City and BRPD have a policy, practice, or custom of failing to perform adequate investigations of any violations of BRPD officers that are reported.

139.

By tolerating the failure to investigate constitutional violations made by BRPD officers, the City and BRPD forego the chance to correct dangerous behavior, instead sending the message that there is little institutional oversight or concern about officers' constitutional violations.

140.

The City and BRPD have condoned the pattern or practice of BRPD officers to engage in stopping, searching, and arresting individuals, along with seizing their property in the absence of reasonable suspicion or probable cause.

141.

The City and BRPD's policies and training on warrantless searches and seizures are non-existent or highly inadequate, leaving BRPD officers with little guidance regarding the constitutional limitations on their authority to detain, search, interrogate, and arrest.

142.

The Unites States Attorney's Office has offered in the past to provide free training to law enforcement officers on the constitutional limits of their authority, but neither the City

nor BRPD has ever requested or inquired about such training.

143.

The City and BRPD have a policy of utilizing field training officers to instruct new officers on the appropriate procedures to be used when interacting with members of the public.  By failing to provide accurate and up-to-date training by legally trained experts on the protection of citizens' constitutional rights, new officers are trained by individuals who lack knowledge of current legal requirements, and who suffer from misconceptions of law and the proper scope of police authority.

144.

The inadequate policies and training provided to officers of the BRPD by the City and the BRPD leave officers without the basic foundation to perform their duties within constitutional boundaries, increasing the likelihood that officers, unable to perceive and articulate reasonable suspicion and probable cause, may either stop individuals arbitrarily or rely on impermissible factors such as an individual's race or ethnicity.

145.

The City and its actors have failed to institute systems designed to prevent, detect, and respond to discriminatory policing, and to ensure that officers of the BRPD are conducting themselves in accordance with constitutional guarantees of equal protection.

146.

The City and its actors have failed to take reasonable steps to counteract and eradicate bias based on factors such as race, ethnicity, and sexual orientation in its policing practices.

147.

BRPD's use of force practices present a significant threat to the safety of Plaintiff, the public in general, and officers of the BRPD, and create a substantial obstacle to strong community-police partnerships.

148.

The City has failed to provide officers of the BRPD with adequate and sufficient training on how to properly carry out stops, searches, seizures, interrogations, and arrests.

149.

The training that the City and BRPD has provided to its law enforcement officers is out of date and conflicts with current legal requirements.

150.

The City's failure to train officers of the BRPD or otherwise provide guidance on the limits and requirements of the U.S. and Louisiana Constitutions contributed directly to the deprivation of Plaintiff's rights described herein.

151.

The City's and BRPD's failure to provide sufficient guidance, training, and support to officers within the BRPD, as well as their failure to implement systems to ensure officers are wielding their authority effectively and safely, have created an environment that permits and promotes constitutional harm.

152.

The City and BRPD have failed to provide the supervision necessary to prevent or detect misconduct by its officers and ensure effective policing.

153.

Supervisors within the BRPD, as a matter of course, fail to hold officers engaged in violations of individuals' civil rights accountable for their actions.  These supervisors regularly approve the use of unnecessary or excessive force, conduct flawed investigations, sign off on materially deficient arrest reports, and/or simply do not perform any supervision of their subordinates.

154.

The City's and BRPD's focus on statistics such as number of arrests and number of firearms seized, particularly in combination with poor training and policies, encourages BRPD officers to violate individuals' rights by conducting illegal stops, searches, seizures, interrogations, and arrests.

155.

The BRPD has engaged and is engaged in a pattern or practice of discriminatory policing in violation of constitutional and statutory law.

156.

The City and its actors have failed to implement adequate policies and provide appropriate training regarding the limits of the authority exercised by law enforcement officers with respect to conducting stops, searches, seizures, interrogations, and arrests.

157.

The City's lack of policies and training on the limits of police authority, combined with a general failure to acknowledge and address the potential for stereotypes and bias in BRPD officers' decision-making has cultivated an atmosphere in which discriminatory policing occurs unchecked.

158.

The City has no system in place that is capable of tracking allegations and complaints of racial profiling, and does not collect, analyze, or report race or ethnicity data for most citizen encounters with police.

159.

Collectively, the actions of the Defendants, described above, have had a substantial chilling effect on the exercise of constitutionally protected activity by individuals within the City of Baton Rouge.

CLAIMS FOR DECLARATORY RELIEF AND MONETARY DAMAGES

160.

Each of the foregoing paragraphs is incorporated as if set forth fully herein.

COUNT 1

42 U.S.C. §1983 (1st and 14th Amendments)

161.

The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of aggressively pursuing individuals who voiced complaints against officers of the BRPD, and condoning the efforts of BRPD officers to violate the civil rights of such individuals through intimidation, the use of unconstitutional searches and seizures, and/or making arrests in the absence of probable cause.

162.

This policy, practice or custom was utilized by officers Ardoin, Thomas, and/or John Doe #1 - #4 to retaliate against Taylor for exercising his rights to seek redress from the government for his grievances with the City and its actors.

163.

Defendant Dadabie's explicit stated policy of ignoring judicial precedent and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force.

164.

Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

165.

Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights in pursuit of protecting members of the BRPD directly resulted in retaliation against individuals who exercised their right under the First Amendment to criticize governmental actors and seek redress for their wrongdoings.

166.

Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD in retaliation for Taylor's filing of a lawsuit in federal court.

167.

The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted for exercising their First Amendment rights.

168.

The policies, practices, and/or customs described above have had a profound chilling effect on individuals' exercise of their right under the First Amendment to voice criticism of government actors who have engaged in misdeeds.

169.

Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to seek from the government a redress of grievances as guaranteed by the First Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

170.

As the policies, practices, customs, and/or tactics employed by the City and its actors violate the First Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

COUNT 2

42 U.S.C. §1983 (4th and 14th Amendments)

171.

The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of condoning BRPD officers routine engagement in unlawful searches and seizures.

172.

This policy, practice or custom was utilized by officers Ardoin, Thomas, and/or John

Doe #1 - #4 in performing unlawful searches and seizures with respect to Taylor in violation of his rights under the Fourth Amendment to the U.S. Constitution.

173.

Defendant Dabadie has employed a policy which expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

174.

Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights directly resulted in the performance of unlawful searches and seizures by officers of the BRPD.

175.

Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on April 29-30, 2014.

176.

The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted pursuant to evidence acquired through unconstitutional searches and seizures in violation of individuals' Fourth Amendment rights.

177.

The policies, practices, and/or customs described above have had a profound

chilling effect on individuals' exercise of their right to travel unmolested, free from unreasonable searches and seizures, guaranteed by the Fourth Amendment to the U.S. Constitution.

178.

Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

179.

As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fourth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

COUNT 3

42 U.S.C. §1983 (5th and 14th Amendments)

180.

The City of Baton Rouge, and its individual actors also instituted and/or maintained a policy, practice, or custom of condoning BRPD officers routine engagement in unlawful interrogation practices by failing to advise individuals of their rights under the Fifth Amendment.

181.

This policy, practice or custom was utilized by officers Thomas,  Ardoin and/or John

Doe #1 - #4 in performing unlawful interrogation techniques with respect to Taylor in violation of his rights under the Fifth Amendment to the U.S. Constitution.

182.

Defendant Dadabie's explicit stated policy of ignoring judicial precedent, and his accompanying failure to properly train his officers, has resulted in a complete ignorance of the constitutional requirements applicable to custodial interrogations impose by the Fifth Amendment.

183.

Dabadie's policy of permitting and encouraging unlawful interrogations expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

183.

Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights by ignoring requirements placed upon the BRPD by virtue of judicial precedent has directly resulted in the performance of unlawful interrogation techniques by officers of the BRPD.

184.

Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal questioning performed by officers of the BRPD with respect to Taylor on  April 29-30, 2014.

185.

The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted pursuant to confessions or other information subject to the exclusionary rule as stated in Miranda v. Arizona in violation of individuals' Fifth Amendment rights.

186.

Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

187.

As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fifth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

COUNT 4

42 U.S.C. §1983 (14th Amendment – Equal Protection)

188.

The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of promoting, encouraging and/or condoning BRPD officers routine use of discriminatory police tactics, selective enforcement of laws, and racist mentalities.

189.

This policy includes the maintenance and enforcement of illegal provisions of law that have historically been used to marginalize minority individuals such as Taylor.

190.

The City and its actors instituted and/or maintained a policy whereby BRPD officers were instructed to utilize aggressive tactics, perform unconstitutional searches and seizures, and otherwise violate the constitutional rights of individuals living in poor, black communities such as the 70805 zip code.

191.

Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force, and has fostered and cultivated the use of discriminatory policing tactics by members of the BRPD.

192.

Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws, when the actions of individuals within his department are challenged, or when an officer's prejudices lead him or her to steroptype minority individuals.

193.

Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights directly resulted in the performance of unlawful searches

and seizures by officers of the BRPD, primarily on minority members of the community.

194.

The rate at which illegal provisions of law were enforced against minority individuals cannot be explained by any other reasoning than the utilization of discriminatory policing tactics by members of the BRPD.

195.

Dabadie's policy of ignoring and/or encouraging the discriminatory tactics used by members of the BRPD directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on April 29-30, 2014.

196.

The policies, practices, and/or customs described above directly resulted in black individuals being arrested, prosecuted, and convicted for activity that white individuals engaged in without interference from the BRPD, in violation of these individuals' Fourteenth Amendment rights.

197.

The policies, practices, and/or customs described above have had a profound chilling effect on minority individuals' exercise of their constitutional rights due to fear that they will be subjected to discriminatory police practices on account of their race.

198.

Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution.

199.

As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fourteenth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

COUNT 5

42 U.S.C. §1985 and  §1986

200.

Defendants Thomas, Ardoin, and/or John Doe #1 - #4 conspired to deter Taylor, by force, intimidation, or threat, from further prosecution of his lawsuit against the City of Baton Rouge and certain of its actors in violation of 42 U.S.C. §1985(1).

201.

Defendants Thomas, Ardoin, and/or John Doe #1 - #4 also violated 42 U.S.C. §1985(1) by conspiring for the purpose of impeding, hindering, obstructing, and/or defeating the due course of justice, with the intent to deny Taylor the equal protection of the laws and/or injure Taylor for lawfully attempting to enforce his right to equal protection of the laws.

202.

Defendants Ardoin, and/or John Doe #1 - #4 neglected and/or refused to prevent or aid in preventing the unlawful acts of Defendant Thomas in intimidating and retaliating against Taylor for the filing of his federal lawsuit in violation of 42 U.S.C. §1986.

203.

The above-named Defendants' violations of 42 U.S.C. §1985 and §1986 entitle

Taylor to an award of monetary damages.

COUNT 6

42 U.S.C. §1988

204.

As Plaintiff has brought this proceeding pursuant to 42 U.S.C. §1983, §1985, and §1986, Plaintiff is entitled to an award of reasonable attorney's as part of the costs awarded for vindicating his constitutional rights, pursuant to 42 U.S.C. §1988(b).

COUNT 7

Louisiana Constitution Article I, § 3

205.

The protections afforded by Article I, § 3 of the Louisiana Constitution are coextensive with those afforded by the Fourteenth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 4 also violate Article 1, § 9 of the Louisiana Constitution.

206.

Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages.

COUNT 8

Louisiana Constitution Article I, § 5

207.

The protections afforded by Article I, §5 of the Louisiana Constitution are coextensive with those afforded by the Fourth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 2 violate Article 1, §5 of the Louisiana

Constitution.

208.

Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages.

COUNT 9

Louisiana Constitution, Article I, § 9

209.

The protections afforded by Article I, § 9 of the Louisiana Constitution are coextensive with those afforded by the First Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 1 violate Article 1, § 9 of the Louisiana Constitution.

210.

Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages.

COUNT 11

Louisiana Constitution, Article I, § 13

211.

The protections afforded by Article I, § 13 of the Louisiana Constitution are coextensive with those afforded by the Fifth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 3 violate Article 1, § 13 of the Louisiana Constitution.

212.

Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution

entitles Taylor to an award of monetary damages.

COUNT 12

La. C.C. Art. 2315, 2316, 2317 and 2320

213.

Louisiana Civil Code Article 2315 requires that every act of man that causes damage to another obliges him by whose fault it happened to repair it.

214.

Louisiana Civil Code Article 2316 provides that every person is responsible for the damage he occasions not merely by his act, but also by his negligence, his imprudence, or his want of skill.

215.

Louisiana Civil Code Article 2317 provides that individuals are responsible not only for the damage occasioned by their own acts, but also for damage caused by the acts of persons for whom the individual is answerable, or of the things which the individual has in his custody.

216.

Louisiana Civil Code Article 2320 provides that employers are answerable for the damage occasioned by their  employees in the exercise of the functions in which they are employed.

217.

Defendants are obligated to make good the injuries they caused Plaintiff to suffer as a result of their illegal deprivation of Taylor's constitutional rights, liberty, and property pursuant to La. C.C. Arts. 2315 and 2316.

218.

Under the facts described above, all or some Defendants may be held liable under La. C.C. 2315 for torts including, but not necessarily limited to: (1) assault, (2) battery, (3) unnecessary/excessive force, (4) false arrest, (5) false imprisonment, and (6) malicious prosecution

219.

The City of Baton Rouge may also be held liable by virtue of La. C.C. Arts. 2317 and 2320 for the actions of its employees described herein.

220.

Pursuant to the above-cited provisions of the Louisiana Civil Code, Defendants are liable to Taylor for an award of monetary damages.

DAMAGES

221.

Each of the foregoing paragraphs is incorporated as if fully set forth herein.

222.

As a result of the events of April 29-30, 2014, Plaintiff Ernest Taylor has suffered and continues to suffer damages including, but not limited to the following:

a)      Conscious physical pain and suffering in the past;

b)      Conscious physical pain and suffering likely to be experienced in the future;

c)      Mental anguish in the past;

d)      Mental anguish likely to be experienced in the future;

e)      Loss of earnings;

f)      Deprivation of his property;

g)      Deprivation of his liberty through false arrest and forced confinement;

h)      Accrual of legal fees in connection with criminal charges.

i)      Plaintiff also seeks punitive damages against all defendants for the knowing and willful deprivation of Plaintiff's constitutional rights.

j)      Plaintiff further seeks an award of reasonable attorney's fees pursuant to 42 U.S.C. §1988, and any other applicable statute which provides for the award of reasonable attorney's fees in actions vindicating an individual's constitutional rights.

PRAYER

WHEREFORE Plaintiff Ernest Taylor prays that upon final determination of these causes of action Plaintiff receives a judgment against Defendants The City of Baton Rouge; Baton Rouge Chief of Police Carl Dabadie, Jr.; Baton Rouge Police Officer James Thomas; Baton Rouge Police Officer Jeremiah A. Ardoin, and Baton Rouge Police Officers John Doe #1 - #4 as follows:

a)      Awarding actual damages as proven at trial, jointly and/or solidarily, against all defendants;

b)      Awarding Punitive Damages as proven at trial, jointly and/or solidarily against all defendants;

c)      Awarding costs of court and reasonable attorney fees necessary for preparing the case for trial;

d)      Awarding prejudgment interest at the highest rate permitted by law;

e)      Awarding interest on the judgment at the highest rate of legal interest from the date of judgment until collected; and

f)      Awarding all such other and further relief at law or in equity to which Plaintiff may

show himself to be justly entitled.

JURY DEMAND

Plaintiff is entitled to and demands trial by jury.

**Respectfully Submitted**,

/s/ Karl J. Koch _____
**KARL J KOCH (#17010)**
P.O. Box 359
Baton Rouge, LA 70821
Tel: (225) 223-6215
Fax: (225) 612-6412

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing pleading has been served on

all counsel of record via the ECF system, this 8th day of September, 2015.

_____ /s/ Karl J. Koch