UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF LOUISIANA

ERNEST TAYLOR,                                        Case No. 15-00153-BAJ-RLB

      **Plaintiff;**

**v.**

THE CITY OF BATON ROUGE;
CARL DABADIE, JR., Chief of Police;
MARY E. ROPER, Former Parish Attorney;
LEA ANNE BATSON, Interim Parish Attorney;
LISA FREEMAN, City Prosecutor;
FRANK J. GREMILLION, Assistant Parish Attorney;
JAMES L. HILBURN, Assistant Parish Attorney;
TEDRICK K. KNIGHTSHEAD, Assistant Parish Attorney
JAMES THOMAS, Police Officer;
PATRICK WENNEMANN, Police Officer;
JEREMIAH A. ARDOIN, Police Officer;
KAROLE MULLER, Police Officer;
THEODORE SMITH, Police Officer;
BRETT DELCAMBRE, Police Officer;
KAMA RUSSELL, Police Officer; and
MARLON HARRIS, Police Officer

*IN THEIR INDIVIDUAL AND*
*OFFICIAL CAPACITIES*

      **Defendants.**

_____

FIRST AMENDED
VERIFIED COMPLAINT AND REQUEST FOR JURY TRIAL

1.     Plaintiff, Ernest Taylor, through undersigned counsel, submits this complaint

against Defendants (1) The City of Baton Rouge; (2) Baton Rouge Chief of Police Carl Dabadie,

Jr.; (3) Former East Baton Rouge Parish Attorney Mary Roper (4) Current East Baton Rouge Parish

Attorney Lea Ann Batson; (5) Baton Rouge City Prosecutor Lisa Freeman; (6) Assistant East

Baton Rouge Parish Attorney Frank J. Gremillion; (7) Assistant East Baton Rouge Parish Attorney

James L. Hilburn; (8) Assistant East Baton Rouge Parish Attorney Tedrick K. Knightshead; (9)

Baton Rouge Police Officer James Thomas; (10) Baton Rouge Police Officer Patrick Wennemann; (11) Baton Rouge Police Officer Karole Muller; (12) Baton Rouge Police Officer Jeremiah A. Ardoin; (13) Baton Rouge Police Officer Theodore Smith; (14) Baton Rouge Police Officer Brett Delcambre; (15) Baton Rouge Police Officer Kama Russell; and (16) Baton Rouge Police Officer Marlon Harris (hereinafter referred to collectively as "Defendants").

2.      Through this action Plaintiff seeks all relief to which he may be entitled, including, but not limited to monetary damages from Defendants for abrogating Plaintiff's rights under the United States Constitution and Louisiana law, and injunctive relief preventing the Baton Rouge Police Department from enforcing unconstitutional laws appearing in the Baton Rouge Code of Ordinances and/or the Louisiana Revised Statutes.  Plaintiff asserts that Defendants created and/or maintained policies, procedures, practices, and/or customs which contravene the rights guaranteed to Plaintiff, and others similarly situated, under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, while also violating various provisions of Louisiana law.

3.      Plaintiff does not assert claims against Defendants pursuant to the Second Amendment to the U.S. Constitution, as those claims are being adjudicated in a separate case – *Ernest Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB, currently pending in this Court.

4.      In this Complaint Plaintiff does, however, assert those claims appearing in *Ernest Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB which do not arise under the Second Amendment to the U.S. Constitution, and which the Court ordered to be considered in the present suit.  *See* Docket No. 98, *Taylor v. City of Baton Rouge, et al.,* 13-579-BAJ-RLB.

5.      Plaintiff specifically asserts the applicability of La. C.C. Art. 2324(C) to the claims

asserted herein.

## JURISDICTION AND VENUE

6.      This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202. This action is also brought pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 alleging violations of Plaintiff's First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

7.      Venue is proper in the Middle District of Louisiana pursuant to 28 U.S.C. §1391

8.      This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367, including, but not limited to, claims asserted pursuant to Louisiana Civil Code Articles 2315, 2316, 2317 and 2320, and for violations of Article I, Sections 3, 5, 9, 11 and 13 of the Louisiana Constitution.

## PARTIES

### Plaintiff

9.      Plaintiff Ernest Taylor ("Taylor") is a resident and domiciliary of The City of Baton Rouge, East Baton Rouge Parish, Louisiana, and is a citizen of the United States of America and the State of Louisiana. Taylor resides within the 70805 zip code.

10.      Taylor has previously been arrested and prosecuted pursuant to outdated and unconstitutional laws for engaging in activities that are lawful and constitutionally protected.

11.      In the future, Taylor intends to engage in constitutionally protected activities that are prohibited by unconstitutional laws enforced by the Baton Rouge Police Department

### Defendants

12.      Defendant The City of Baton Rouge ("City") is a municipality and political subdivision of the State of Louisiana.  For purposes of this complaint, references to the City include

both the City of Baton Rouge and the Parish of East Baton Rouge, as appropriate.  Reference to departments or subdivisions within the City such as "Baton Rouge City Police," "Baton Rouge Police Department,"  "BRPD," "East Baton Rouge Parish Attorney's Office," "Parish Attorney's Office, and "City Prosecutor's Office" include the City, and the individuals acting within the department or subdivision, as appropriate.  The City has previously waived service in this suit.

13.     Defendant Carl Dabadie, Jr. ("Dabadie") is the current Baton Rouge Chief of Police, and is sued both in his individual capacity, and in his official capacity as a policymaker for the City.  Dabadie has previously waived service in this suit.

14.     Defendant Mary E. Roper ("Roper") is the former East Baton Rouge Parish Attorney, and is sued solely in her individual capacity, as she is no longer a City official.  Roper has previously waived service in this suit.

15.     Defendant Lea Anne Batson ("Batson") is the current the East Baton Rouge Parish Attorney, and is sued in both her individual capacity, and in her official capacity as a policymaker for the City. Batson has previously waived service in this suit.

16.     Defendant Lisa Freeman ("Freeman") is the Baton Rouge City Prosecutor, and is sued both in her individual capacity, and in her official capacity as a policymaker for the City. Freeman has previously waived service in this suit.

17.     Defendant Frank J. Gremillion ("Gremillion") is an Assistant Parish Attorney and head of the East Baton Rouge Attorney's Office Litigation Division.  Gremillion is being sued in his individual capacity and in his official capacity as a policymaker for the City.  Gremillion has previously waived service in this suit.

18.     Defendant James L. Hilburn ("Hilburn") is a former Assistant Parish Attorney with the East Baton Rouge Parish Attorney's Office, and is sued solely in his individual capacity, as he

is no longer an official of the City.  Hilburn has previously waived service in this suit.

19.    Defendant Tedrick K. Knightshead ("Knightshead") is an Assistant Parish Attorney with the East Baton Rouge Parish Attorney's Office, and is sued solely in his individual capacity. Knightshead has previously waived service in this suit.

20.    Defendant James Thomas ("Thomas") is an officer with the Baton Rouge Police Department, and is sued solely in his individual capacity.  Thomas has previously waived service in this suit.

21.    Defendant Patrick Wennemann ("Wennemann") is a corporal in the Baton Rouge Police Department, and is sued solely in his individual capacity.  Wennemann has previously waived service in this suit.

22.    Defendant Jeremiah A. Ardoin ("Ardoin") is an officer with the Baton Rouge Police Department, and is sued solely in his individual capacity.  Ardoin has previously waived service in this suit.

23.    Upon information and belief Defendant Karole Muller ("Muller") was an officer-in-training with the Baton Rouge Police Department accompanying Corporal Wennemann in his police cruiser during the early morning hours of October 13, 2012, and who participated in Plaintiff's arrest, the search of his vehicle, and the confiscation of his personal property.  Officer Muller is being sued solely in her individual capacity.  Officer Muller may be served at the Baton Rouge Police Department, 9000 Airline Hwy., Baton Rouge, LA 70815.

24.    Defendant Theodore Smith ("Smith") is an officer with the Baton Rouge Police Department who accompanied Officer Thomas to Plaintiff's residence on the evening of April 29, 2014 and/or early morning hours of April 30, 2014.  Officer Smith is being sued solely in his individual capacity and may be served at the Baton Rouge Police Department, 9000 Airline Hwy.,

Baton Rouge, LA 70815.

25.     Defendant Brett Delcambre ("Delcambre") is an officer with the Baton Rouge Police Department who accompanied Officer Thomas to Plaintiff's residence on the evening of April 29, 2014 and/or early morning hours of April 30, 2014.  Officer Delcambre is being sued solely in his individual capacity and may be served at the Baton Rouge Police Department, 9000 Airline Hwy., Baton Rouge, LA 70815.

26.     Defendant Kama Russell ("Russell") is an officer with the Baton Rouge Police Department who accompanied Officer Thomas to Plaintiff's residence on the evening of April 29, 2014 and/or early morning hours of April 30, 2014.  Officer Russell is being sued solely in his individual capacity and may be served at the Baton Rouge Police Department, 9000 Airline Hwy., Baton Rouge, LA 70815.

27.     Defendant Marlon Harris ("Harris") is an officer with the Baton Rouge Police Department who accompanied Officer Thomas to Plaintiff's residence on the evening of April 29, 2014 and/or early morning hours of April 30, 2014.  Officer Harris is being sued solely in his individual capacity and may be served at the Baton Rouge Police Department, 9000 Airline Hwy., Baton Rouge, LA 70815.

## FACTS

28.     Each of the foregoing paragraphs is incorporated as if fully set forth herein.

### The Events of October 13, 2012

29.     On October 13, 2012, at approximately 1:35 A.M., Officers Thomas, Wennemann, and Muller were traveling in marked Baton Rouge Police Department (also referred to as "BRPD") patrol vehicles near the 4000 Block of Plank Road in Baton Rouge.[1]

---

[1] Videos taken from the dashboard cameras of Thomas and Wennemann's vehicles have been submitted conventionally in Taylor's other pending suit, *Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB (M.D.

30.    Officer Muller, as an officer in training, was accompanying Corporal Wennemann in his vehicle. *See* Criminal Discovery, attached hereto as Exhibit A.

31.    Upon information and belief, Officers Thomas and Wennemann were patrolling this area of Baton Rouge with Officer Muller for the express purpose of illustrating to the officer-in-training the methods and procedures utilized by the Baton Rouge Police Department in high crime areas, such as the 70805 zip code.

32.    At or around the same time, Plaintiff Ernest Taylor was in his vehicle, a gray Cadillac Brougham, leaving the parking lot of an abandoned discount store located across the street from Romeo's Lounge on Plank Road in Baton Rouge.  Taylor had parked his vehicle in that location prior to entering Romeo's earlier that evening.

33.    Romeo's Lounge is located at 4115 Plank Road in Baton Rouge, Baton Rouge, LA, in the 70805 zip code.

34.    After purportedly observing a vehicle leave the parking lot of the Boss Lady Lounge, located at 3827 Plank Road, without its headlights engaged, Officer Wennemann radioed Officer Thomas instructing him to initiate a stop of the vehicle.

35.    At the time he received this instruction from Corporal Wennemann, Officer Thomas did not observe any vehicles being operated without their headlights.

36.    Still, after receiving Wennemann's instruction, Thomas activated his patrol vehicle's lights and sirens and proceeded at a high rate of speed away from 3827 Plank Road in the direction of the parking lot from which Taylor had just departed.

37.    Despite the fact that neither Taylor nor his vehicle had ever been present at 3827 Plank Road at any time on October 12th or 13th, 2012, and that the lights of Taylor's vehicle were

La.).

in operation when Officer Thomas approached from the rear, Officer Thomas positioned his police cruiser behind Taylor's vehicle to initiate a traffic stop.

38.     Taylor complied with Officer Thomas' request by pulling onto a side street, placing his vehicle in park, turning off the engine, and opening the door to his vehicle.

39.     Officer Thomas followed Taylor and parked his marked police vehicle behind Taylor's Cadillac.

40.     Once his police cruiser was parked, Officer Thomas exited and loudly and forcefully instructed Taylor to step out of his vehicle and walk towards the front of Thomas' parked cruiser.

41.     In compliance with Officer Thomas' instruction, Taylor exited his vehicle and moved to the rear of his vehicle where he began conversing with Officer Thomas.

42.     Immediately upon approaching Taylor, Officer Thomas proceeded to perform a "pat-down" of Taylor for the stated purpose of identifying any concealed weapons.

43.     Prior to placing his hands upon Taylor and performing a warrantless search of Taylor's person, Thomas had no probable cause to arrest Taylor, did not request Taylor's consent, and lacked any reasonable suspicion that Taylor had any dangerous weapons on his person.

44.     While Officer Thomas was patting Taylor down, Corporal Wennemann and Officer Muller arrived at the scene, exited Wennemann's police cruiser and approached Taylor's vehicle.

45.     As he approached, Corporal Wennemann observed two long-barreled firearms in plain view inside of Taylor's vehicle.

46.      Upon observing Taylor's firearms, Wennemann shouted an expletive and indicated that Taylor had a "shotgun on the floor" and "a rifle between the seats."

47.     Responding to Officer Wennemann's remarks, Taylor informed Wennemann,

Thomas, and Muller that he "had papers" on the weapons, meaning that the firearms in his vehicle were legally in his possession, and that he had documentation to establish this fact.  *See* Firearm Documentation, attached as Exhibit B.

48.    At this time Taylor also alerted the officers to the presence of a third firearm located in the trunk of his vehicle.

49.    Officer Thomas told Taylor that "[i]t doesn't matter if you've got papers on them or not … you're not supposed to have weapons in your vehicle at a bar."

50.    When Taylor responded that he had not brought any weapons inside any establishment that sold or served alcohol, Thomas stated, "[y]ou had them in the parking lot."

51.    Officer Thomas then requested that Taylor take a seat in the back of his police cruiser, explicitly stating to Taylor, "[y]ou're not under arrest."

52.    As Taylor attempted to comply with Officer Thomas' request to take a seat in the back of the police cruiser, Thomas forcibly grabbed Taylor, pushing him in the direction of the cruiser.

53.    Taylor balked at Thomas' unnecessary use of force, stating, "[y]ou don't have to put your hands on me" and "[y]ou ain't gotta push me, I'm going."

54.    Despite Taylor's willingness to cooperate, his agreement to follow Thomas' direction, and Thomas' explicit statement that Taylor was not under arrest, Officer Thomas proceeded to subdue Taylor through the use of force, stating, "I'm holding you … I'm going to put you in f---ing handcuffs," and wrestled Taylor to the ground.

55.    Officers Wennemann and Muller observed Officer's Thomas' use of unnecessary force against Taylor, and Wennemann proceeded to assist Thomas in subduing Taylor, placing him in handcuffs, and relocating him to the back seat of Thomas' vehicle.

56.     The force used by Thomas and Wennemann was a "takedown," a form of "hard control technique" generally recognized by law enforcement personnel to present a higher likelihood of injury than other tactics.

57.     The use of hard control techniques are generally reserved for situations where officers encounter active aggression.

58.     At no time did Taylor display any active aggression toward Officers Thomas, Wennemann, or Muller.

59.     As a result of Thomas' and Wennemann's unnecessary use of force, Taylor sustained physical injuries in the nature of scrapes and bruises.

60.     At the time Thomas and Wennemann placed Taylor in handcuffs and relocated him to Thomas' police cruiser, both officers intended to arrest Taylor for violating §13:95.3, despite the lack of any evidence to suggest that Taylor or his vehicle had been present at the location where officer Wennemann observed the vehicle operating without headlights, and despite the knowledge that Louisiana citizens were afforded the right to keep firearms in their vehicles at all times, absent narrow circumstances not present in Taylor's situation.

61.     With Taylor secured in the back seat of Thomas' police cruiser, Officers Thomas, Wennemann, and/or Muller proceeded, without consent, to search the interior of Taylor's vehicle and confiscate his lawfully held firearms.

62.     Upon searching the trunk of Taylor's vehicle – without requesting or receiving Taylor's consent - Officers Thomas, Wennemann, and Muller also located a third gun – A Yugo 59/66 SKS-type rifle – which they also seized.

63.     All three of Taylor's lawfully-held guns were confiscated by Thomas, Wennemann and Muller, and retained by the Baton Rouge Police Department as evidence of Taylor's violation

of §13:95.3.

64.     After he had taken Taylor into custody, Officer Thomas also used his police radio to relay Taylor's information to a dispatch officer for the purpose of identifying any outstanding warrants issued for Taylor's arrest.

65.     Upon information and belief, the dispatch officer performed a search of Taylor's information and identified an affidavit of probable cause signed by a member of the East Baton Rouge Sheriff's Department, but did not identify any valid warrant for arrest.

66.     The dispatch officer informed Thomas that she had been able to locate only the Sheriff's Department affidavit when checking Taylor for outstanding warrants.

67.     While Officers Thomas, Wennemann, and/or Muller were inspecting the firearms they had seized from Taylor's vehicle, another officer of the Baton Rouge Police Department arrived at the scene with another officer-in-training.

68.     Upon information and belief, one of the individuals arriving at the scene was an officer-in-training with the BRPD who was accompanying the other individual, a senior officer, for the purpose of being instructed on the methods and procedures employed by the Baton Rouge Police Department in high crime areas, such as the 70805 zip code.

69.     Taylor had previously been stopped by other BRPD officers despite having committed no offense.

70.     On the previous occasions where Taylor had been unjustifiably stopped by members of the BRPD, the officers would take pictures of Taylor's guns, purportedly to perform a check to ensure that Taylor was in legal possession.  Taylor's guns had never previously been seized.

71.     During these events Taylor explained to Officers Thomas, Wennemann, and Muller

First Amended Complaint and Request for Jury Trial                                                                11

his understanding that he was allowed to carry the guns inside of his vehicle.

72.    Officers Thomas, Wennemann, and/or Muller responded that it was illegal for anyone to possess a firearm in the parking lot of an establishment that sold alcohol.

73.    As Taylor's vehicle was not the one Officer Wennemann had observed leaving the parking lot at 3827 Plank Road, Officer Thomas and/or Officer Wennemann repeatedly questioned Taylor about the location where his vehicle had been parked.

74.    Prior to questioning Taylor, neither Officer Thomas, Wennemann, nor Muller advised Taylor of his rights under the Fifth Amendment to the U.S. Constitution, as required by the U.S. Supreme Court's decision in *Miranda v. Arizona.*

75.    In an attempt to elicit information from Taylor that would establish Taylor's presence at The Boss Lady Lounge, Officer Thomas asked Taylor if he had been at an establishment "down there by Mohican[2]," prior to being pulled over.

76.    Taylor responded negatively, indicating that he had been parked at a location within a block of where Officer Thomas pulled him over.

77.    When Taylor indicated that he had not been present at the location where Officer Wennemann observed the vehicle leaving without its lights engaged, Officer Thomas and/or Wennemann began to question Taylor about the owner of the abandoned store parking lot where his vehicle had been parked.

78.    Taylor responded that he did not know who owned the property where his vehicle had been parked.

79.    As he was unable to determine the location where Taylor's vehicle had been parked, Officer Thomas indicated that he would drive by the location where Corporal Wennemann had

---

[2] 3827 Plank Road, the location of the Boss Lady Lounge, is in close proximity to the intersection of Plank Road and Mohican Street.

observed the vehicle entering the roadway without its lights engaged so that this information could appear in the incident report filed by the officers.

80.     Officers Thomas and/or Wennemann determined that the vehicle purportedly observed by Officer Wennemann without its lights engaged had left The Boss Lady Lounge, located at 3827 Plank Road, and included this information within the incident report filed in connection with Taylor's October 13, 2012 arrest.

81.     Only after restraining Taylor in Officer Thomas' police cruiser, searching his vehicle, seizing his firearm, and performing an extensive interrogation was Taylor advised of his Fifth Amendment *Miranda* rights.

82.     Officers Thomas, Wennemann, and Muller arrested Taylor for Possession of a Firearm Where Alcohol Is Being Sold (in violation of Baton Rouge Code of Ordinances §13:95.3); Resisting An Officer (in violation of Baton Rouge Code §13:108), and for violation of Baton Rouge Code of Ordinances §11:283 (requiring a motor vehicle operator to "dim the lights to the lowermost distribution of light when approaching an oncoming vehicle within five hundred (500) feet, or when following another vehicle within two hundred (200) feet to the rear"). *See* Exhibit A.

83.     Despite the fact that the dispatch officer had not informed Officers Thomas and/or Wennemann that there were any outstanding warrants for Taylor's arrest – only an affidavit signed by a deputy sheriff – the Incident Report drafted by Thomas and/or Wennemann indicates the presence of an outstanding warrant, and upon this basis asserts that Taylor was also in violation of La. C. Cr. P. 575.

84.     La. C. Cr. P. 575 does not criminalize any conduct, it only provides procedural exceptions to the time limitations appearing in La. C. Cr. P. 572.

First Amended Complaint and Request for Jury Trial                                            13

85.     Taylor was brought to East Baton Rouge Parish Prison, where he remained for several days until bail was posted on his behalf.

86.     At the time of the incidents described above, Taylor owned and was in lawful possession of the three guns seized by Officers Thomas, Wennemann, and Muller.

87.     Taylor has never been convicted of a felony.

88.     The guns confiscated by Thomas, Wennemann, and Muller had not been brought into any establishment serving or selling alcohol, and Taylor never entered any establishment that served or sold alcohol with guns in his possession.

89.     Taylor did not violate any of the legal provisions cited on the incident report filed by Officers Thomas, Wennemann and/or Muller.

90.     The presence of Officer Muller, the Baton Rouge Police Department Officer who arrived during the inspection of Taylor's firearms, and the officer-in-training accompanying him is mentioned nowhere in the incident report authored by Thomas, Wennemann, and/or Muller.

91.     Thomas, Wennemann and Muller lacked probable cause to search Plaintiff and his vehicle.

92.     Thomas, Wennemann and Muller lacked any reasonable suspicion that Taylor was armed and dangerous.

93.     Thomas, Wennemann and Muller lacked probable cause to support Taylor's arrest.

94.     Officers Thomas, Wennemann, and/or Muller prepared and submitted an Incident Report and a non-notarized affidavit detailing the encounter with Taylor on October 13, 2012.

95.     The Incident Report and non-notarized affidavit prepared by Thomas, Wennemann, and/or Muller contain numerous material misrepresentations of fact.

96.     Upon information and belief, the misrepresentations of fact appearing in the

Incident Report and non-notarized affidavit were made intentionally to make it appear as though Taylor had been uncooperative and deceitful in his interactions with the officers, increasing the likelihood of a later conviction.

97.     After his arrest and release from prison, Taylor filed a complaint with the Baton Rouge City Police Department of Internal Affairs regarding the treatment he had received on October 13, 2012.

98.     Upon information and belief, Thomas, Wennemann and Muller were informed that Taylor had lodged a complaint as a result of the officers' actions.

99.     Taylor has never received any response to the complaint he filed with the Internal Affairs Division of the Baton Rouge Police Department.

100.     No criminal prosecution was ever initiated by the East Baton Rouge Parish District Attorney's Office in connection with the misdemeanor charges for which there purportedly existed a warrant for Taylor's arrest.

101.     Upon information and belief, despite Taylor's filing of a complaint with the Internal Affairs Division, and his subsequent filing of a suit in federal court, no investigation into Corporal Wennemann, Officer Thomas, Officer Muller, or the events described herein has ever been conducted by the Baton Rouge Police Department or the East Baton Rouge Parish Attorney's Office, or the Baton Rouge City Prosecutor's Office.

<u>The Events Leading Up to April 29, 2014</u>

102.     After his release from Parish Prison, Taylor contacted Chris Glisson ("Glisson"), an attorney and personal friend who had previously represented Taylor in connection with a personal injury claim and in obtaining patent protection for technology Taylor had created.

103.     Despite the lack of a notarized affidavit of probable cause, in addition to an absence

of facts which demonstrated a violation of any applicable provision of law, Assistant City Prosecutor Devon Bardon executed a misdemeanor affidavit for the purpose of instituting a criminal prosecution against Taylor.

104.    Bardon's actions were consistent with the policy of the City Prosecutor's Office to institute criminal proceedings on all charges referred by the Baton Rouge Police Department without first reviewing the file to determine if criminal prosecution was warranted.

105.    Glisson enrolled as Taylor's counsel in connection with the criminal charges brought by the City Prosecutor's Officer on behalf of the City of Baton Rouge in Baton Rouge City Court as a result of the events of October 13, 2012.

106.    At his first court appearance representing Taylor in connection with these criminal charges, Glisson informed the Assistant City Prosecutor assigned to Taylor's case of his belief that §13:95.3 was unconstitutional in that it impermissibly infringed upon Taylor's rights as guaranteed by the United States Constitution and the laws of the State of Louisiana, and that Taylor should not be prosecuted under the unenforceable ordinance.

107.    The Assistant City Prosecutor stated to Glisson that he did not disagree that there were Constitutional infirmities present with §13:95.3, but offered to dismiss the charges against Taylor only if Taylor would agree to relinquish ownership of his firearms to the City.

108.    Taylor declined to relinquish ownership of his firearms, and the City Prosecutor's Office continued to prosecute him pursuant to an ordinance known to possess constitutional infirmities.

109.    On July 19, 2013, Glisson sent a letter to Lisa Freeman, Baton Rouge City Prosecutor, again asserting that Taylor's criminal prosecution should be terminated and that Taylor's lawfully-held firearms should be returned to his possession.

First Amended Complaint and Request for Jury Trial                                            16

110.    Glisson's July 19, 2013 correspondence noted that the ordinance under which Taylor had been arrested, when applied to firearms located inside of vehicles, would prevent hunters from getting gasoline from a convenience store, as well as preventing any Baton Rouge citizen from going to a grocery store while firearms were present in their vehicle.

111.    Glisson's correspondence also indicated that if Taylor's weapons were not returned to his possession, a lawsuit against the City would be filed in federal court pursuant to 42 U.S.C. §1983.

112.    Upon receiving Glisson's correspondence, the City Prosecutor and/or certain Assistant City Prosecutors evaluated the constitutionality of §13:95.3 and determined that the ordinance violated both the Second and Fourth Amendments to the U.S. Constitution.

113.    After determining that §13:95.3 was legally defective, the City Prosecutor's Office again ignored the unconstitutional nature of §13:95.3 and continued to prosecute Taylor and withhold his firearms pursuant to the ordinance.

114.    On September 19, 2013, Taylor filed suit against the City of Baton Rouge, the officers who arrested Taylor and confiscated his firearms on October 13, 2012, the Baton Rouge City Prosecutor, the East Baton Rouge Parish Attorney, and the Chief of the Baton Rouge Police Department in the United States District Court for the Middle District of Louisiana.

115.    Taylor also moved to quash the charges brought against him in Baton Rouge City Court on several grounds.

116.    Taylor's motion to quash asserted that the charge of violating §13:95.3 should be quashed because the ordinance conflicted with provisions of the United States Constitution and the Louisiana Constitution.

117.    Taylor's motion to quash asserted that the description of events provided in the

Baton Rouge Police Department Incident Report and the non-notarized affidavit of Corporal Wennemann did not assert facts showing Taylor had violated either §13:108 or §11:283, and that the facts appearing in these documents actually established that no such violations had occurred.

118.    Through his suit in federal court, Taylor sought to prevent the City of Baton Rouge from further enforcement of §13:95.3, sought an order declaring §13:95.3 unconstitutional and unenforceable, sought the return of the firearms confiscated on October 13, 2012, and also sought an award of monetary damages.

119.    Taylor's federal complaint was served upon Lisa Freeman, Baton Rouge City Prosecutor; Mary Roper, East Baton Rouge Parish Attorney; Carl Dabadie, Chief of the Baton Rouge Police Department, in addition to Corporal Wennemann and Officer Thomas.

120.    Upon being served with Taylor's complaint, Defendant Freeman assessed the allegations contained therein and concluded that the City Prosecutor's Office had been, and was continuing to prosecute individuals under §13:95.3 in violation of the U.S. Constitutions and/or other provisions of law.

121.    Freeman also concluded that Taylor's rights under both the United States Constitution and Louisiana law had likely been violated on October 13, 2012.

122.    Instead of dismissing the charges against Taylor and ceasing his prosecution due to §13:95.3's constitutional infirmities and the lack of any support for the other alleged violations, Defendant Freeman continued Taylor's prosecution under the unconstitutional ordinance, and sought to recuse herself and all members of the City Prosecutor's Office from Taylor's criminal prosecution.

123.    The City Prosecutor's Office did not serve Taylor with a copy of its motion to recuse and did not inform Taylor or his counsel of their intention to make such a request.

First Amended Complaint and Request for Jury Trial                                                      18

124.    On the date scheduled for Taylor's trial and the hearing on his motion to quash, the City Prosecutor's Office asked that it be granted a continuance, and that its motion for recusal be heard instead.

125.    While granting the City's motions to continue and its motion for recusal, Judge Yvette Alexander stated she felt the charges against Taylor needed to be resolved, as it was her understanding that §13:95.3 was unconstitutional.

126.    The City Prosecutor's Office was recused from Taylor's criminal case on November 8, 2013.

127.    Upon information and belief, the East Baton Rouge Parish District Attorney's Office declined to assume responsibility for Taylor's criminal prosecution after concluding that §13:95.3 was unconstitutional and that Taylor's rights had been violated.

128.    The Parish Attorney's Office never enrolled or participated in Taylor's criminal case, despite being fully aware that Taylor was being prosecuted and his guns withheld pursuant to an invalid ordinance in derogation of Taylor's rights under the U.S. Constitution and Louisiana law.

129.    Rather than assume responsibility for Taylor's criminal prosecution or dismiss the charges against him, the City Prosecutor and/or Parish Attorney requested that a representative of the Louisiana Attorney General's Office be appointed to actively pursue Taylor's criminal prosecution.

130.    On January 2, 2014, the Louisiana Attorney General's Office accepted appointment to act as prosecutor on the City's behalf with respect to the criminal charges pending against Taylor.

131.    Upon being served with Taylor's complaint, Defendant Roper did not undertake an

analysis of the claims appearing therein to determine whether §13:95.3 was unconstitutional and should no longer be enforced, and/or whether the criminal charges against Taylor should be dismissed and his firearms returned to him.

132.   Instead, Defendant Roper opted, as was her policy in any suit in which she had been named as a defendant, to have no involvement with the case.

133.   It is a common and necessary practice to include policymakers, such as the Parish Attorney and Chief of Police, as defendants in lawsuits seeking to prevent the enforcement of unconstitutional laws, as these individuals exercise the authority to constrain and prevent overreach by governmental actors.

134.   Instead of participating in Taylor's lawsuit and evaluating the allegations appearing therein, Roper delegated the responsibility for Taylor's federal lawsuit to Frank Gremillion, head of the East Baton Rouge Parish Attorney Office's Litigation Division.

135.   Upon reviewing Taylor's federal complaint, Gremillion undertook to evaluate the allegations appearing therein, along with the constitutionality of §13:95.3.

136.   Through his evaluation, Gremillion determined that the U.S. District Court for the Western District of Louisiana had declared a law virtually identical to §13:95.3 to be violative of the United States Constitution in 1985 - nearly 30 years prior - and concluded that §13:95.3 was likewise unconstitutional.

137.   Through his evaluation, Gremillion also came to the conclusion that the continued existence of §13:95.3 in the Baton Rouge Code of Ordinances was an oversight, as the Baton Rouge Metropolitan Council had also previously determined that the ordinance was unconstitutional, and in 1986 had enacted §13:95.4 of the Baton Rouge Code of Ordinances to replace §13:95.3 and cure its constitutional infirmities.

138.    With respect to Taylor in particular, Gremillion concluded that Taylor had been, and was continuing to be deprived of rights guaranteed to him by the U.S. Constitution and the laws of the State of Louisiana.

139.    Gremillion was employed by the East Baton Rouge Parish Attorney's Office in 1985 and 1986, and, upon information and belief, possessed first-hand knowledge of the constitutional issues implicated by §13:95.3, along with the Metro Council's passage of §13:95.4 to replace the unconstitutional provision.

140.    Despite having determined that §13:95.3 violated the United States Constitution, and that its continued existence in the Baton Rouge Code of Ordinances was a mistake, Gremillion assigned Assistance Parish Attorney James Hilburn to vigorously defend against Taylor's federal suit.

141.    Upon reviewing the allegations in Taylor's complaint, Defendant Hilburn concluded that §13:95.3 violated the United States Constitution and also various provisions of Louisiana law, and that Taylor had been, and was continuing to be deprived of rights guaranteed to him by the U.S. Constitution and the laws of the State of Louisiana.

142.    Upon information and belief, Gremillion, as Hilburn's supervisor, instructed Hilburn to oppose any attempt to prohibit use of §13:95.3, despite his own belief that the ordinance was unconstitutional and that its continued existence would likely result in additional deprivations of rights held by Baton Rouge citizens.

143.    Upon information and belief, Gremillion also instructed Hilburn to oppose any attempt by Taylor to have his lawfully owned firearms returned to his possession.

144.    Despite receiving requests on behalf of Taylor to do so, and in violation of the Federal Rules of Civil Procedure and the Rules of Court for the Middle District of Louisiana,

Hilburn refused to answer Taylor's federal lawsuit, or to provide information in his possession regarding Taylor's arrest on October 13, 2012.

145.    The unwillingness of Roper, Freeman, and their subordinates to participate in Taylor's federal suit and/or to halt Taylor's criminal prosecution in Baton Rouge City Court resulted in the continued deprivation of Taylor's lawfully held firearms, the continued enforcement by the Baton Rouge Police Department of an ordinance known to be unconstitutional, and brought to a halt the process by which Taylor could be made whole for the wrongs visited upon him by the City and its actors.

146.    Based upon the Parish Attorney's Office's failure to participate in Taylor's federal lawsuit, Taylor requested that the Clerk of U.S. Court for the Middle District of Louisiana place all Defendants named in his federal suit in default.  The Clerk granted Taylor's request the same day.

147.    After Taylor placed the Defendants named in his federal suit in default, Tedrick K. Knightshead, an Assistant East Baton Rouge Parish Attorney, assumed primary responsibility for defending against Taylor's federal suit.

148.    Upon reviewing the allegations in Taylor's complaint, Defendant Knightshead concluded that §13:95.3 violated the United States Constitution and also various provisions of Louisiana law, and that Taylor had been, and was continuing to be deprived of rights guaranteed to him by the U.S. Constitution and the laws of the State of Louisiana.

149.    Gremillion, as Knightshead's supervisor, instructed Knightshead to oppose any attempt to prohibit use of §13:95.3, despite his own belief that the ordinance was unconstitutional and would likely result in additional deprivations of rights held by Baton Rouge citizens.

150.    Gremillion also instructed Knightshead to oppose any attempt by Taylor to have

his lawfully owned firearms returned to his possession.

151.    Knightshead followed Gremillion's instruction, and took actions designed to permit the continued utilization of §13:95.3 by the City and its actors.

152.    Even after the criminal charges filed by the City against Taylor had been dismissed, Knightshead, acting on behalf of the City, refused to facilitate the return of Taylor's firearms.

153.    On June 18, 2014 a hearing was held before the Honorable Brian Jackson of the U.S. District Court for the Middle District of Louisiana.

154.    During the hearing, the Court declined to set aside the default which had been entered against the defendants in Taylor's federal suit.

155.    Subsequent to the hearing, the Court ordered Roper, Hilburn, and Knightshead to appear in court to determine whether sanctions should be imposed for the manner in which Taylor's case had been handled.

156.    Fearing the possibility of sanctions, Knightshead arranged for the return of the firearms that had been unlawfully seized from Taylor on October 13, 2012.

157.    Knightshead also hastily arranged with Roper and Gremillion to have the Parish Attorney's Office recommend the repeal of §13:95.3 to the Baton Rouge Metropolitan Council, and had the item placed on the agenda of an upcoming council meeting.

158.    At Knightshead's request, Gremillion also drafted a letter to Police Chief Dabadie stating that Baton Rouge Code of Ordinances §13:95.4 suffered from constitutional infirmities, and should no longer be enforced by members of the Baton Rouge Police Department.

159.    Roper's and Gremillion's request that the Metro Council repeal of §13:95.3 was presented to the Baton Rouge Metropolitan Council on June 25, 2014.  Due to the last-minute addition of the item to the Council's agenda, and the lack of information provided by the Parish

Attorney's Office in connection with its request, the vote on §13:95.3's repeal was deferred to a later date.

160.    Without explanation, the Parish Attorney's Office subsequently withdrew its request for the Metro Council to repeal §13:95.3, and the issue was never voted upon, nor considered by the Council again.

161.    Furthermore, upon information and belief, the letter to Defendant Dabadie, drafted by Gremillion at Knightshead's request, was never transmitted to Dabadie.

162.    The actions and/or inaction of the Parish Attorneys described above were motivated solely by financial concerns.

163.    Specifically, the Parish Attorney and her subordinates feared that ceasing Taylor's criminal prosecution, returning his firearms, and/or admitting the unconstitutionality of §13:95.3 would be an admission of liability that would increase the likelihood of an award of monetary damages and/or the likelihood that the non-City Defendants would be held personally liable for any such award.

The Baton Rouge Police Department Retaliates Against Taylor

164.    As the City and its actors refused to abandon Taylor's criminal prosecution in Baton Rouge City Court, Taylor retained Glisson's firm to defend him against those charges.

165.    Representatives from the Louisiana Attorney General's Office, acting on behalf of the City, reviewed the Motion to Quash the criminal charges filed against Taylor, and determined that §13:95.3 was unconstitutional, and that Taylor had violated no law on October 13, 2012.  As a result, no response to Taylor's Motion to Quash was filed by the City, and no defense of §13:95.3's constitutionality was made.

166.    Taylor's criminal trial and the hearing on his motion to quash were scheduled for

April 28, 2014.

167.    Defendants Thomas and Wennemann had been notified and were aware that Taylor's criminal trial was scheduled to be conducted on April 28, 2014.

168.    On April 28, 2014 the Louisiana Attorney General's Office, on behalf of the City, dismissed all charges brought against Taylor arising from his arrest on October 13, 2012.  *See* Order Dismissing Criminal Charges, attached hereto as Exhibit C.

169.    At approximately 10:11 A.M. on April 29 – the day after Taylor's criminal charges were dismissed -- Officer J. Ardoin of the BRPD was dispatched to a residence located on Alliquippa Street in Baton Rouge in response to a report of an armed robbery.  *See* Initial Report of J. Ardoin, attached hereto as Exhibit D.

170.    Through his investigation Ardoin determined that an individual identified only as a "black male" had purportedly entered the Alliquippa Street residence with a handgun, and stolen a television set valued at approximately two hundred dollars ($200.00).

171.    After questioning the individual that had reported the alleged robbery, Ardoin took no further action, and drafted an "Initial Report" detailing his actions and findings.

172.    Upon information and belief, at some point prior to 11:23 P.M. on April 29, 2014, Officer Thomas was informed of the dismissal of the criminal charges filed against Taylor as a result of his October 13, 2012 arrest.

173.    Upon information and belief, upon being notified of the dismissal of Taylor's criminal charges, Thomas became concerned about the effect the dismissal might have on Taylor's federal lawsuit, and his continued employment with the Baton Rouge Police Department.

174.    Upon information and belief, Thomas conspired with Ardoin and other members of the Baton Rouge Police Department, including Corporal Wennemann, and/or Officers Smith,

Delcambre, Russell and Harris to retaliate against Taylor for submitting a complaint to the internal affairs division, and for his filing of a federal lawsuit.

175.    Upon information and belief Officers Thomas, Ardoin, Smith, Delcambre, Russell and Harris developed a plan to implicate Taylor as a suspect in a crime he had not committed, then to invade Taylor's home and take him into custody.

176.    Upon information and belief, the plan developed by the officers was intended to make Taylor feel unsafe in his own home, to demonstrate to Taylor that members of the Baton Rouge Police Department could enter his home, harass him, and take him into custody even though he had committed no offense, and to frighten and intimidate Taylor into abandoning his federal civil rights lawsuit.

177.    Upon information and belief, Officers Thomas, Ardoin, Smith, Delcambre, Russell and Harris decided to execute their plan to intimidate and retaliate against Taylor during the late night hours of April 29, 2014 and the early morning hours of April 30, 2014.

178.    At 11:23 P.M., Officer Thomas was on duty traveling in his marked police cruiser in the 70805 zip code.  *See* April 29, 2014 Incident Report, attached hereto as Exhibit E.

179.    At approximately 11:23 P.M., a female individual phoned 911 and relayed facts virtually identical to those recorded by Officer Ardoin more than twelve hours earlier.

180.    While the individual who had contacted police earlier that day had identified the alleged burglar only as a black male, the individual who called 911 on the night of April 29, 2014, without being asked to make any identification, stated that "Ernest Taylor" was the individual who had stolen her television.

181.    Upon information and belief, the individual making the call to 911 had been previously instructed by Thomas, Ardoin, and/or other member(s) of the Baton Rouge Police

Department to call and identify Plaintiff as the perpetrator of a crime on Alliquippa Street.

182.   Taylor was never present at the Alliquippa Street residence, and has never met and is unacquainted with the individual who made the 911 call.

183.   Despite having knowledge that there were numerous individuals answering to the name "Ernest Taylor" in Baton Rouge and the surrounding areas, and lacking any evidence to indicate that Plaintiff herein was involved with the events being reported, upon hearing the 911 call, Thomas immediately concluded that the "Ernest Taylor" referenced in the 911 call was Plaintiff herein.[3]

184.   Even though there were numerous other BRPD officers available in the vicinity, Officer Thomas elected to respond to the 911 call, despite the fact that Thomas was then a defendant in a lawsuit filed by Taylor.

185.   Even though no description had been provided of the individual who allegedly burglarized the Alliquippa Street residence, Officer Thomas informed the other on-duty officers via his police radio that Taylor was the suspect being sought, and attempted to provide them with a physical description matching that of Plaintiff.

186.   While traveling to the Alliquippa Street residence, Thomas informed other officers by radio that Taylor had filed suit against he and other members of the Baton Rouge Police Department.

187.   Without basis or justification, Thomas also informed the other on-duty police officers that Taylor was "very violent."

188.   Upon his arrival at the Alliquippa Street residence, Officer Thomas immediately engaged in an overtly suggestive line of questioning with the female present at the residence in an

---

[3] The video from Officer Thomas' dashboard camera has been submitted conventionally in Taylor's other suit, *Taylor v. City of Baton Rouge, et al.,* Case No. 13-579-BAJ-RLB (M.D. La.)

effort to elicit responses supportive of Thomas' conclusion that the alleged suspect was Plaintiff herein.

189.   Thomas also engaged in an overtly racial line of questioning, asking the individual at the Alliquippa Street Residence whether the person who allegedly robbed the home "dresses like a pimp" sometimes.

190.   Despite Thomas' attempts, the female present at the Alliquippa Street residence provided no information to corroborate Thomas' belief that the individual that had allegedly stolen her television was, in fact, Plaintiff herein.

191.   Instead, the female present at the Alliquippa Street residence provided information that would exclude Plaintiff herein as a suspect in the alleged burglary, stating that she had personal knowledge of the alleged suspect and that he was "in his thirties."

192.   On April 29, 2014, Plaintiff herein was 54 years old.

193.   Despite receiving information that would eliminate Plaintiff as a suspect in the alleged crime on Alliquippa Street, Officer Thomas resorted to additional suggestive tactics that would elicit a false identification of Plaintiff as the alleged suspect.

194.   Specifically, Officer Thomas indicated to the female at the Alliquippa residence that he was going to show her a picture of Plaintiff to determine whether he was the individual that had perpetrated the alleged crime.

195.   Officer Thomas then retrieved a computer from his vehicle and positioned himself so that his dashboard camera would not be able to record any identification made by the female.

196.   Through the use of techniques designed to do so, or alternatively, via explicit request, Thomas indicated to the female that he wanted her to identify Plaintiff as the individual who purportedly robbed the Alliquippa Street residence.

197.    As a result of Thomas' suggestive techniques, or alternatively, in acquiescence to Thomas' specific request, the female at the Alliquippa Street residence incorrectly identified Plaintiff herein as the individual that had committed the alleged robbery.

198.    Despite the absence of probable cause or any legitimate evidence suggesting that Plaintiff had been involved in any wrongdoing, and despite the lack of any exigent circumstances, Thomas proceeded to Plaintiff's residence for the purpose of placing him under arrest.

199.    Upon information and belief, Thomas did not believe that Taylor had been involved in any criminal activity on the evening of April 29, 2014.

200.    Rather, Thomas saw the television robbery as an opportunity to intimidate Taylor and to retaliate against him for filing a complaint with internal affairs, and for naming Thomas and other members of the Baton Rouge Police Department in his federal lawsuit.

201.    To achieve his goal of intimidation, while en route to Plaintiff's residence, or shortly after arriving, Thomas again conspired with Officers Ardoin, Smith, Delcambre, Russell and Harris to conceal Thomas' presence while utilizing false pretenses to summon Plaintiff to the door of his home.

202.    Under the plan devised by the officers, when Plaintiff answered the door to his home, Thomas would not then be present, so as to avoid alerting Plaintiff to any impropriety.  Once Thomas was able to confirm Plaintiff's identity, Thomas would then come forward, enter Plaintiff's home, place him in handcuffs, and take him into custody.

203.    The plan was designed to demonstrate to Plaintiff that officers of the Baton Rouge Police Department, and Officer Thomas in particular, were capable of forcing their way into Taylor's home and taking him into custody despite the fact that Taylor had committed no crime.

204.    After deciding upon the actions they would take, officers Smith, Delcambre,

Russell and Harris approached the door to Taylor's residence, knocked, and shouted, "[d]id somebody call 911?"

205.    Eventually, Taylor opened the front door in a state of undress and stepped outside to speak with the officers, indicating that no one at his residence had called 911.

206.    When Taylor stepped outside, Thomas informed the other officers over his police radio that the individual who had exited the home was, in fact, the Taylor he desired to intimidate.

207.    After receiving confirmation of Taylor's identity from Thomas, one of the other officers stated that Taylor needed to speak with another officer, and asked Taylor to step back inside of his home.

208.    Pursuant to the officer's request, Taylor reentered his home.

209.    Without a warrant and in the absence of consent or any exigent circumstance, Thomas immediately followed Taylor and entered his home, asked Taylor if he knew his rights, then began Mirandizing Taylor.

210.    Taylor repeatedly questioned the officers as to why they had come to his home and placed him under arrest.

211.    None of the officers present at Taylor's home provided him with any explanation of their authority to arrest him and search his home, nor did they inform him of the charges for which they believed they had probable cause or provide any other reason for his arrest.

212.    Upon realizing that it was Thomas that had entered his home, Taylor inquired as to whether Thomas was one of the defendants in Taylor's federal lawsuit, to which Thomas responded affirmatively.

213.    Taylor was then handcuffed inside of his residence and led outside where, still in a state of undress, he was placed in the backseat of Thomas' police cruiser.

214. Without a warrant, and despite Taylor's refusal to consent to a search, the officers proceeded to search both Taylor's residence and his vehicle.

215. As Taylor had committed no crime, nothing that would implicate Taylor in any wrongdoing was discovered as a result of the officers' search of Taylor's home and vehicle in the early morning hours of April 30, 2014.

216. Taylor was eventually taken from the backseat of Thomas' police cruiser, and placed into the backseat of another officer's cruiser, then driven to the First District Precinct where he was placed in a holding cell.

217. Upon leaving Taylor's residence, Thomas returned to the Alliquippa Street residence, purportedly to locate the female individual with whom he had previously spoken, and to then transport her to the First District Precinct in order to identify Taylor as the alleged robber.

218. Thomas was unable to locate the female at the Alliquippa Street residence, either because she had wrongfully identified Taylor as the culprit at Thomas' suggestion or alternatively, pursuant to Thomas' explicit instruction that she not be present when Thomas returned from Taylor's home.

219. Their plan having been successfully executed, after several hours, the BRPD officers eventually released Taylor from the holding cell at First Precinct, and allowed him to return home.

220. After he was released from custody, Taylor contacted Glisson's firm to inform him of the actions undertaken by officers of the Baton Rouge Police Department.

221. Upon learning of Taylor's arrest by Officer Thomas and other members of the Baton Rouge Police Department, Taylor's attorney contacted Knightshead to apprise him of the situation and to request an investigation into the officers' actions.

222.    Knightshead agreed that it would be inappropriate for Thomas to have any contact with Taylor given the pendency of Taylor's federal suit, and indicated that he would look into the matter.

223.    Officers of the Baton Rouge Police Department continued to harass Taylor after April 30, 2014 by regularly parking near Taylor's residence and/or driving by his home in order to make him fear that they might again take him into custody without justification.

224.    Knightshead was informed about this continued harassment of Taylor.

225.    In addition to Knightshead, Defendants Roper, Freeman, and Dabadie were informed of the events of April 29th and 30th, 2014, described above, through filings made in Taylor's federal suit.

226.    Upon information and belief, no investigation of Corporal Wennemann, Officer Thomas, Officer Ardoin, Officer Muller, Officer Smith, Officer Delcambre, Officer Russell, or Officer Harris, or of the events described above has ever been made by the Baton Rouge Police Department, the Parish Attorney's Office, the City Prosecutor's Office, or any other individual or department within the City of Baton Rouge.

<u>Organization and Policymaking of the City of Baton Rouge</u>

227.    At all times pertinent hereto, defendants acted under color of law pursuant to statutes, ordinances, regulations, policies, customs, practices, and usage of the State of Louisiana and/or the City of Baton Rouge.

228.    The Chief of the Baton Rouge Police Department possesses the authority to direct and control the powers exercised by the officers of the Baton Rouge Police Department pursuant to Baton Rouge City Ordinance Sec. 4:51.

229.    The Chief of the Baton Rouge Police Department exercises the authority granted to

him by Baton Rouge City Ordinance §4:51 through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

230.    Officers of the Baton Rouge Police Department are required to "obey absolutely" the orders and directions of the Chief of Police pursuant to Baton Rouge City Ordinance Sec. 4:55.

231.    Section 6.02 of the City's Plan of Government provides that the Chief of Police shall be in direct command of the Police Department, and shall have the power to appoint and remove officers and employees of the department, assign members of the department to their respective posts, and to make rules and regulations concerning the operation of the department, the conduct of its officers and employees, along with matters relating to equipment, training, and discipline.

232.    Baton Rouge Code of Ordinances Sec. 4:50 and Section 6.01 of the City's Plan of Government also vests responsibility with the Baton Rouge Police Department to preserve the rights and property of Baton Rouge citizens with respect to their persons and property, and to uphold the laws of the State of Louisiana.

233.    Donald Dewayne White served as Baton Rouge Chief of Police from May 27, 2011 until on or about February 16, 2013 when he was replaced by Carl Dabadie, Jr.  Dabadie currently still holds the position.

234.    Section 11.01 of the City's Plan of Government provides for the appointment of a Parish Attorney who is to serve as the legal advisor for the City and all of its departments, offices and agencies, and is charged with furnishing opinions regarding questions of law involving the powers and duties of City officials.

235.    The Parish Attorney is charged with the responsibility of ensuring that the laws appearing in the Baton Rouge Code of Ordinances are valid and enforceable, and are not likely to

result in the unlawful deprivation of an individual's rights or property, or expose the City to liability.

236.   To ensure the legal soundness of the Baton Rouge Code of Ordinances and to protect the rights and property of the citizens of Baton Rouge, the Parish Attorney is vested with the authority and responsibility to draft proposed ordinances and recommend the amendment or repeal of ordinances that are outdated or suffer from legal infirmities.

237.   The East Baton Rouge Parish Attorney is authorized to appoint Assistant Parish Attorneys, at least one of whom is to be dedicated to the prosecution of ordinance violations.

238.   The Parish Attorney may delegate her duty to prosecute all ordinance violations in the City Court to an Assistant Parish Attorney, or City Prosecutor.

239.   The Parish Attorney is the head administrator for the Parish Attorney's Office, which includes the City Prosecutor's Office, and possesses the authority to appoint and remove Assistant Parish Attorneys, Assistant City Prosecutors and other employees of the department, to assign members of the department specific duties or tasks, and to make rules and regulations concerning the operation of the department, the conduct of its employees, and matters relating to the execution of the Parish Attorney Office's function.

240.   The Parish Attorney exercises the authority described in the foregoing paragraph through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

241.   The City Prosecutor is the primary administrator within the City Prosecutor's Office and possesses the authority to appoint and remove Assistant City Prosecutors and other employees of the department, to assign members of the department specific duties or tasks, and to make rules and regulations concerning the operation of the department, the conduct of its

employees, and matters relating to the execution of the City Prosecutor Office's function.

242.   The City Prosecutor exercises the authority described in the foregoing paragraph through the issuance of policy directives, standard operating procedures, memoranda, or similar means.

243.   The Parish Attorney, City Prosecutor, and all Assistant Parish Attorneys and Assistant City Prosecutors are required to possess a valid license to practice law in the State of Louisiana.

244.   As attorneys licensed in the State of Louisiana, the Parish Attorney, City Prosecutor, and all Assistant Parish Attorneys are sworn to support the Constitution of the United States and the Constitution of the State of Louisiana, and are forbidden from maintaining any suit or proceeding which they believe to be unjust or any defense which they believe to be invalid.[4]

245.   Mary Roper was appointed as East Baton Rouge Parish Attorney in 2008 and remained in that position until September 10, 2014.

246.   After Roper's departure, Lea Anne Batson was appointed East Baton Rouge Parish Attorney.  Batson currently still holds this position.

247.   Lisa Freeman previously served as Chief City Prosecutor with the primary responsibility for prosecuting ordinance violations in Baton Rouge City Court.  Freeman no longer holds this position.

### Development and Status of the Rights Guaranteed by Federal and Louisiana Law

248.   On December 15, 1791 the First, Second and Fourth Amendments to the United States Constitution came into effect after having been ratified by three-fourths of the States.

249.   On July 28, 1868, the 14th Amendment to the United States Constitution came into

---

[4] *See* Louisiana Oath of Admission, appearing at: https://www.lascba.org/lawyers_oath.asp

effect after having been ratified by three-fourths of the States.

250.    On April 20, 1974, Louisiana Voters ratified the 1974 Louisiana Constitution, which became effective January 1, 1975.

## 1.   The Right to Seek Redress of Grievances

251.    The First Amendment provides, "[c]ongress shall make no law respecting an establishment of religion, or prohibiting the free access thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

252.    The right to petition the government, guaranteed by the First Amendment, is implicit in the very idea of government, republican in form.  *United States v. Cruikshank,* 92 U.S. 542 (1876).

253.    The right of access to the courts via filing of a lawsuit "is an aspect of the First Amendment right to petition the Government for redress of grievances."  *See Bill Johnson's Rests. v. NLRB,* 461 U.S. 731, 741 (1983), citing *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508 (1972).

254.    Article I, Section 9, of the 1974 Constitution provides, "No law shall impair the right of any person to assemble peaceably or to petition government for a redress of grievances."

255.    The right to petition long antedates the existence of the U.S. Constitution, is cut from the same cloth as the other guarantees of the First Amendment, and is an assurance of a particular freedom of expression.  *McDonald v. Smith,* 472 U.S. 479 (1985).

## 2.   The Right to Keep and Bear Arms

256.    The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

257.    The Second Amendment did not create a right that was dependent upon the Constitution for its existence, but rather only gave Constitutional protection to a fundamental individual right that preexisted the Constitution's enactment.  *See District of Columbia v. Heller,* 554 U.S. 591 (2008).

258.    On July 23, 1879, the Louisiana Constitutional Convention adopted the Louisiana Constitution of 1879.  Article 3 of the Constitution largely adopted the language of the federal government's Second Amendment: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged.  This shall not prevent the passage of laws to punish those who carry weapons concealed."  Earlier versions of the Louisiana Constitution had provided that "free white men of the state shall be armed and disciplined for its defense."  *See e.g.,* Louisiana Constitution of 1812, Article III, §22.

259.    In 1951, the City enacted the 1951 Baton Rouge City Code which criminalized certain conduct.  In particular, Title 13, §83, with certain limited exceptions, made it illegal for individuals to possess firearms or any other "instrumentality customarily used or intended for probable use as a dangerous weapon, in any premises where alcoholic beverages are sold and/or consumed on the premises."  Subsection (b) of the ordinance provided that police officers "shall confiscate" any firearm or other weapon found on any person "in any place where alcoholic beverages are sold or consumed on the premises."  Subsection (c) of the ordinance also provided that "[t]he phrase, '…premises where alcoholic beverages are sold and/or consumed on the premises' shall include all of the licensed premises, including the parking lot."  By its clear and unambiguous language, the ordinance forbid possession of any weapon (not just a firearm), on the premises of any establishment that either sold or permitted consumption of alcoholic beverages – even where the weapon was located inside a parked vehicle outside the establishment.

260.    It has never been illegal for an individual to possess a firearm inside their vehicle in the State of Louisiana, and from the moment of its passage, §13:95.3 was unenforceable, as it conflicted with provisions of the Louisiana and U.S. Constitutions.

261.    In 1962 the City enacted the 1962 East Baton Rouge Parish Code, which reenacted Title 13, §83 of the 1951 Baton Rouge City Code, redesignating it as Title 13, §205.

262.    The ordinance first appearing as Title 13, §83 in the 1951 Baton Rouge City Code still exists and has not been amended.  It appears in the current version of the Code of Ordinances of the City of Baton Rouge as Title 13, Section 95.3 ("the ordinance").

263.    Article I, Section 11 of the 1974 Constitution made clear that the right to keep and bear arms was one granted to individual citizens: "The right of each citizen to keep and bear arms shall not be abridged, but this provision shall not prevent the passage of laws to prohibit the carrying of weapons concealed on the person."

264.    On January 12, 1979, the Louisiana Supreme Court stated unequivocally that the 1974 Constitution guaranteed to each citizen the right to keep and bear arms.  Confronted with a situation in which an individual was arrested for possessing firearms in the parking lot of a drug store, the Court stated: "The carrying of an unconcealed weapon is not a special privilege or advantage enjoyed by a police officer.  Each citizen is guaranteed the right to keep and bear arms not concealed on his person."  *State v. Nelson*, 367 So. 2d 317, 318 (La. 1979).

265.    On October 9, 1984, the Louisiana First Circuit Court of Appeal struck down Louisiana Revised Statute §56:330 (forbidding possession of firearms while frog hunting) as being in direct conflict with Louisiana Constitution Article I, §11.  The court determined that a prohibition against possessing a firearm while engaged in certain acts bore no rational relationship to any legitimate state interest.  The court also stated that the statute presented a "clear illustration"

of the reason for recognizing a broad right of citizens to keep and bear arms – an individual capturing game at night "could be attacked" and "needs to protect himself." *State v. Chaisson,* 457 So.2d 1257 (La.App. 1 Cir. 1984).

266.    Shortly after the decision in *Ringe v. Romero,* 624 F. Supp. 417 (W.D. La. 1985), the Louisiana Legislature passed Act. No. 765, enacting Louisiana Revised Statute 14:95.5, which applied similar restrictions to the possession of firearms as §13:95.3, but in a much narrower set of circumstances.

267.    Specifically, La. R.S. §14:95.5 limits its application to "firearms" in the possession of persons on the premises of "commercial establishments in which alcoholic beverages … are sold in individual servings for consumption on the premises" and contained no provision that would include areas outside the establishment, such as the parking lot, in the definition of "premises."

268.    Thus La. R.S. §14:95.5 applies only to possession of firearms (not all "instrumentalities customarily used or intended to be used as a weapon") and only where alcohol was sold for consumption on the premises (not where alcohol was "sold and/or consumed"), and the statute did not include parking lots in the definition of "premises."

269.    On March 12, 1986, the City enacted Ordinance No. 8118, containing Title 13, §95.4, which reproduced verbatim the more narrowly tailored provisions appearing in La. R.S. §14:95.5, and which currently still appears in the City's Code of Ordinances, under the same title and section.

270.    The City enacted §13:95.4 in response to the constitutional deficiencies present in §13:95.3 that had been identified by the federal court in *Ringe v. Romero.*

271.    While §13:95.4 was enacted to cure the legal flaws present in §13:95.3, the

unconstitutional ordinance was never repealed.

272.    On June 26, 2008, the United States Supreme Court issued its decision in *District of Columbia v. Heller,* 554 U.S. 570 (2008), wherein it confirmed that, like Article I, Section 11 of Louisiana's Constitution, the Second Amendment to the United States Constitution protects an individual's right to possess firearms.

273.    On July 2, 2008, Louisiana Governor Bobby Jindal signed into law Act 684, codified at La. R.S. 32:292.1, titled "Transportation and Storage of Firearms in Privately Owned Motor Vehicles."  §32:292.1 explicitly provides that "a person who lawfully possesses a firearm may transport or store such firearm in a locked, privately-owned motor vehicle in any parking lot, parking garage, or other designated parking area."

274.    On March 2, 2010, the United States Supreme Court reaffirmed its earlier decision in *Heller,* and determined that "it is clear" that the provisions of the Second Amendment to the United States Constitution are fully applicable to the States by virtue of the Fourteenth Amendment.  *McDonald v. City of Chicago,* 130 S.Ct. 3020 (2010).

275.    On November 6, 2012 the citizens of the State of Louisiana voted to further buttress the protections provided by the State's Constitution with respect to the right of its citizens to keep and bear arms.  In its current form, Art. 1, §11 provides: "The right of each citizen to keep and bear arms is fundamental and shall not be infringed.  Any restriction on this right shall be subject to strict scrutiny."  The provision became effective December 10, 2012.

### 3.   The Right to be Free From Unreasonable Searches and Seizures

276.    The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation,

and particularly describing the place to be searched, and the persons or things to be seized."

277.    In 1964 the United States Supreme Court made clear that the existence of probable cause could not be established through the utilization of overly suggestive techniques.  *Beck v. Ohio,* 379 U.S. 89 (1964); s*ee also, Gibson v. State,* 758 So.2d 782, 788 (La. 2000).

278.    As early as 1967, the United States Supreme Court recognized that "[t]he practice of showing suspects singly to persons for the purpose of identification has been widely condemned."  *See Stovall v. Denno,* 388 U.S. 293, 302 (1967) (citations omitted).

279.    Absent probable cause, the Fourth Amendment permits law enforcement officers to briefly detain individuals for investigative purposes if the officers possess reasonable suspicion that criminal activity is afoot.  *Terry v. Ohio,* 392 U.S. 1, 21 (1968)

280.    On January 12, 1971, the United States Supreme Court made clear that police could not enter an individual's home without a warrant in the absence of certain limited situations.  *See Coolidge v. New Hampshire,* 403 U.S. 443 (1971); *see also, Payton v. New York,* 445 U.S. 573 (1979).

281.    Article I, Section 5 of the Louisiana Constitution of 1974 provides, "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches and seizures, or invasions of privacy.  No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the person or things to be seized, and the lawful purpose or reason for the search."

282.    "The search of a home without a warrant is banned notwithstanding probable cause to believe that it contains contraband or other seizable articles.  Such a search, moreover, is not validated by what it brings to light.  The tradition of time immemorial sustains this firm constitutional policy protecting the privacy of the home."  *Id.*

283.    "The substantive restriction against the invasion of private homes without a search warrant … forms a sacred feature of our American heritage.  Curtailing the substantive restriction … impairs the protection of the right of privacy of all the homes in our state – those of both the just and the unjust."  *Id., see also, Vale v. Louisiana,* 399 U.S. 30 (1970).

284.    On March 29, 1976, the Louisiana Supreme Court held that Article I, Section 5, of the Louisiana Constitution prevents police officers within the state from conducting searches of an individual's person or vehicle when the person is detained for a traffic violation and there is no reasonable suspicion that he is armed and dangerous.  *See State v. Breaux,* 329 So.2d 696 (La. 1976).

285.    In 1977, the United States Supreme Court, echoing its determination in *Stovall v. Denno,* condemned the use of a single photograph for purposes of identifying a suspect as "impermissibly suggestive" in the absence of exigent circumstances.  *See Manson v. Braithwaite,* 432 U.S. 98 (1977).

286.    On October 9, 1978, the Louisiana Supreme Court reaffirmed its holding in *State v. Breaux,* adding that searches of an individual's person or vehicle in connection with a traffic violation violated the Fourth Amendment to the U.S. Constitution, in addition to Article I, Section 5, of the Louisiana Constitution.  *See State v. Daigre,* 364 So.2d 902 (La. 1978).

287.    On September 4, 1979 the Louisiana Supreme Court clearly stated that the existence of a firearm inside of a motorist's vehicle could not provide probable cause for police to search the vehicle.  *See State v. Blanchard,* 374 So.2d 1248 (La. 1979).

288.    On December 28, 1984, the Louisiana First Circuit Court of Appeal determined that reliance upon subsection (b) of the Baton Rouge Code Sec. 13:95.3 (the ordinance), when applied to individuals who were located on the "premises", but not actually inside the establishment that

served or sold alcoholic beverages, violated the individual's rights under the Fourth and Fourteenth Amendments to the United States Constitution.  *State v. Garrett,* 461 So.2d 651 (La. App. 1 Cir. 1984).

289.    On December 23, 1985, the United States District Court for the Western District of Louisiana declared La. R.S. §14:95.4(A) and Lafayette Code of Ordinances §§10-74 – 10-74 – provisions of law with provisions identical to those appearing in §13:95.3 of the Baton Rouge Code of Ordinances – as facially unconstitutional and violative of the Fourth and Fourteenth Amendments to the U.S. Constitution.  *Ringe v. Romero,* 624 F. Supp. 417 (W.D. La. 1985).

290.    Under limited circumstances, an officer may briefly search a detained individual for weapons incident to a valid *Terry* stop.  *See Maryland v. Buie,* 494 U.S. 325, 332-334 (1990). A *Terry* weapons search must be premised on "individualized suspicion" derived from "specific and articulable facts" that a suspect "is armed and dangerous" or "may gain immediate control of weapons."  *Id.  See also, Arizona v. Johnson,* 129 S. Ct. 781, 784-786 (2009); *United States v. Rideau,* 969 F.2d 1572, 1575 (5th Cir. 1992).

291.    In 1993 the United States Court of Appeals for the Fifth Circuit stated, "[t]he Supreme Court, in *Manson v. Brathwaite,* made clear that exhibiting a single photograph for identification purposes is impermissibly suggestive."  *United States v. Sanchez,* 988 F.2d 1384, 1389 (5th Cir. 1993).  The *Sanchez* decision reiterated that, in the absence of other factors providing an indicia of reliability, the identification of a suspect using a single photograph is insufficient to support the existence of probable cause.  *Id.; see also, In re Extradition of Gonzales,* 52 F.Supp.2d 725 (W.D. La. 1999).

292.    On March 22, 2006 the United States Supreme Court issued its decision in *Georgia v. Randolph,* 547 U.S. 103 (2006), holding that one occupant may not give effective consent to

search shared premises against a co-tenant who is present and refuses the search.

293.    On April 4, 2008, the United States District Court for the Western District of Louisiana determined that an officer's search for and seizure of firearms from an individual who was in lawful possession constituted a violation of the U.S. Constitution's Fourth and Fourteenth Amendment's protection against unwarranted searches and seizures sufficient to sustain a cause of action under 42 U.S.C. §1983. *Club Retro, L.L.C. v. Hilton*, 2008 U.S. Dist. LEXIS 35231, 39 (W.D. La. 2008).

294.    On May 6, 2009 the United States Court of Appeals for the Fifth Circuit upheld the district court's decision in the *Club Retro LLC* case identified above.  The Fifth Circuit stated that the defendant police actors had "wisely conceded" at oral argument that the searches, seizures, and arrests made pursuant to gun possession charges "violated clearly established constitutional rights of which a reasonable person would have known." *Club Retro LLC v. Hilton,* 568 F.3d 181, 203, n.17 (5th Cir. 2009).

### 4.    The Right Against Self-Incrimination

295.    The Fifth Amendment provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself, nor deprived of life, liberty, or property without due process of law."[5]

296.    On June 13, 1966 the United States Supreme Court issued its decision in *Miranda v. Arizona,* 384 U.S. 436 (1966), "to give concrete constitutional guidelines for law enforcement agencies and courts to follow" with respect to police interrogations.  The decision imposed the requirement that "prior to any questioning, the [arrested] person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that

---

[5] The Fourteenth Amendment also establishes the right to due process of law.

First Amended Complaint and Request for Jury Trial                                                              44

he has the right to the presence of an attorney, either retained or appointed."

297.    Article I, Section 13 of the Louisiana Constitution of 1974 incorporates the requirements announced in *Miranda v. Arizona* into substantive Louisiana law.  In addition to the requirements announced in *Miranda,* Section 13 also imposes a duty upon police officers to "fully advise" any person who has been arrested or detained of "the reason for his arrest or detention."

### 5.   The Right to Equal Protection of the Laws

298.    Section 1 of the Fourteenth Amendment provides, in pertinent part, "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

299.    The Equal Protection Clause of the Fourteenth Amendment prohibits selective or discriminatory enforcement of the law.   *Whren v. United States,* 517 U.S. 806, 813 (1996). Discriminatory policing may arise from an explicit classification or a facially neutral law or policy. *Id.*

### 6.   Other Provisions of Law

300.    La. C.Cr.P. Art. 211(C)(1) provides:

> When a peace officer has reasonable grounds to believe a person has committed an offense of driving without a valid drivers' license in his possession, the officer shall make every practical attempt based on identifying information provided by the person to confirm that the person has been issued a valid driver's license.  If the officer determines that the person has been issued a valid driver's license which is not under revocation, suspension, or cancellation, but that the license is not in his possession, the officer shall issue a written summons to the offender in accordance with the law, commanding him to appear and answer the charge.

301.    La. C.Cr.P Art. 215.1(D) states, in pertinent part:

> During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the

violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity.

302.    La. C.Cr.P. Art. 218 states, in pertinent part:

A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of his arrest.

303.    La. C.Cr.P. Art. 218.1 provides:

When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest and detention, his right to remain silent, his right against self-incrimination, his right to the assistance of counsel and, if indigent, his right to court-appointed counsel.

304.    La. R.S. §32:391(A) states, in pertinent part:

Whenever any person is arrested for a violation of any provision of this Chapter or any regulation of the department or secretary of the Department of Public Safety and Corrections adopted pursuant thereto, except as otherwise provided in this Section, the arresting officer shall take his name, address, the license number of his motor vehicle, and the number of his operator's license, and shall issue a summons or otherwise notify him in writing to appear at a time and place to be specified in such summons and notice.

305.    La. R.S. §32:411.1(A)(4) states, in pertinent part:

Whenever any person who resides in this state is arrested and charged with a violation of the Louisiana Highway Regulatory Act or any municipal or parish ordinance regulating traffic in any parish or municipality such person shall be released on his own recognizance upon the signing of a promise to appear section of the traffic citation.

*See also, Hebert v. Maxwell,* 214 Fed.Appx. 451, 455 (5th Cir. 2007)(unpublished)

306.    La. R.S. §32:411.1(C)(1) provides:

When an officer or agent of the department or any police officer of the state, or any parish or municipality has reasonable grounds to believe a person has committed an offense of driving without a valid driver's license in his possession, the police officer shall make every practical attempt based on identifying information provided by the person to confirm that the person has been issued a valid driver's license.  If the police officer determines that the person has been issued a valid driver's license which is neither under

revocation, suspension, or cancellation, but the license is not in his possession, the peace officer shall issue a written summons to the offender in accordance with the law, commanding him to appear and answer the charge.

307.    Under Louisiana law, a person commits the offense of "resisting arrest" only if he resists a "lawful arrest"; that is, an arrest supported by probable cause. *Deville v. Marcantel,* 567 F.3d 156 (5th Cir. 2009), citing *State v. Lindsay,* 388 So.2d 781, 782 (La. 1980) ("It is a long-established principle in Louisiana law that a citizen has the right to resist an unlawful arrest").

308.    As demonstrated above, the particular contours of a Louisiana citizen's rights to: (1) seek a redress of grievances from the government, (2) to keep and bear arms, (3) to be free from unreasonable searches and seizures, (4) to be free from compelled self-incrimination, and (5) to equal protection of the law, were sufficiently defined at all times relevant to this complaint such that no reasonable law enforcement officer or attorney would have been unaware of the existence of these rights.

309.    Since the very formation of the United States government and the adoption of the Louisiana Constitution, both Federal and Louisiana courts have repeatedly reinforced the fundamental nature and high level of protection afforded by both state and federal law to the rights described above, making any infringement upon these rights by a government actor cloaked in the color of law patently unreasonable.

### Recognition of National and Regional Problems and Recommendations for Reform

310.    In order to assist the state and local governments – the entities bearing primary responsibility for law enforcement in the United States – in conducting their functions, the President's Commission on Law Enforcement and Administration of Justice ("the Commission") was established in 1965.

311.    In 1967 the Commission issued several reports identifying problem areas and

recommending actions that could be taken in order to ensure the protection of rights guaranteed to individuals by the U.S. Constitution while more effectively preventing crime. *See* The President's Commission on Law Enforcement and the Administration of Justice Task Force Report: The Police[6]; and The President's Commission on Law Enforcement and the Administration of Justice Task Force Report: The Courts[7] (hereinafter referred to collectively as "Commission Reports").

312.    The Commission Reports made numerous observations, identified many problem areas, and recommended actions to be taken for the improvement of the American criminal justice system as operated by state and local governments.

313.    In response to the findings of the Commission, numerous organizations involved in the administration of criminal justice began to promulgate standards of practice that would protect individual rights in an increasingly complex system.

314.    One organization promulgating such standards was the American Bar Association, which issued standards in relation to the urban police function and the prosecutorial function, among others. *See* ABA Standards on Urban Police Function[8]; ABA Standard for Criminal Justice Prosecution Function and Defense Function[9].

315.    The ABA Standards described have been characterized by the United States Supreme Court as reflecting "prevailing norms of practice" and "guides to determining what is reasonable." *See Strickland v. Washington,* 466 U.S. 668, 688 (1984).[10]

316.    The National District Attorney's Association has also issued national prosecution

---

[6] Available at: https://www.ncjrs.gov/pdffiles1/Digitization/147374NCJRS.pdf
[7] Available at: https://www.ncjrs.gov/pdffiles1/Digitization/147397NCJRS.pdf
[8] Available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_urbanpolice.html
[9] Available at:
http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_pfunc_toc.html
[10] *See also,* Marcus, M., "The Making of the ABA Criminal Justice Standards – Forty Years of Excellence*," Criminal Justice,* vol. 23, no. 4 (2009) (describing the overwhelming and uniform acceptance of the standards in the American criminal justice system).

standards in order to provide guidance to criminal prosecutors.[11]

317.    In addition to the standards issued by the organizations discussed above, the Louisiana Supreme Court has enacted the Louisiana Rules of Professional Conduct, provisions of substantive law applicable to members of the legal profession within the State of Louisiana which are designed to protect the integrity of the criminal justice system, and legal proceedings in general.

318.    The Louisiana Rules of Professional Conduct were enacted by the Louisiana Supreme court in 2004.

319.    In the late 1990's the United States Department of Justice ("DOJ") opened an investigation into certain practices of the New Orleans Police Department ("NOPD").

320.    In the course of its investigation, the DOJ found that many New Orleans Police Officers could not articulate proper legal standards for stops, searches or seizures, and recommended that the City of New Orleans provide annual in-service training on this "critical topic."

321.    In May of 2010, the Mayor of New Orleans invited another investigation of the city's police department by the DOJ's Civil Rights Division so that recommendations could be made to effect "a complete transformation" of the police department that was "necessary and essential to ensure safety for the citizens of New Orleans."

322.    On March 16, 2011, the DOJ issued a report detailing the findings from its investigation of the NOPD.

323.    Among other things, the DOJ found that:

- officers of the NOPD could not articulate proper legal standards for stops, searches or seizures, just as they had been unable to during the DOJ's previous investigation ten years earlier;

- officers of the NOPD routinely used unnecessary and unreasonable force in

---

[11] Available at: http://www.ndaa.org/pdf/NDAA%20NPS%203rd%20Ed.%20w%20Revised%20Commentary.pdf

violation of the U.S. Constitution;

- officers of the NOPD engaged in a pattern of stops, searches, and arrests that violate the Fourth Amendment;

- NOPD engaged in a pattern or practice of discriminatory policing in violation of constitutional and statutory law

- NOPD's failure to provide sufficient guidance, training, and support to its officers, as well as its failure to implement systems to ensure officers were wielding their authority effectively and safely, had created an environment that permitted and promoted constitutional harm;

- there existed "direct links" between NOPD's inadequate training of its officers and serious, systemic problems in use of force; stops, searches, and arrests; supervision; interacting with and building partnerships with members of the community; and racial, ethnic, and gender bias in policing;

- NOPD's system for receiving, investigating, and resolving misconduct complaints did not function as an effective accountability measure;

- NOPD's custodial interrogation practices reflected many of the same problems found throughout NOPD: inadequate policies, poor or non-existent training, and weak supervision and accountability

324.    Upon information and belief, at the time the DOJ made its investigative findings with respect to the NOPD, Officer Thomas was an employee and officer within the NOPD.

325.    Most, if not all of the deficiencies identified by the DOJ in its investigation of the NOPD have, at all times relevant to this complaint, also been present within the Baton Rouge Police Department.

326.    In response to the DOJ's investigative report, the City of New Orleans entered into the most expansive Consent Decree then in existence with the U.S. Department of Justice, reflecting a shared commitment by those agencies to effective, constitutional, and professional law enforcement.

327.    Despite the presence of the same systemic flaws in the Baton Rouge criminal justice system as existed in New Orleans, the City and its actors took no measures to alleviate the

inevitable effects of the BRPD's unconstitutional policing.

328.     The City and its actors ignored the recommendations of the Commission, the American Bar Association, the National District Attorney's Association, and the Department of Justice, in addition to the requirements of the Louisiana Rules of Professional Conduct, not only permitting, but tacitly condoning the unconstitutional practices routinely used by officers of the BRPD, and employees of the City Prosecutor's and Parish Attorney's Offices.

## The Existence and Enforcement of Unconstitutional Laws in Baton Rouge

329.     The existence of unconstitutional and invalid laws in the legal provisions enforced by the Baton Rouge Police Department and prosecuted by the Baton Rouge City Prosecutor's Office has been common knowledge both within the criminal justice system and in the community at large since long before the events involving Taylor described herein.

330.     Among the outdated and unenforceable criminal laws still "on the books" at the time of the events described in this complaint, up to and including the present, are the following:

a.   Baton Rouge Code of Ordinances §13:95.3 (Possession of Weapons Where Alcoholic Beverages Are Sold and/or Consumed), *see State v. Blanchard,* 374 So.2d 1248 (La. 1979) ("[i]t is not a criminal offense to carry a weapon in a vehicle, unless the possessor happens to be a convicted felon"); *State v. Garrett,* 461 So.2d 651 (La. App. 1 Cir. 1984) (holding search performed pursuant to §13:95.3 violated the Fourth Amendment); *Ringe v. Romero,* 624 F.Supp. 417 (W.D. 1985) (declaring similar Lafayette ordinance and state statute unconstitutional on their face); La. R.S. 32:292.1 ("a person who lawfully possesses a firearm may transport or store such firearm in a locked, privately-owned motor vehicle in any parking lot, parking garage, or other designated parking area"); *Taylor v. City of Baton Rouge,* 2014 U.S. Dist. LEXIS 117919 (M.D. La. 2014) (permanently enjoining the enforcement of §13:95.3 and prosecutions for its violation);

b.   Baton Rouge Code of Ordinances §13:106.1 (Profanity), *see Cox v. Louisiana,* 379 U.S. 536 (1964) (striking down Louisiana's "breach of the peace statute" as violative of the First Amendment); *Gooding v. Wilson,* 405 U.S. 518 (1972) (striking down similar Georgia ordinance as violative of the First Amendment); *Lewis v. New Orleans,* 415 U.S. 130 (1973) (same); *City of Baton Rouge v. Ewing,* 308 So.2d 776 (La.

1975) (declaring previous version of ordinance unconstitutional because it was not limited to the prohibition of "fighting words"); *United States v. Hicks,* 980 F.2d 963 (5th Cir. 1992) ("[t]he Supreme Court has long held that, as a general rule, simple profanity or vulgarity – not rising to the level of 'fighting words' or obscenity – is constitutionally protected speech");

c.   La. R.S. §14:47 (Defamation), *see Garrison v. Louisiana,* 379 U.S. 64 (1964) ("the Louisiana statute … incorporates constitutionally invalid standards in the context of criticism of the official conduct of public officials"); *State v. Snyder,* 277 So.2d 660 (La. 1973) ("[i]n unequivocal language the United States Supreme Court in Garrison v. Louisiana declared our statutory scheme for control of defamatory expression unconstitutional"); *State v. Defley,* 395 So.2d 759 (La. 1981); *see also, Simmons v. City of Mamou,* 2012 U.S. Dist. LEXIS 36081 (W.D. La. 2012); *McLin v. Ard,* 2014 U.S. Dist. LEXIS 17876 (M.D. La. 2014);

d.   La. R.S. §14:89 (Crime Against Nature), *see Lawrence v. Texas,* 539 U.S. 558 (2003) (declaring the sodomy laws then existent in 13 states, including Louisiana to be unconstitutional); *Louisiana Electorate of Gays and Lesbians, Inc. v. Connick,* 902 So.2d 1090 (La. App. 5 Cir. 2005), *writ denied,* 2005 La. LEXIS 2677 (La. 2005) (upholding trial court's permanent injunction prohibiting prosecution for sodomy under §14:89 pursuant to *Lawrence v. Taylor,* and reforming the statute to prohibit only prostitution and bestiality);

e.   La. R.S. 14:95.4 (Consent to Search; Alcoholic Beverage Outlet), *see Ringe v. Romero,* 624 F. Supp. 417 (W.D. La. 1985) (declaring the statute to be unconstitutional on its face); *see also, State v. Garrett,* 461 So.2d 651 (La. App. 1 Cir. 1984) (holding search performed pursuant to identical provision of municipal ordinance violated the Fourth Amendment).

331.   The provisions of law cited above do not comprise the entirety of the unenforceable provisions of law which remain "on the books."

332.   Despite the fact that numerous and varied courts have declared the foregoing provisions of law to be in violation of rights guaranteed to citizens of Louisiana and the United States – a fact known to its City and its actors – the Baton Rouge Police Department has at all times relevant to this complaint, up to and including the present time, had a policy of enforcing all laws "on the books," including those found to be unenforceable by courts of competent

jurisdiction.

<u>Baton Rouge Code of Ordinances §13:95.3</u>

333.    In April of 2010, various members of federal, state and local law enforcement authorities, including the Baton Rouge Chief of Police, formed a task force to investigate several high-profile murders that remained unsolved in the city of Baton Rouge.

334.    The task force's efforts were successful, and on October 29, 2010, law enforcement officials, including the Baton Rouge Chief of Police, announced plans to create a permanent unit dedicated to the prevention of violent crime within the City of Baton Rouge and the Parish of East Baton Rouge.

335.    In announcing the creation of the permanent unit, named the "East Baton Rouge Violent Crimes Unit," the various law enforcement officials also stated various goals they hoped to achieve by the year 2014.

336.    Among the stated goals of the East Baton Rouge Violent Crimes Unit were to reduce the number of murders and violent crimes occurring in East Baton Rouge Parish by 15%, to increase "clearance rates" for violent crimes by 20%, and to "aggressively focus on removing firearms from the hands of violent offenders."

337.    While the Violent Crimes Unit included members of several agencies working cooperatively, each agency was also charged with working independently within his or her own agency to further the goals of the Unit.

338.    Within a discrete agency, such as the Baton Rouge Police Department, the agency's head was charged with conducting bi-weekly meetings with their division commanders to discuss crime trends, enforcement activities, and crime planning solutions – including the use of crime mapping, graphs, and statistical analysis.

339.    The information described in the preceding paragraph was to be disseminated to law enforcement personnel so that they might deploy "proactive enforcement strategies" that furthered the Unit's stated goals.

340.    Upon information and belief, the Baton Rouge Chief of Police made attainment of the goals set by the Violent Crimes Unit a priority among officers under his command.

341.    To attain the Violent Crimes Unit's goals, the Baton Rouge Police department instituted, or, in the alternative, continued a policy of enforcing any laws that "were on the books," even if the law had been previously rendered unenforceable as a result of judicial decree.

342.    One such law the officers were instructed to utilize was §13:95.3 of the Baton Rouge Code of Ordinances.

343.    In accordance with departmental policy, Officers of the Baton Rouge Police Department thus set out to seize lawfully held firearms in furtherance of the Unit's stated goals.

344.    For example, as reported in the Baton Rouge Advocate's Police and Fire Briefs, on December 29, 2010, members of the Baton Rouge Police Department used §13:95.3 to arrest an individual and seize firearms located inside his vehicle because the vehicle was located in the parking lot of an establishment that sold alcohol.

345.    To further confront the issue of gun violence within the Parish of East Baton Rouge, officials of the City created the "Baton Rouge Area Violence Elimination" initiative, referred to as "BRAVE".

346.    One of the goals of the BRAVE initiative was to remove as many guns as possible from high crime areas.

347.    At its inception, the BRAVE initiative was to apply only within a specified area of the City of Baton Rouge – the area bearing zip code 70805.

First Amended Complaint and Request for Jury Trial                                              54

348.    The enforcement of §13:95.3 by officers patrolling the 70805 zip code was specifically encouraged by the administrators and supervisors of the Baton Rouge Police Department so that they could cite seizure of the firearms as proof of the BRAVE initiative's success.

349.    The City of Baton Rouge sought and received federal funding to implement its BRAVE initiative in the 70805 zip code.

350.    As part of the BRAVE initiative, the Baton Rouge Police Department instituted, or in the alternative, continued a policy of violating the rights of individuals located within the designated area through the use of unnecessary force, the performance of unlawful searches and seizures, the enforcement of invalid laws, inducing non-voluntary confessions, and the like.

351.    Upon information and belief, the efforts of the BRPD, described above, resulted only in the arrests of African-American individuals within the 70805 zip code.

352.    During the times relevant to this complaint, the Baton Rouge City Prosecutor's Office had a policy of prosecuting all charges referred to it by the Baton Rouge Police Department, even if the charges were brought pursuant to unenforceable provisions of law, or the evidence supporting the charge had been obtained illegally and was thus inadmissible.

353.    On July 7, 2014, a local media outlet inquired whether the Baton Rouge Police Department's continued utilization of §13:95.3 was legal and complied with constitutional requirements.

354.    In response to the question regarding the Baton Rouge Police Department's enforcement of §13:95.3, a spokesman for the department stated, "[t]he officers acted in good faith when this ordinance was enforced and we will continue to use it as long as it is a law that is on the books."

355.    The spokesman's statement was consistent with the policy, procedure, practice, or custom of the Baton Rouge Police Department to enforce any and all laws that were "on the books" without regard to the legality or enforceability of the provisions.

356.    During the times relevant to this complaint, the Baton Rouge Police Department also had in place a policy, practice or custom of taking no action, performing no investigation, and imposing no discipline when it was notified of unlawful actions taken by members of the department which were consistent with departmental policy.

357.    On August 25, 2014, the City and its actors were permanently enjoined from continued enforcement of §13:95.3 in order issued by the Hon. Brian A. Jackson, Chief Judge of the U.S. District Court for the Middle District of Louisiana.

358.    In response, Chief Dabadie issued the following statement to media outlets reporting on the injunction, "[a]t the time of the arrest of Ernest Taylor, the ordinance was on the books … even though the judge has determined the ordinance to be unconstitutional, we have already had 13:95.3 repealed."

359.    Contrary to Dabadie's representation, §13:95.3 has never been repealed, and remains "on the books" in Baton Rouge's Code of Municipal Ordinances.

360.    Upon information and belief, no efforts have been made to instruct officers of the Baton Rouge Police Department that they should no longer enforce §13:95.3.

361.    In addition to failing to communicate the unenforceability of §13:95.3 to officers of the Baton Rouge Police Department, Dabadie has continued to maintain a policy by which all laws appearing "on the books" are to be enforced by officers within his department.

<u>La. R.S. §14:47</u>

362.    Despite the fact that Louisiana's criminal defamation statute has repeatedly been

held to be unconstitutional, the fact that extensive media coverage had been given to the unlawful use of the statute by officials in neighboring Livingston Parish, and despite a ruling from the federal district court sitting in Baton Rouge, the BRPD continued to use the provision to conduct illegal searches of individuals who had levied criticism against members of the BRPD, as set forth below.

363.     In May of 2014, the Baton Rouge Police Department began investigating a photograph received by the Mayor's office which showed two Baton Rouge Police Department Officers, one of whom appeared to be sleeping.

364.     The focus of the investigation was not on the officer who appeared to be sleeping, but rather upon the individual who had furnished the information to the Mayor's office.

365.     In conjunction with the investigation, officers from the Baton Rouge Police Department sought and obtained a warrant from the Nineteenth Judicial District Court of Louisiana based upon the officers' representation that there existed probable cause to believe the individual supplying the information had violated La. R.S. §14:47.

366.     The news media became aware of the Baton Rouge Police Department's unlawful obtainment and execution of the warrant in November of 2014 and multiple news stories were published on the topic.

367.     In an article published November 12, 2014, one news media outlet indicated that a spokesman for the Baton Rouge Police Department "didn't deny the charge was unconstitutional, but emphasized: 'it's still on the books.'"

368.     The spokesman also indicated that the Baton Rouge Police Department "commonly uses the threat of defamation charges as an investigative tool."

369.     The cited justification for the continued utilization of the unenforceable statute by

the Baton Rouge Police Department was "the seriousness in which BRPD takes complaints against officers."

370.    Another article detailing the actions of the police department cited a different spokesman for the Baton Rouge Police Department as stating that as long as legislators didn't repeal the law, the department would continue to enforce it as they would any other state law.

371.    The spokesman was quoted as stating, "[i]f it's on the books, we're going to enforce the law."[12]

<u>La. R.S. §14:89</u>

372.    Shortly after the United States Supreme Court issued its decision in *Lawrence v. Texas,* invalidating Louisiana's prohibition on uncompensated consensual sodomy between adults, then Louisiana Attorney General Richard Ieyoub issued a statement indicating that the invalid law should no longer be enforced.

373.    Despite this fact, the Baton Rouge Police Department conducted undercover investigations designed to enforce La. R.S. §14:89 after the United States Supreme Court had declared the statute to authorize an unconstitutional deprivation of rights in violation of the U.S. Constitution.

374.    For instance, on January 19, 2007, the Baton Rouge Police Department issued a press release identifying an undercover investigation operation which resulted in the arrests of five individuals under La. R.S. §14:89.

375.    In a news article published on October 2, 2007, a spokesman for the Baton Rouge Police Department indicated that BRPD conducted undercover sting operations for the purpose of

---

[12] This statement was made approximately 2 ½ months after §13:95.3 had been declared unconstitutional, and the Baton Rouge Police Department had been permanently enjoined from its continued use in connection with Taylor's federal lawsuit.

enforcing La. R.S. 14:89 "a couple times a year."

376.    The spokesman also stated that the majority of the individuals identified by these sting operations were arrested, booked into East Baton Rouge Parish Prison, and charged with either obscenity or attempted crimes against nature.

377.    Ignoring the judicial decisions which had declared La. R.S. §14:89 unconstitutional and unenforceable, the article also states, "[i]f two consenting adults engage in sexual activity other than intercourse, they are committing a crime against nature.  Crimes against nature include all acts of sodomy and oral sex."

378.    The Baton Rouge Police Department issued another press release on May 23, 2008 identifying the arrest of three additional individuals resulting from another undercover investigation designed to enforce the unconstitutional statute.

379.    Prior to August, 2013, the East Baton Rouge Sheriff's Department shared the Baton Rouge Police Department's policy of enforcing all laws then in existence, even those known to be unenforceable as a result of judicial decisions.

380.    Pursuant to this policy, the East Baton Rouge Sheriff's Department also conducted multiple undercover operations between 2011 and 2013 designed to enforce Louisiana's unconstitutional sodomy law, La. R.S. §14:89.

381.    As a violation of La. R.S. §14:89 is a felony, removing its prosecution from the jurisdiction of Baton Rouge City Court, the prosecution of alleged violations are not handled by the Parish Attorney's Office or the City Prosecutor's Office.

382.    Rather, the prosecution of individuals charged with violating La. R.S. §14:89 is referred to the East Baton Rouge Parish District Attorney, who is empowered to institute criminal proceedings in the 19th Judicial District Court of Louisiana.

383.    Upon information and belief, at all times relevant to this complaint the East Baton Rouge District Attorney's Office had a system in place whereby the constitutionality and enforceability of the provisions of law underlying the charges recommended to them by enforcement officers were evaluated prior to instituting formal proceedings.

384.    Upon information and belief, at all times relevant to this complaint, the East Baton Rouge District Attorney's Office also had a system whereby the evidence underlying the charges referred by enforcement agencies are evaluated prior to the institution of formal proceedings to determine whether it would be admissible at trial, and whether there existed sufficient admissible evidence to justify bringing formal charges.

385.    Upon information and belief, during the times relevant to this complaint, the only law enforcement officers within the state of Louisiana who continued to enforce §14:89 were members of the East Baton Rouge Parish Sheriff's Department and the Baton Rouge Police Department.

386.    In contrast to the East Baton Rouge District Attorney's Office, neither the East Baton Rouge Parish Attorney's Office nor the Baton Rouge City Prosecutor's Office has any system or procedure such as that utilized by the East Baton Rouge Parish District Attorney, as described in the preceding paragraphs.

387.    As a result of the systems and procedures in place at the East Baton Rouge Parish District Attorney's Office, no formal charges or criminal proceedings were filed against individuals subjected to unlawful arrests by the East Baton Rouge Parish Sheriff's Department pursuant to La. R.S. §14:89.

388.    In July of 2013, the story of the East Baton Rouge Sheriff Department's unconstitutional enforcement of La. R.S. §14:89 made local and national news, drawing attention

to the practice of those charged with enforcing the laws in Baton Rouge to ignore judicial precedent limiting the scope of their authority.

389.    Similar media attention had been directed to the Raleigh, North Carolina Police Department's enforcement of that state's unconstitutional sodomy law in 2008.  In that instance, the Police Chief indicated that enforcement was appropriate because "[t]he law is still on the books."  The district attorney in that case also declined to pursue formal charges under the invalid provision due to the Supreme Court's decision in *Lawrence v. Texas*.

390.    In response to the media attention, a spokesman for the East Baton Rouge Parish Sheriff echoed the same policy in use by the Baton Rouge Police Department, stating that "[La. R.S. §14:89] is a law that is currently on the Louisiana books, and the sheriff is charged with enforcing the laws passed by the Louisiana Legislature."

391.    The spokesman also indicated that enforcement of La. R.S. §14:89, while unconstitutional, was appropriate, because the practices for which the individuals had been arrested were "unseemly."

392.    Another spokesman for the Sheriff's Department indicated that "when a deputy [sheriff] is hired and trained, they are given the [Louisiana Criminal Code] as the laws to enforce."

393.    Upon information and belief, as a result of the negative media attention surrounding the Sheriff Department's unlawful enforcement of La. R.S. 14:89, the East Baton District Attorney's Office informed the Sheriff that the law should no longer be enforced.

394.    After consultation with the East Baton Rouge District Attorney, the Sheriff's Office discontinued its policy of enforcing all laws that remain "on the books," and took measures to ensure that the rights of individuals present in East Baton Rouge Parish would not continue to be infringed through the enforcement of invalid laws.

395.    Among the steps taken by the Sheriff to remedy the problem of enforcing invalid provisions of law were the following:

- admitting that the unlawful arrests made by members of his department had been a mistake, and apologizing to the individuals arrested, and the community at large for the actions of his deputies;

- publicly committing to learn from the mistakes of his department and to undertake measures to ensure that such unlawful arrests were not made in the future;

- meeting with the East Baton Rouge Parish District Attorney to discuss ways of improving communication between the two agencies to ensure that arrests were not made on the basis of unenforceable laws;

- approaching the East Baton Rouge District Attorney, Louisiana legislators, and the Louisiana Sheriff's Association about having unconstitutional and unenforceable provisions removed from the Louisiana Criminal Code;

- communicating to his deputies and other employees of his office that they were no longer to enforce La. R.S. 14:89;

- undertaking to evaluate the procedures under which individuals had been unlawfully arrested and committing to make changes to ensure better supervision, training and guidance; and

- meeting with public interest groups concerned about the unlawful actions taken by the Sheriff's Department in order to "further the dialogue."

396.    In response to the media attention surrounding the Sheriff Department's unlawful arrests pursuant to La. R.S. 14:89, one Louisiana legislator drafted a bill that would remove the unconstitutional provision from the Louisiana Criminal Code.

397.    In response to the proposed legislation to repeal La. R.S. §14:89, members of the Baton Rouge Metropolitan Council drafted a resolution that would recommend removal of the unconstitutional ordinance as proposed by the state legislation.

398.    The Baton Rouge Metro Council commonly votes on resolutions supporting or opposing bills in the Louisiana legislature.

399.     A public hearing on the resolution before the Metro Council was held on or about February 13, 2014.

400.     The resolution to recommend repeal of the unconstitutional law failed by a vote of 3 to 7.

401.     As with the Metro Council's resolution recommending repeal of La. R.S. §14:89, the state bill proposing the unlawful statute's repeal ultimately failed in the Louisiana Legislature by a vote of 27 to 67.

402.     Despite the attention given to the unconstitutionality of La. R.S. §14:89 in 2013 and 2014, the Baton Rouge Police Department continued to enforce the statute pursuant to its policy of enforcing all laws that are "on the books."

403.     On February 12, 2015, pursuant to the Baton Rouge Police Department's policy of enforcing invalid laws, officers from the department arrested two individuals for violating La. R.S. §14:89.

404.     As a result of the Baton Rouge Police Department's unlawful enforcement of La. R.S. §14:89, the City of Baton Rouge received more negative media attention for its staunch refusal to incorporate binding judicial decisions circumscribing the authority wielded by police into its law enforcement policies.

<u>The City of Baton Rouge's History of Discrimination</u>

405.     Baton Rouge has a long history of resisting the rule of law so that it might engage in activities that actively discriminate against minority individuals, requiring intervention by Federal Courts to protect the rights of individuals subjected to this discrimination. *See e.g., Garner v. Louisiana,* 368 U.S. 157 (1961); *Cox v. Louisiana,* 379 U.S. 536 (1965).

406.     In November, 1976, an Assistant Attorney General in the Civil Rights Division of

the Department of Justice wrote a letter to the Attorney General for the State of Louisiana, informing him of the results of an investigation into the employment practices of municipal and parish fire and police departments within the State of Louisiana, including those located in the City of Baton Rouge.  *See United States v. Alexandria,* 614 F.2d 1358 (5th Cir. 1980).

407.     The letter spelled out in detail the racial and sexual composition of the labor force of the municipalities involved in the study, and stated that the DOJ was convinced of the existence of a pattern and practice of discriminatory employment practices in the fire and police departments involved in the study.

408.     On June 29, 1977, the DOJ filed suit in the United States District Court for the Eastern District of Louisiana alleging that certain Louisiana municipalities, including the City of Baton Rouge, "have traditionally pursued and continued to pursue policies and practices which discriminate against blacks and females and which deprive or tend to deprive them of employment opportunities or adversely affect their status as employees because of race or sex."

409.     Along with its complaint, the DOJ also submitted a consent decree, signed by officials of the City of Baton Rouge which spelled out a detailed plan to insure that blacks and women would not be unlawfully discriminated against in the future.

410.     In 1980, after the district court declined to enter the consent decree, the U.S. Fifth Circuit Court of Appeals reversed the lower court's decision and directed it to enter the decree as agreed to by the parties.

411.     In 1996, two African-American officers within the BRPD filed a lawsuit against the City alleging racial discrimination and racial harassment during their employment with the department, the majority of which had occurred during a time where the above-referenced consent decree was in effect.  *See Alcorn v. City of Baton Rouge,* 851 So.2d 1194 (La. App. 1 Cir. 2003).

412.     The evidence introduced during the *Alcorn* trial illustrates the pervasive racial discrimination that was rampant throughout the BRPD from the 1970s through the mid-1990s, including common usage of racial slurs by all ranks of officers within the department. *Id.*

413.     In January, 2002, a jury awarded more than $1 million to the plaintiffs in the *Alcorn* case.

414.     On September 13, 2005, Major Daniel Lopez of the New Mexico State Police, Investigations Bureau sent a letter to the Baton Rouge Police Department, Office of Internal Affairs, detailing instances of misconduct committed by BRPD officers that had been observed by New Mexico State Police Officers while providing assistance in the wake of Hurricane Katrina. *See* September 13, 2005 Letter from Major Daniel Lopez with attachments, attached hereto as Exhibit F.

415.     The letter detailed various concerns voiced by members of the New Mexico State Police Department with respect to the actions of BRPD officers.

416.     Among the stated concerns were the following:

- No probable cause for contact and enforcement;

- Physical and unnecessary mistreatment of prisoners and the public;

- Inappropriate and unprofessional language;

- Questionable police practices relative to the location of evidence;

- Racially motivated enforcement;

- Offering to let out-of-state officers beat a prisoner as a "thank-you" for helping out with relief efforts;

- Destruction of private/civilian property;

- Forced entry into private residence, followed by the arrest, physical mistreatment of a prisoner and subsequent unarresting of said prisoner;

- General treatment of citizenry based on neighborhood and perceived

societal class;

- Miscellaneous stops, searches and contacts absent cause.

417.    In response to the reports he received from the New Mexico State Police Officers, Major Lopez immediately pulled his men from their assignment in Baton Rouge, and informed the BRPD that, "[a]t current, the New Mexico State Police will not place its personnel in a working environment with the Baton Rouge Police Department."

418.    Along with Major Lopez's letter, the New Mexico State Police also submitted statements from several of its officers who had personally observed the misconduct of BRPD officers.  *See* Exhibit F.

419.    The officer's statements describe clear constitutional violations and discriminatory practices being employed with impunity by officers of the BRPD.

420.    When one local news media outlet learned that certain officers of the BRPD had been disciplined as a result of complaints received by out-of-state officers in the wake of hurricane Katrina, a public records request was issued to the BRPD for disclosure of the files.  *See City of Baton Rouge v. Capital City Press, LLC,* 4 So.3d 807 (La. App. 1 Cir. 2008).

421.    The BRPD refused to turn over the files, asserting that they were confidential and could be embarrassing to the officers involved, and to the BRPD as a whole.

422.    Siding with the BRPD and its officers, Defendant Roper undertook to maintain the secrecy of the BRPD with respect to the illegal actions of its officers, vigorously defending against the disclosure of the records establishing the BRPD's routine practice of committing constitutional violations.

423.    Ignoring the rights of the individuals who had been victimized by officers of the BRPD, Roper asserted in court filings that releasing the reports of the officers' misconduct would be a violation of the *officers'* rights under Article I, Section 5 of the Louisiana Constitution.

424.     Jeff LeDuff, then Chief of the Baton Rouge Police Department, testified that as a matter of course in all Internal Affairs investigations, the officers being investigated sign a "Garrity Declaration" which guarantees that the officer will not be criminally prosecuted on the basis of any testimony he provides to the investigations from internal affairs.

425.     Such a practice had been denounced by the DOJ in its report on the New Orleans Police Department, because of the likelihood that such practices would insulate officers that committed crimes from prosecution, conviction, or even disclosure of the facts underlying the crime.

426.     The 19th Judicial District Court for the State of Louisiana refused to require disclosure of the documents detailing the officers' misconduct, finding, in part, "that the conduct at issue in the internal affairs investigation was not of such a serious or heinous nature so as to require serious discipline…"

427.     The Louisiana First Circuit Court of Appeal reversed the decision of the lower court, and ordered the City to disclose the IAD files, with certain sensitive information redacted.

428.     Roper continued to vigorously fight against disclosure of the records, first seeking a stay of the order, which was granted by the First Circuit.

429.     Once the stay issued by the First Circuit had been lifted, Roper sought another stay from the Louisiana Supreme Court, which was denied.

430.     Subsequent to the denial of the City's request for a stay, Roper filed four separate writs with the Louisiana Supreme Court, each of which was denied.

431.     In October of 2011, Police Chief DeWayne White candidly stated that at least 10 percent of the Baton Rouge Police Department had a problem with "racial profiling."

432.     To combat the practice of racial profiling by officers of the Baton Rouge Police

Department, Chief White made it a priority to locate racists within the ranks of the BRPD, and take action to ensure that these individuals were not engaging in discriminatory police tactics.

433.    In February of 2013, Mayor Kip Holden removed DeWayne White as Chief of the Baton Rouge Police Department.

434.    City officials admitted at the time that the decision to remove White as Chief of the BRPD was made, in part, because of White's comments regarding the presence of racism within the Baton Rouge Police Department.

435.    At a public hearing before the Baton Rouge Metro Council regarding his termination, also in February, 2013, White stated that there exists "a serious race relations problem between [BRPD] officers and the public we serve. I'm personally aware of racial insensitivities and so are you."

436.    At the hearing, White recounted an instance in which an officer under his command had responded to the location of a homicide and stated -- within earshot of the victim's family -- "I'm here on my wife's birthday, and I'm standing over a dead n-----."

437.    White also stated at the hearing that the U.S. Justice Department had expressed "grave concern" over the BRPD's failure to recruit more minorities and females into the department, and that as a result, the City would likely not be released from the consent decree regarding BRPD hiring practices that had been in effect since 1980.

438.    In response, officials speaking on behalf of the City characterized White's remarks as "hyperbole," stating that the DOJ "have never raised a question as to the hiring practices of the city." The official went on to state, that contrary to White's assessment, the City was "meeting the expectation of the Justice Department on this particular issue."

439.    Contrary to the City official's representations, the U.S. Justice Department had in

fact declined to release the City from the requirements of the 1980 Consent Decree when it released twenty other Louisiana municipalities and parishes from its requirements in late 2012.

440.    According to a spokesman for the DOJ, the requirements of the consent decree continued to apply to the City of Baton Rouge because the city was "found to need additional time to meet the requirements of the decree."

441.    In commenting on the continued application of the consent decree, a former BRPD officer who had served as the department's first black female captain stated, "Over the years, they haven't been as blatant as they were when I went through.  I feel that if they could have, I never would have went up the ladder.  If they had a choice, they never would have promoted me."

442.    In response to White's firing and the information he had provided during the public hearing, at least one Baton Rouge Metro Council Member submitted a formal request to the U.S. Justice Department to investigate the discriminatory practices of the BRPD.

443.    In September, 2014, the Baton Rouge Police Department's troubles with race relations continued, when several racist text messages sent by a BRPD officer were discovered by the media.

444.    One of the texts sent by an officer of the BRPD stated, "I wish someone would pull a Ferguson on them and take them out.  I hate looking at those African monkeys at work … I enjoy arresting those thugs with their saggy pants."  Another text stated, "[t]hey are nothing but a bunch of monkeys."

445.    After receiving attention from the media, the officer who authored the racist text messages resigned from the BRPD, even though Chief Dabadie had not spoken with him, and no request for his resignation had been made.

446.    Subsequently, Chief Dabadie permitted the officer to alter his departure paperwork

to indicate that the officer had retired, instead of resigning as a result of the scandal.

447.   Members of the Baton Rouge community, including members of the Metro Council, decried Dabadie's decision as too lenient given the seriousness of the officer's offense.

448.   As described above, the City of Baton Rouge has had a consistent and unbroken pattern of tolerating and promoting discriminatory behavior among the members of its police force for many decades.

449.   The City's pattern of tolerating and promoting discriminatory behavior was in effect at all times relevant to this complaint, and has continued unabated, with neither the City nor its actors having put systems in place to discourage and eliminate such activity.

<u>Defendants' Wrongful Conduct</u>

450.   Defendants are charged at all relevant times with the knowledge of the law as it existed with respect to Taylor's rights under the Constitution of the United States and Louisiana law.

451.   During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Defendant Thomas' search of Taylor's person on October 13, 2012, during a routine traffic stop, was appropriate as there was no articulable basis to believe Taylor had dangerous weapons on his person.

452.   During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Defendant Thomas and Wennemann's use of force against Taylor in the early morning hours of October 13, 2012 would be authorized or justified.

453.   During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that information obtained from an arrested individual would be admissible in a court of law where the officers did not advise the individual of his *Miranda* rights

prior to questioning.

454.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the storage and transportation of firearms by a non-felon in a vehicle located on any street or in any parking lot in the State of Louisiana was a criminal act.

455.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the search of Taylor's vehicle on October 13, 2012 was justified or within the scope of the authority granted to the officers.

456.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the existence of an affidavit of probable cause signed only by a law enforcement officer would provide sufficient authority to perform an arrest.

457.     During all times relevant to this complaint, any reasonable law enforcement officer or attorney would believe that the actions of the Defendant Police Officers on October 13, 2012 and April 29-30, 2014 were not only unauthorized, but also constituted violations of both civil and criminal law.

458.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that the identification of a suspect through the display of a single photograph would provide probable cause sufficient to perform an arrest or search.

459.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Taylor's arrest on April 30, 2014 was justified or authorized by law.

460.     During all times relevant to this complaint, no reasonable law enforcement officer or attorney would believe that Officer Thomas should be permitted to interact with or exercise control over Taylor, when Thomas had been named as a defendant in a lawsuit filed by Taylor, and any such interaction was unnecessary due to the availability of other officers and the lack of

exigent circumstances.

461.    During all times relevant to this complaint, no reasonable prosecuting attorney would believe the information available regarding the events of October 13, 2012 justified the bringing of criminal charges against Taylor.

462.    During all times relevant to this complaint, any reasonable attorney would realize that the unconstitutional legal provisions identified within this complaint were legally infirm and unenforceable.

463.    Through the enforcement of unlawful provisions of law and the prosecution of individuals alleged to have violated these provisions, Defendants created and/or maintained a policy whereby they would enjoy virtually unfettered discretion to deprive individuals of their constitutionally protected rights.

464.    The City of Baton Rouge encouraged the enforcement and prosecution of individuals pursuant to unenforceable and legally infirm provisions of law by retaining such provisions in the Baton Rouge Code of Municipal Ordinances and through the failure to recommend removal of such provisions from the Louisiana Criminal Code.

465.    In light of the stated policy of the Baton Rouge Police Department to enforce all laws that were "on the books," the Metro Council's retention of unenforceable provisions in the Baton Rouge Code of Ordinances, and its failure to recommend repeal of unlawful provisions appearing in the Louisiana Criminal Code communicated a desire to have its policymakers and employees enforce the illegal provisions of law and prosecute individuals who had engaged in no criminal conduct.

466.    Police Chief Dabadie has a policy of directing the police officers under his command to enforce all laws that are "on the books," despite having knowledge that many of these

legal provisions were unenforceable and constitutionally infirm.

467. The BRPD lacks any system to inform or train the police officers under their command regarding the limits placed on the scope of their authority, and/or the actions required of them in order to protect the fundamental rights of individuals within their jurisdiction, as dictated by rulings from both Louisiana and Federal Courts.

468. Dabadie particularly encourages the use of police tactics which have long been condemned and the enforcement of unconstitutional provisions of law in high crime areas such as the 70805 zip code as a means to confiscate weapons that were being lawfully possessed, and for which they lacked any authority to seize.

469. Through training programs controlled, instituted and/or maintained by Dabadie, Baton Rouge City Police officers are instructed to enforce illegal provisions of law in situations where it would clearly violate an individual's rights under the United States and Louisiana Constitutions.

470. Defendant Dabadie had a policy of refusing to return firearms that had been seized by them under color of law, but with no legal authority, despite requests for their return.

471. Defendant Dabadie knew or should have known that the unenforceable legal provisions cited herein violate the U.S. Constitution and/or the Louisiana Constitution.

472. The East Baton Rouge Parish Sheriff's Department and Louisiana State Police have jurisdiction to exercise the same authority as the Baton Rouge City Police with respect to the enforcement of provisions of Louisiana law.

473. Neither the Sheriff's Department nor the Louisiana State Police have ever had a policy of enforcing Baton Rouge Code §13:95.3, as they are not charged with the enforcement of municipal ordinances.

474.    Thus, only those individuals encountering a Baton Rouge City Police officer were subject to losing firearms located inside their vehicle solely because they were in the parking lot of an establishment that sold alcohol.

475.    On information and belief, the decision of the City and its policymakers to actively enforce and prosecute unconstitutional laws and engage in inappropriate investigation tactics, in conjunction with the admitted practice of profiling individuals on the basis of their race and the concentration of these tactics in the 70805 zip code, has resulted primarily in the deprivation of rights held by minorities such as Plaintiff.

476.    On the evening of October 13, 2012 Officers Thomas and Wennemann were training Officer Doe regarding the procedures utilized by the Baton Rouge City Police in high crime areas populated primarily by African-Americans.

477.    Defendant police officers used illegal tactics and unenforceable provisions of law as a means of harassing and intimidating individuals, including Plaintiff, by performing unlawful searches, violating or attempting to violate their right against self-incrimination, and depriving them of their property and/or liberty in situations where the individuals were abiding by the law and where there existed no legal authority under which such actions could be taken.

478.    Defendant police officers knew or should have known that their tactics and the laws they purported to enforce violated Taylor's rights under both the U.S. Constitution and the Louisiana Constitution.

479.    Chief Dabadie also instituted or continued in effect of policy of protecting police officers made the subject of citizen complaints, and of permitting the use of illegal and unconstitutional means to discourage aggrieved citizens from seeking redress.

480.    Defendants Roper, Batson and Freeman have/had a policy of prosecuting

First Amended Complaint and Request for Jury Trial                                          74

individuals, like plaintiff, cited with violating unenforceable provisions of law despite the fact that the individuals had not violated any state or Federal law.

481.    Defendants Roper, Batson and Freeman have/had a policy of refusing requests for the return of property seized from individuals lawfully exercising their rights under the United States and Louisiana Constitutions, notwithstanding the lack of any legal authority to do so.

482.    Defendants Roper, Batson and Freeman lack(ed) any system whereby the tactics used by the police officers recommending the institution of criminal proceedings were evaluated for compliance with the law.

483.    Defendants Roper, Batson and Freeman lack(ed) any system whereby the laws that were "on the books" and which were being enforced by the Baton Rouge Police Department were evaluated for their legality and enforceability.

484.    Defendants Roper, Batson and Freeman have/had a policy of instituting criminal charges and prosecuting individuals for all violations referred to them by the Baton Rouge Police Department.

485.    Defendants Roper, Batson and Freeman have/had a policy of prosecuting individuals under the color of law through legally infirm statutes and ordinances, with the knowledge that these provisions of law violate the United States Constitution and/or the Louisiana Constitution both on their face, and as they are being applied.

486.    Defendants Roper, Batson, Freeman and Gremillion have/had a policy of concealing the misconduct of BRPD officers from the public, permitting the officers to continue such misconduct without any accountability or consequence.

487.    Defendants Roper, Batson and Gremillion have/had a policy of ignoring conflicts of interest in cases where the City has been sued as a result of the actions of one or more of its

actors.

488.     Pursuant to Roper, Batson and/or Gremillion's policy of ignoring potential or actual conflicts of interest, it has been the practice of the Parish Attorney's office to assign only a single Assistant Parish Attorney to handle lawsuits against the City based upon the illegal actions of one of its policymakers or employees, despite the existence of apparent conflicts of interest.

489.     Defendants Roper, Batson and/or Gremillion have/had a policy of failing to disclose these conflicts of interest to the City and any individual actors involved, and neither seek nor obtain written consent from the parties to proceed despite the existence of a conflict.

490.     Defendants Roper and Batson have instituted and/or continued a policy of permitting attorneys within the East Baton Rouge Parish Attorney's Office to engage in the private practice of law in addition to the work the attorney's perform on behalf of the City.

491.     Roper and/or Batson's policy of permitting outside employment within the Parish Attorney's Office has disincentivized employees of the department from devoting proper time and attention from critically important City business, and encouraged the performance of outside work that could potentially provide income in addition to the employees' City salary.

492.     The policies of the Parish Attorney's Office, described herein, directly resulted in the City's failure to provide any response to the complaint appearing in Taylor's federal lawsuit, the entry of default against the City, and the continued deprivation of constitutional rights at the hands of the City's actors.

493.     Through the continued existence, enforcement, and prosecution of unconstitutional and illegal provisions of law, the City of Baton Rouge and its individual actors repeatedly and systematically deprived citizens of the State of Louisiana and the United States of America of their constitutional rights under the color of state law.

First Amended Complaint and Request for Jury Trial                                                    76

494.    The legally infirm provisions of law utilized by the city were targeted against the most vulnerable and disadvantaged members of society in order to lessen the likelihood of reprisal or recrimination.

495.    The City and its actors created and implemented a plan or policy which gave them virtually unfettered discretion to detain individuals, perform illegal searches, seize their property, and place them under arrest for conduct which was protected by the Louisiana and U.S. Constitutions.

496.    The City and its actors knew that they lacked any legal authority to enforce or prosecute violations of the legal provisions cited herein, and that doing so would deprive citizens of their constitutionally protected rights.    Despite this fact, Defendants' unwarranted, unconstitutional, and illegal acts continue to this day.

497.    Each of the public officials and/or policymakers named within this complaint established or continued in effect a policy of not only tolerating the continued existence of unenforceable provisions in the Baton Rouge Code of Ordinances and Louisiana Criminal Code, but actively enforcing the unlawful provisions and prosecuting individuals for their violation.

498.    Each of the non-public governmental actors named within this complaint acted in accordance with the official policies, procedures, practices, and/or customs then (and currently) in effect.

499.    In addition to the policies, practices, and/or customs described above, the deficiencies within the City's operations and the Baton Rouge Police Department include, but are not limited to: (1) failure to adopt and enforce appropriate policies; (2) failure to properly recruit, train, and supervise law enforcement officers; (3) adequately review and investigate officer uses of force; (4) failure to fully investigate allegations of officer misconduct; (5) failure to identify and

respond to patterns of at-risk officer behavior; and (6) failure to enact appropriate performance review and promotional systems.

500.    As a direct result of the official policies, procedures, practices and/or customs described above, Plaintiff Ernest Taylor was denied of significant rights guaranteed him by the United States and/or Louisiana Constitutions, in addition to other applicable provisions of law.

501.    At all times relevant to this complaint, the Baton Rouge Police Department ("BRPD") has lacked the basic elements of effective policing – clear policies, training, accountability, and confidence of the citizenry.

502.    Officers of the BRPD regularly show a lack of respect for the civil rights and dignity of the people of Baton Rouge, particularly those segments that have historically been marginalized.

503.    Officers of the BRPD, at every rank, either do not understand or choose to ignore the boundaries of constitutional policing.

504.    The BRPD's failure to ensure that its officers routinely respect the United States and Louisiana Constitutions and the rule of law undermines trust within the very communities whose cooperation the department most needs to enforce the law and prevent crime.

505.    The City and its actors have encouraged or have been indifferent to widespread violations of law by officers of the BRPD.

506.    In the absence of mechanisms to protect and promote the civil rights of individuals subject to its authority, officers of the BRPD regularly use unnecessary or excessive force, and conduct illegal stops, searches, interrogations, and arrests with impunity.

507.    The City and BRPD have failed to institute systems designed to prevent and detect the use of unnecessary or unreasonable uses of force by officers of the BRPD, have failed to provide training on the appropriate use of force, have failed to provide the supervision necessary

to oversee the use of force by BRPD officers, and have failed to develop policies to provide BRPD officers with clear and consistent guidance on when and how to use and report force.

508.    The City and BRPD have failed to collect and/or monitor data on the use of force by BRPD officers which would enable the identification and prevention of unlawful uses of force before they result in significant or widespread harm.

509.    The City and BRPD have a policy, practice, or custom of tolerating widespread underreporting or non-reporting of uses of force by BRPD officers.

510.    The failure of BRPD officers to report uses of force is the result of a systemic failure to hold the officers accountable for not reporting uses of force, or to even acknowledge the extent to which BRPD officers use force.

511.    The City and BRPD have failed to institute a policy making clear that all employees have a responsibility to ensure that constitutional violations inflicted by BRPD officers are reported and investigated.

512.    The City and BRPD have a policy, practice, or custom of failing to perform adequate investigations of any violations of BRPD officers that are reported.

513.    By tolerating the failure to investigate constitutional violations made by BRPD officers, the City and BRPD forego the chance to correct dangerous behavior, instead sending the message that there is little institutional oversight or concern about officers' constitutional violations.

514.    The City and BRPD have condoned the pattern or practice of BRPD officers to engage in stopping, searching, and arresting individuals, along with seizing their property in the absence of reasonable suspicion or probable cause.

515.    The City and BRPD's policies and training on warrantless searches and seizures

are non-existent or highly inadequate, leaving BRPD officers with little guidance regarding the constitutional limitations on their authority to detain, search, interrogate, and arrest.

516.    The Unites States Attorney's Office has offered in the past to provide free training to law enforcement officers on the constitutional limits of their authority, but neither the City nor BRPD has ever requested or inquired about such training.

517.    The City and BRPD have a policy of utilizing field training officers to instruct new officers on the appropriate procedures to be used when interacting with members of the public. By failing to provide accurate and up-to-date training by legally trained experts on the protection of citizens' constitutional rights, new officers are trained by individuals who lack knowledge of current legal requirements, and who suffer from misconceptions of law and the proper scope of police authority.

518.    The inadequate policies and training provided to officers of the BRPD by the City and the BRPD leave officers without the basic foundation to perform their duties within constitutional boundaries, increasing the likelihood that officers, unable to perceive and articulate reasonable suspicion and probable cause, may either stop individuals arbitrarily or rely on impermissible factors such as an individual's race or ethnicity.

519.    The City and its actors have failed to institute systems designed to prevent, detect, and respond to discriminatory policing, and to ensure that officers of the BRPD are conducting themselves in accordance with constitutional guarantees of equal protection.

520.    The City and its actors have failed to take reasonable steps to counteract and eradicate bias based on factors such as race, ethnicity, and sexual orientation in its policing practices.

521.    BRPD's use of force practices present a significant threat to the safety of Plaintiff,

the public in general, and officers of the BRPD, and create a substantial obstacle to strong community-police partnerships.

522.    The City has failed to provide officers of the BRPD with adequate and sufficient training on how to properly carry out stops, searches, seizures, interrogations, and arrests.

523.    The training that the City and BRPD has provided to its law enforcement officers is out of date and conflicts with current legal requirements.

524.    The City's failure to train officers of the BRPD or otherwise provide guidance on the limits and requirements of the U.S. and Louisiana Constitutions contributed directly to the deprivation of Plaintiff's rights described herein.

525.    The City's and BRPD's failure to provide sufficient guidance, training, and support to officers within the BRPD, as well as their failure to implement systems to ensure officers are wielding their authority effectively and safely, have created an environment that permits and promotes constitutional harm.

526.    The City and BRPD have failed to provide the supervision necessary to prevent or detect misconduct by its officers and ensure effective policing.

527.    Supervisors within the BRPD, as a matter of course, fail to hold officers engaged in violations of individuals' civil rights accountable for their actions.  These supervisors regularly approve the use of unnecessary or excessive force, conduct flawed investigations, sign off on materially deficient arrest reports, and/or simply do not perform any supervision of their subordinates.

528.    The City's and BRPD's focus on statistics such as number of arrests and number of firearms seized, particularly in combination with poor training and policies, encourages BRPD officers to violate individuals' rights by conducting illegal stops, searches, seizures, interrogations,

and arrests.

529.    The BRPD has engaged and is engaged in a pattern or practice of discriminatory policing in violation of constitutional and statutory law.

530.    The City and its actors have failed to implement adequate policies and provide appropriate training regarding the limits of the authority exercised by law enforcement officers with respect to conducting stops, searches, seizures, interrogations, and arrests.

531.    The City's lack of policies and training on the limits of police authority, combined with a general failure to acknowledge and address the potential for stereotypes and bias in BRPD officers' decision-making has cultivated an atmosphere in which discriminatory policing occurs unchecked.

532.    The City has no system in place that is capable of tracking allegations and complaints of racial profiling, and does not collect, analyze, or report race or ethnicity data for most citizen encounters with police.

533.    Collectively, the actions of the Defendants, described above, have had a substantial chilling effect on the exercise of constitutionally protected activity by individuals within the City of Baton Rouge.

## CLAIMS FOR INJUNCTIVE RELIEF AND MONETARY DAMAGES

534.    Each of the foregoing paragraphs is incorporated as if set forth fully herein.

### COUNT 1

### 42 U.S.C. §1983 (1st and 14th Amendments)

535.    The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of aggressively pursuing individuals who voiced complaints against officers of the BRPD, and condoning the efforts of BRPD officers to violate the civil rights of such

individuals through intimidation, the use of unconstitutional searches and seizures, and/or making arrests in the absence of probable cause.

536.    This policy, practice or custom was utilized by officers Thomas, Wennemann, Smith, Delcambre, Russel and/or Harris to retaliate against Taylor for exercising his rights to seek redress from the government for his grievances with the City and its actors.

537.    Defendant Dadabie's explicit stated policy of ignoring judicial precedent and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force.

538.    Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

539.    Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights in pursuit of protecting members of the BRPD directly resulted in retaliation against individuals who exercised their right under the First Amendment to criticize governmental actors and seek redress for their wrongdoings.

540.    Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD in retaliation for Taylor's filing of a lawsuit in federal court.

541.    Defendants Roper, Freeman, and/or Batson instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

542.   It is/was Roper's, Freeman's, Batson's and/or Gremillion's  policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully in contravention of an individual's rights under the First Amendment to the U.S. Constitution.

543.   The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

544.   Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the retaliatory tactics employed by members of the BRPD against Taylor, as described above.

545.   In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to inform any City official of the deficiencies exhibited by the department or recommend training in constitutional policing.

546.   The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted for exercising their First Amendment rights.

547.   The policies, practices, and/or customs described above have had a profound chilling effect on individuals' exercise of their right under the First Amendment to voice criticism of government actors who have engaged in misdeeds.

548.   Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to seek from the government a redress of grievances as guaranteed by the First Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth

Amendment.

549.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the First Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983 and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

<u>COUNT 2</u>

<u>42 U.S.C. §1983 (4th and 14th Amendments)</u>

550.    The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of condoning BRPD officers' routine engagement in unlawful searches and seizures pursuant to unenforceable provisions of law that remain "on the books."

551.    This policy, practice or custom was utilized by officers Thomas, Wennemann, Ardoin, Muller, Smith, Delcambre, Russell, and/or Harris in performing unlawful searches and seizures with respect to Taylor in violation of his rights under the Fourth Amendment to the U.S. Constitution.

552.    Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force.

553.    Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within

his department are challenged.

554.  Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights under the guise of outdated and unenforceable laws directly resulted in the performance of unlawful searches and seizures by officers of the BRPD.

555.  Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on October 13, 2012 and April 29-30, 2014.

556.  Defendants Roper, Freeman, Batson, and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

557.  It is/was Roper's, Freeman's, Batson's, and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully in contravention of an individual's rights under the Fourth Amendment to the U.S. Constitution.

558.  The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

559.  Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

560.  In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn and Knightshead

failed to inform any City official of the deficiencies exhibited by the department or recommend training in constitutional policing.

561.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted pursuant to evidence acquired through unconstitutional searches and seizures in violation of individuals' Fourth Amendment rights.

562.    The policies, practices, and/or customs described above have had a profound chilling effect on individuals' exercise of their right to travel unmolested, free from unreasonable searches and seizures, guaranteed by the Fourth Amendment to the U.S. Constitution.

563.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

564.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fourth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983 and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

## COUNT 3

## 42 U.S.C. §1983 (5th and 14th Amendments)

565.    The City of Baton Rouge, and its individual actors also instituted and/or maintained a policy, practice, or custom of condoning BRPD officers' routine engagement in unlawful

interrogation practices by failing to advise individuals of their rights under the Fifth Amendment.

566.   This policy, practice or custom was utilized by officers Thomas, Wennemann, Ardoin, Smith, Delcambre, Russell, and/or Harris in performing unlawful interrogation techniques with respect to Taylor in violation of his rights under the Fifth Amendment to the U.S. Constitution.

567.   Defendant Dadabie's explicit stated policy of ignoring judicial precedent, and his accompanying failure to properly train his officers, has resulted in a complete ignorance of the constitutional requirements applicable to custodial interrogations impose by the Fifth Amendment.

568.   Dabadie's policy of permitting and encouraging unlawful interrogations expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

569.   Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights by ignoring requirements placed upon the BRPD by virtue of judicial precedent has directly resulted in the performance of unlawful interrogation techniques by officers of the BRPD.

570.   Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and encouraging his officers' violations of the law directly resulted in the illegal questioning performed by officers of the BRPD with respect to Taylor on October 13, 2012 and April 29-30, 2014.

571.   Defendants Roper, Freeman, Batson, and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

572.    It is/was Roper's, Freeman's, Batson's and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully in contravention of an individual's rights under the Fifth Amendment to the U.S. Constitution.

573.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

574.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

575.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to inform any City official of the deficiencies exhibited by the department or recommend training in constitutional policing.

576.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, and convicted pursuant to confessions or other information subject to the exclusionary rule as stated in *Miranda v. Arizona* in violation of individuals' Fifth Amendment rights.

577.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right against self-incrimination as guaranteed by the Fifth Amendment to the United States Constitution, made applicable to the State of Louisiana and its political subdivisions through the Fourteenth Amendment.

578.    As the policies, practices, customs, and/or tactics employed by the City and its

actors violate the Fifth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983.

COUNT 4

42 U.S.C. §1983 (14th Amendment – Equal Protection)

579.   The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of promoting, encouraging and/or condoning BRPD officers routine use of discriminatory police tactics, selective enforcement of laws, and racist mentalities.

580.   This policy includes the maintenance and enforcement of illegal provisions of law that have historically been used to marginalize minority individuals such as Taylor.

581.   The City and its actors instituted and/or maintained a policy whereby BRPD officers were instructed to utilize aggressive tactics, perform unconstitutional searches and seizures, and otherwise violate the constitutional rights of individuals living in poor, black communities such as the 70805 zip code.

582.   Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force, and has fostered and cultivated the use of discriminatory policing tactics by members of the BRPD.

583.   Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws, when the actions of individuals within his department are challenged, or when an officer's prejudices lead him or her to stereotype minority individuals.

584.    Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights under the guise of outdated and unenforceable laws directly resulted in the performance of unlawful searches and seizures by officers of the BRPD, primarily on minority members of the community.

585.    The rate at which illegal provisions of law were enforced against minority individuals cannot be explained by any other reasoning than the utilization of discriminatory policing tactics by members of the BRPD.

586.    Dabadie's policy of ignoring and/or encouraging the discriminatory tactics used by members of the BRPD directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on October 13, 2012 and April 29-30, 2014.

587.    Defendants Roper, Freeman, Batson, and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

588.    It is/was Roper's, Freeman's, Batson's, and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors acted unlawfully and discriminatorily in contravention of an individual's rights under the Fourteenth Amendment to the U.S. Constitution.

589.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result, and that entire segments of Baton Rouge's population would be subjected to unlawful and criminal activity solely as a result of their race.

590.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

591.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights and engaged in discriminatory police tactics, Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to inform any City official of the deficiencies exhibited by members of the BRPD or recommend training in constitutional policing.

592.    The policies, practices, and/or customs described above directly resulted in black individuals being arrested, prosecuted, and convicted for activity that white individuals engaged in without interference from the BRPD, in violation of these individuals' Fourteenth Amendment rights.

593.    The policies, practices, and/or customs described above have had a profound chilling effect on minority individuals' exercise of their constitutional rights due to fear that they will be subjected to discriminatory police practices on account of their race.

594.    Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to equal protection of the laws, as guaranteed by the Fourteenth Amendment to the United States Constitution.

595.    As the policies, practices, customs, and/or tactics employed by the City and its actors violate the Fourteenth Amendment to the Constitution of the United States, and as federal law is the supreme law of the land, Taylor is entitled to monetary damages pursuant to 42 U.S.C. §1983 and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

## COUNT 5

## 42 U.S.C. §1985 and  §1986

596.    Defendants Thomas, Wennemann, Ardoin, Smith, Delcambre, Russell and/or Harris conspired to deter Taylor, by force, intimidation, or threat, from further prosecution of his lawsuit against the City of Baton Rouge and certain of its actors in violation of 42 U.S.C. §1985(1).

597.    Defendants Thomas, Wennemann, Ardoin, Smith, Delcambre, Russel and/or Harris also violated 42 U.S.C. §1985(1) by conspiring for the purpose of impeding, hindering, obstructing, and/or defeating the due course of justice, with the intent to deny Taylor the equal protection of the laws and/or injure Taylor for lawfully attempting to enforce his right to equal protection of the laws.

598.    Defendants Ardoin, Smith, Delcambre, Russell, and/or Harris neglected and/or refused to prevent or aid in preventing the unlawful acts of Defendant Thomas and/or Wennemann in intimidating and retaliating against Taylor for the filing of his federal lawsuit in violation of 42 U.S.C. §1986.

599.    The above-named Defendants' violations of 42 U.S.C. §1985 and §1986 entitle Taylor to an award of monetary damages.

## COUNT 6

## 42 U.S.C. §1988

600.    As Plaintiff has brought this proceeding pursuant to 42 U.S.C. §1983, §1985, and §1986, Plaintiff is entitled to an award of reasonable attorney's as part of the costs awarded for vindicating his constitutional rights, pursuant to 42 U.S.C. §1988(b).

## COUNT 7

## Louisiana Constitution Article I, § 3

601.   The protections afforded by Article I, § 3 of the Louisiana Constitution are coextensive with those afforded by the Fourteenth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 4 also violate Article 1, § 9 of the Louisiana Constitution.

602.   Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

<u>COUNT 8</u>

<u>Louisiana Constitution Article I, § 5</u>

603.   The protections afforded by Article I, §5 of the Louisiana Constitution are coextensive with those afforded by the Fourth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 2 violate Article 1, §5 of the Louisiana Constitution.

604.   Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

<u>COUNT 9</u>

<u>Louisiana Constitution, Article I, § 9</u>

605.   The protections afforded by Article I, § 9 of the Louisiana Constitution are coextensive with those afforded by the First Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 1 violate Article 1, § 9 of the Louisiana Constitution.

606.   Defendants' deprivation of rights guaranteed to Taylor by the Louisiana

Constitution entitles Taylor to an award of monetary damages and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

COUNT 10

Louisiana Constitution, Article I, § 11

607.    The City of Baton Rouge, and its individual actors instituted and/or maintained a policy, practice, or custom of utilizing unconstitutional and unenforceable laws that remained "on the books" to deprive individuals, primarily minorities, of their lawfully held firearms.

608.    This policy, practice or custom was utilized by officers Thomas, Wennemann and/or Muller when seizing Taylor's lawfully-held firearms on October 13, 2012.

609.    Defendant Dadabie's explicit stated policy of ignoring judicial precedent, applying all laws that were "on the books," and his accompanying failure to properly train his officers has resulted in a complete ignorance of the constitutional limitations placed upon the authority wielded by the BRPD among members of the force, particularly with respect to an individual's right to keep and bear arms.

610.    Dabadie's policy expresses complete indifference to the rule of law – and conveys the message to officers under his command that fundamental individual rights, long held inviolate, can be disregarded on the basis of unenforceable laws or when the actions of individuals within his department are challenged.

611.    Dabadie's policy of not only tolerating, but actively encouraging the deprivation of individuals' constitutional rights under the guise of outdated and unenforceable laws directly resulted in the performance of unlawful seizures of lawfully held firearms by officers of the BRPD.

612.    Specifically, Dabadie's policy of ignoring the limits of the BRPD's authority and

encouraging his officers' violations of the law directly resulted in the illegal actions taken by officers of the BRPD with respect to Taylor on October 13, 2012.

613.    Defendants Roper, Freeman, Batson and/or Gremillion instituted and/or maintained a policy of prosecuting individuals arrested by the BRPD without regard to the constitutionality of the laws being prosecuted, the existence of probable cause, or the sufficiency of the evidence presented.

614.    It is/was Roper's, Freeman's, Batson's, and/or Gremillion's policy to admit no liability and take no action when confronted with situations in which governmental actors engaged in unlawful activity in contravention of an individual's rights under Article I, Section 11 of the Louisiana Constitution.

615.    The above-stated policy was instituted and/or maintained solely for financial reasons, with knowledge of, and conscious indifference to, the fact that continued widespread constitutional violations by officers of the BRPD would result.

616.    Pursuant to the policies, practices and/or customs of the Parish Attorney's Office, Defendants Roper, Freeman, Batson, Gremillion, Hilburn, and Knightshead failed to investigate the unlawful tactics employed by members of the BRPD against Taylor, as described above.

617.    In the face of clear evidence that officers of the BRPD regularly violated individuals' constitutional rights, Roper, Freeman, Batson, Gremillion, Hilburn and Knightshead failed to inform any City official of the deficiencies exhibited by members of the department or recommend training in constitutional policing.

618.    The policies, practices, and/or customs described above directly resulted in individuals being arrested, prosecuted, convicted, and permanently deprived of their lawfully-held firearms for exercising the rights granted to them by Article I, Section 11 of the Louisiana

Constitution.

619.   The policies, practices, and/or customs described above have had a substantial chilling effect on individuals' exercise of their right to keep and bear arms, as provided by Article I, Section 11 of the Louisiana Constitution.

620.   Considering the above, the City of Baton Rouge and its individual actors have infringed upon Taylor's and other individuals' right to keep and bear arms as guaranteed by Article I, Section 11 of the Louisiana Constitution.

621.   Defendants' deprivation of rights guaranteed to Taylor in the Louisiana Constitution entitles him to an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

## COUNT 11

### Louisiana Constitution, Article I, § 13

622.   The protections afforded by Article I, § 13 of the Louisiana Constitution are coextensive with those afforded by the Fifth Amendment to the U.S. Constitution, and the actions of Defendants as set forth in Count 3 violate Article 1, § 13 of the Louisiana Constitution.

623.   Defendants' deprivation of rights guaranteed to Taylor by the Louisiana Constitution entitles Taylor to an award of monetary damages and an order enjoining the Baton Rouge Police Department from enforcing unconstitutional provisions of law that remain in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

## COUNT 12

### La. C.C. Art. 2315, 2316, 2317 and 2320

624.   Louisiana Civil Code Article 2315 requires that every act of man that causes

damage to another obliges him by whose fault it happened to repair it.

625.   Louisiana Civil Code Article 2316 provides that every person is responsible for the damage he occasions not merely by his act, but also by his negligence, his imprudence, or his want of skill.

626.   Louisiana Civil Code Article 2317 provides that individuals are responsible not only for the damage occasioned by their own acts, but also for damage caused by the acts of persons for whom the individual is answerable, or of the things which the individual has in his custody.

627.   Louisiana Civil Code Article 2320 provides that employers are answerable for the damage occasioned by their employees in the exercise of the functions in which they are employed.

628.   Defendants are obligated to make good the injuries they caused Plaintiff to suffer as a result of their illegal deprivation of Taylor's constitutional rights, liberty, and property pursuant to La. C.C. Arts. 2315 and 2316.

629.   Under the facts described above, all or some Defendants may be held liable under La. C.C. 2315 for torts including, but not necessarily limited to: (1) assault, (2) battery, (3) unnecessary/excessive force, (4) false arrest, (5) false imprisonment, and (6) malicious prosecution

630.   The City of Baton Rouge may also be held liable by virtue of La. C.C. Arts. 2317 and 2320 for the actions of its employees described herein.

631.   Pursuant to the above-cited provisions of the Louisiana Civil Code, Defendants are liable to Taylor for an award of monetary damages.

## DAMAGES

632.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

633.   As a result of the events of October 13, 2012 and April 29-30, 2014, Plaintiff Ernest

Taylor has suffered and continues to suffer damages including, but not limited to the following:

(a)     Conscious physical pain and suffering in the past;

(b)     Conscious physical pain and suffering likely to be experienced in the future;

(c)     Mental anguish in the past;

(d)     Mental anguish likely to be experienced in the future;

(e)     Loss of earnings;

(f)     Deprivation of his property;

(g)     Deprivation of his liberty through false arrest and forced confinement;

(h)     Accrual of legal fees

(i)     Other general damages.

634.     In addition to compensation for the damages suffered by Taylor, Plaintiff also seeks an order enjoining the Baton Rouge Police Department from enforcing unconstitutional and outdated laws that appear in the Baton Rouge Code of Ordinances and the Louisiana Criminal Code.

635.     Plaintiff also seeks punitive damages against all defendants for the knowing and willful deprivation of Plaintiff's constitutional rights.

636.     Plaintiff further seeks an award of reasonable attorney's fees pursuant to 42 U.S.C. §1988, and any other applicable statute which provides for the award of reasonable attorney's fees in actions vindicating an individual's constitutional rights.

## PRAYER

WHEREFORE Plaintiff Ernest Taylor prays that upon final determination of these causes of action Plaintiff receives a judgment against Defendants The City of Baton Rouge; Baton Rouge Chief of Police Carl Dabadie, Jr.; former East Baton Rouge Parish Attorney Mary E. Roper; Baton

Rouge City Prosecutor Lisa Freeman; current East Baton Rouge Parish Attorney Lea Ann Batson; Assistant East Baton Rouge Parish Attorney Frank J. Gremillion; former Assistant East Baton Rouge Parish Attorney James L. Hilburn; Assistant East Baton Rouge Parish Attorney Tedrick K. Knightshead; Baton Rouge Police Officer James Thomas; Baton Rouge Police Officer Patrick Wennemann; Baton Rouge Police Officer Karole Muller; Baton Rouge Police Officer Jeremiah A. Ardoin, Baton Rouge Police Officer Theodore Smith; Baton Rouge Police Officer Brett Delcambre; Baton Rouge Police Officer Kama Russell; and Baton Rouge Police Officer Marlon Harris as follows:

(a) Enjoining the Baton Rouge Police Department from continuing its policy of enforcing all provisions of law that are "on the books" even when the provisions of law suffer from constitutional infirmities;

(b) Awarding actual damages as proven at trial, jointly and/or solidarily, against all defendants;

(c) Awarding punitive damages as proven at trial, jointly and/or solidarily against all defendants;

(d) Awarding costs of court and reasonable attorney fees necessary for preparing the case for trial;

(e) Awarding prejudgment interest at the highest rate permitted by law;

(f) Awarding interest on the judgment at the highest rate of legal interest from the date of judgment until collected; and

(g) Awarding all such other and further relief at law or in equity to which Plaintiff may show himself to be justly entitled.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully Submitted,


  s/ Ernest Taylor

Ernest Taylor, Plaintiff


SUBSCRIBED AND SWORN TO BEFORE ME on the 29th day of February, 2016, to certify which witness my hand and official seal

  s/  Terrence J. Donahue, Jr.

Terrence J. Donahue, Jr., Notary Public, LA Bar Roll # 32126
My commission expires at death.


  s/ Terrence J. Donahue, Jr.

TERRENCE J. DONAHUE, JR.
Louisiana State Bar No. 32126
**DONAHUE LAW FIRM**
P.O. Box 41017
Baton Rouge, LA   70835
Telephone (225) 939-9104
Facsimile (225) 612-6430
Email: tjdonahuejr@gmail.com

**ATTORNEY FOR PLAINTIFF**